No. 2024-2211

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

NOVARTIS PHARMACEUTICALS CORPORATION, *Plaintiff-Appellant*

v.

MSN PHARMACEUTICALS INC., MSN LABORATORIES PRIVATE LIMITED, MSN LIFE SCIENCES PRIVATE LIMITED, GERBERA THERAPEUTICS, INC., *Defendants-Appellees*

Appeals from the United States District Court for the District of Delaware, Nos. 20-2930-RGA and 22-1395-RGA, Judge Richard G. Andrews.

## NOVARTIS PHARMACEUTICALS CORPORATION'S NON-CONFIDENTIAL OPENING BRIEF

CHRISTOPHER E. LOH
JARED L. STRINGHAM
VENABLE LLP
151 W. 42nd Street, 49th Floor
New York, NY 10036

REBECCA E. WEIRES
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017

DEANNE E. MAYNARD
SETH W. LLOYD
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.: (202) 887-8740
DMaynard@mofo.com

JOEL F. WACKS
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

*Counsel for Novartis Pharmaceuticals Corporation*

AUGUST 20, 2024

**U.S. Patent No. 11,096,918 Claim 1**

1. An amorphous solid form of a compound comprising anionic (S)-N-valeryl-N-{[2'-(1H-tetrazole-5-yl)-biphenyl-4-yl]-methyl}-valine, anionic (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester, and sodium cations in a 1:1:3 molar ratio.

# CERTIFICATE OF INTEREST

Counsel for Novartis Pharmaceuticals Corporation certify under Federal Circuit Rule 47.4 that the following information is accurate and complete to the best of their knowledge:

1.     **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case.

Novartis Pharmaceuticals Corporation.

2.     **Real Parties in Interest.** Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

3.     **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

Novartis AG.

4.     **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.

MCCARTER & ENGLISH, LLP: Daniel M. Silver, Alexandra M. Joyce, Maliheh Zare

VENABLE LLP:  Nicholas N. Kallas, Christina Schwarz, Gregory J. Manas, Laura K. Fishwick, Melinda R. Roberts, Shannon K. Clark, Susanne L. Flanders, Whitney M. Howard.

5.     **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

Yes, see separately filed statement.

6.    **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).

Not applicable.

Dated:  August 20, 2024       /s/ Deanne E. Maynard
                                       Deanne E. Maynard

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................... i

TABLE OF AUTHORITIES ................................................................... vi

TABLE OF ABBREVIATIONS ............................................................. ix

STATEMENT OF RELATED CASES .....................................................x

JURISDICTIONAL STATEMENT ..........................................................x

INTRODUCTION .................................................................................1

STATEMENT OF THE ISSUES.............................................................4

STATEMENT OF THE CASE................................................................4

    A.    The '918 Patent Claims an Amorphous Solid Form of Trisodium Valsartan-Sacubitril Complex ................................................4

    B.    Novartis Sued MSN for Infringement of the '918 Patent ...................8

        1.    Claim construction ..................................................8

        2.    Infringement dispute over MSN's products.............................9

            a.    MSN's ANDA ................................................9

            b.    The parties' testing on MSN's isolated API and finished tablets ................................................12

        3.    Preliminary-injunction proceedings..........................................19

    C.    Other Proceedings ................................................20

SUMMARY OF ARGUMENT .............................................................21

STANDARD OF REVIEW ..................................................................23

ARGUMENT .....................................................................................23

    A.    Novartis Will Likely Succeed in Proving Infringement ...................23

1.     The district court erroneously read limitations into the claims, and Novartis will likely prove infringement under the correct construction .......................................................... 24

    a.     The district court erred in construing "an amorphous solid form of a compound" as requiring comparison to an unclaimed form ................................ 25

        i.     The claim text's meaning is plain and there is no lexicography or disclaimer .......................... 25

        ii.     The district court misread the prosecution history and contradicted precedent in injecting a "predominance" requirement into claim 1 ................................................................ 27

    b.     Under the correct construction, Novartis is likely to prove infringement ........................................... 30

        i.     Dr. Matzger's testing performed the only comparison between the API in MSN's final product and amorphous TVS and showed the final product includes amorphous TVS .......... 30

        ii.     The district court was wrong to demand a comparison that would not resolve the issue and which, in any event, only confirms Dr. Matzger's testing ................................................ 32

2.     Even under the district court's claim construction, Novartis will likely succeed in proving infringement .............. 35

    a.     Novartis's multiple tests amply show likely proof of infringement .................................................................. 36

    b.     The district court wrongly abdicated its responsibility to assess the evidence, which, in any event, supports only the conclusion that MSN likely infringes ......................................................................... 41

B.     Novartis Will Suffer Irreparable Harm Absent an Injunction ............. 45

    1.     Novartis demonstrated substantial and irreparable harm .......... 45

    2.     The district court erroneously relied on MSN's unfounded representations ......................................................................... 49

C.    The Equities Favor an Injunction ......................................................... 54

CONCLUSION ......................................................................................... 55

## CONFIDENTIAL MATERIAL OMITTED

In the non-confidential version of this brief, pages 9-12, 32, 34, 44, 46, 47, 50, and 52 omit material describing Novartis's and MSN's confidential financial information and MSN's manufacturing information.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Sandoz*,
  544 F.3d 1341 (Fed. Cir. 2008) .................................................................47, 50

*Apple v. Samsung Elecs.*,
  809 F.3d 633 (Fed. Cir. 2015) ...........................................................49

*Celsis in Vitro v. CellzDirect*,
  664 F.3d 922 (Fed. Cir. 2012) ...............................................48, 53, 54

*Douglas Dynamics v. Buyers Prods.*,
  717 F.3d 1336 (Fed. Cir. 2013) .........................................................45

*Duncan Parking Techs. v. IPS Grp.*,
  914 F.3d 1347 (Fed. Cir. 2019) ...............................................25, 27

*Genentech, Inc. v. Laurus Labs Ltd. et al.*,
  No. 1:19-cv-00078-RGA (D. Del. Jan. 2, 2020), ECF No. 93 ..........................51

*In re Entresto (Sacubitril/Valsartan) Pat. Litig.*,
  No. 20-mc-2930-LPS, 2021 WL 2856683 (D. Del. July 8, 2021) ....................28

*Microchip Tech. v. Scenix Semiconductor*,
  No. 99-1300, 2000 WL 945308 (Fed. Cir. June 16, 2000)................................24

*Natera v. NeoGenomics Lab'ys*,
  106 F.4th 1369 (Fed. Cir. 2024) ..........................................................45, 48, 49

*Nippon Shinyaku v. Sarepta Therapeutics*,
  25 F. 4th 998 (Fed. Cir. 2022) .........................................................23

*Novartis Pharms. Corp. v. Alkem Lab'ys Ltd.*,
  No. 1:21-cv-01330-RGA (D. Del.)........................................................7

*Novartis Pharms. Corp. v. Hetero USA, Inc.*,
  No. 1:21-cv-01760-RGA (D. Del)........................................................7

*Novartis Pharms. Corp. v. Torrent Pharma Inc.*,
  No. 1:21-cv-01794-RGA (D. Del.)........................................................7

*Novartis Pharms. v. Beccera,*
  No. 1:24-cv-2234 (D.D.C.) ................................................20

*Novartis Pharms. v. Becerra,*
  No. 24-5186 (D.C. Cir. Aug. 19, 2024) ...............................20

*Poly-Am., L.P. v. API Indus., Inc.,*
  839 F.3d 1131 (Fed. Cir. 2016) .........................................25

*Robert Bosch LLC v. Pylon Mfg., Corp.,*
  659 F. 3d 1142 (Fed. Cir. 2011) ........................................23

*Sanofi-Synthelabo v. Apotex,*
  470 F.3d 1368 (Fed. Cir. 2006) ............................47, 53, 54

*SmithKline Beecham v. Apotex,*
  403 F.3d 1331 (Fed. Cir. 2005) ..................................28, 35

*Standard Havens Prods. v. Gencor Indus.,*
  897 F.2d 511 (Fed. Cir. 1990) ...........................................23

*Straight Path IP v. SIPNET EU,*
  806 F.3d 1356 (Fed. Cir. 2015) .........................................25

*Trebro Mfg., Inc. v. Firefly Equip., LLC,*
  748 F.3d 1159 (Fed. Cir. 2014) ..........................24, 41, 45

*Vanda Pharms. Inc. v. Teva Pharms. USA, Inc.,*
  No. 1:18-cv-00651-CFC (D. Del. Jan. 19, 2022) ...............51

*Vanda Pharms. v. West-Ward Pharms. Int'l,*
  887 F.3d 1117 (Fed. Cir. 2018) .........................................47

*Ventana Med. Sys. v. Biogenex Lab'ys,*
  473 F.3d 1173 (Fed. Cir. 2006) .........................................29

*Whitserve, LLC v. Comput. Packages, Inc.,*
  694 F.3d 10 (Fed. Cir. 2012) .............................................49

**Statutes**

28 U.S.C. §§ 1292(a)(1) and (c)(1) ........................................x

28 U.S.C. §§ 1331 and 1338 ..................................................x

35 U.S.C. § 271(e)(4)(A) ..........................................................................47

## TABLE OF ABBREVIATIONS

| ANDA | Abbreviated new drug application |
|------|----------------------------------|
| API | Active pharmaceutical ingredient |
| DSC | Differential scanning calorimetry |
| FDA | United States Food and Drug Administration |
| FT-IR | Fourier-transform infrared spectroscopy |
| TVS | Trisodium valsartan-sacubitril complex |
| XRPD | X-ray powder diffraction |

## STATEMENT OF RELATED CASES

This appeal and Federal Circuit Appeal No. 24-2212 arise from the same order denying Novartis's motion for a preliminary injunction based on U.S. Patent No. 11,096,918. *In re Entresto (Sacubitril/Valsartan) Patent Litig.*, No. 1:20-md-02930-RGA (D. Del. Aug. 12, 2024), Dkt. No. 1456; *Novartis Pharms. Corp. v. MSN Pharms. Inc*., No. 1:22-cv-01395-RGA (D. Del. Aug. 12, 2024), Dkt. No. 239. Novartis's notice of appeal from that order was docketed in the district court in the dockets for both the MDL and Civil Action case, per instructions from the District of Delaware, giving rise to two separate appeal numbers in this Court for the same appeal. *In re Entresto (Sacubitril/Valsartan) Patent Litig.*, No. 1:20-md-02930-RGA (D. Del. Aug. 12, 2024), Dkt. No. 1459; *Novartis Pharms. Corp. v. MSN Pharms. Inc.*, No. 22-cv-1395-RGA (D. Del. Aug. 12, 2024), Dkt. No. 240.

Counsel for Novartis know of no other cases pending in this or any other court that will directly affect or be affected by this Court's decision here.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338. The court denied Novartis's preliminary-injunction motion on August 12, 2024, and Novartis filed a notice of appeal the same day. Appx10-11; Appx9021-9022. This Court has jurisdiction under 28 U.S.C. §§ 1292(a)(1) and (c)(1).

## INTRODUCTION

Novartis scientists created a lifesaving heart-failure treatment: a new pharmaceutical combination of two drugs, valsartan and sacubitril. Sold as ENTRESTO®, the combination therapy has become the preferred first-line treatment for heart failure in adults with reduced ejection fraction—and Novartis's top-selling drug.

Developing ENTRESTO® was no small task. Novartis scientists labored for years to develop and then fine-tune their breakthrough. Along the way, they created multiple inventions as they worked to give patients the best forms of their combination therapy. The '918 patent claims one of those forms—a compound comprising anionic valsartan, anionic sacubitril, and sodium cations non-covalently bound in a 1:1:3 molar ratio ("TVS")—as an amorphous solid.

MSN now wants to piggyback on Novartis's hard labor and substantial investment. More than two years before the '918 patent expires, MSN has threatened to launch at risk a generic competitor to ENTRESTO®. MSN's ANDA adopts a manufacturing process that creates generic products that infringe Novartis's '918 patent—the validity of which is not challenged here. All the relevant factors support preliminarily enjoining MSN's at-risk launch for the short time needed to final judgment, with trial scheduled for December of this year.

*First*, the district court erred in concluding Novartis was unlikely to prove by a preponderance of the evidence that MSN infringes, the only merits issue MSN challenged.   Novartis presented not just one, but *multiple* tests supporting its infringement case.   That testing shows MSN chose a manufacturing process that generates amorphous TVS in the final tablet product.   Novartis's ample evidence points to only one conclusion—Novartis is likely to show infringement.

In concluding otherwise, the district court departed from claim 1's plain text and added a new limitation requiring the amorphous form of TVS to "predominate" over an unrecited form, crystalline TVS.   That construction defies precedent.   Even the district court recognized that the "the intrinsic record provides virtually no useful guidance" supporting such a limitation.   Appx20.   Under bedrock claim-construction principles, that precluded adding such a limitation to claim 1.   And applying the correct construction, Novartis's rigorous testing showing likely infringement stands unrebutted by any comparable testing from MSN.

Novartis also showed likely infringement even under the district court's construction.   The district court's contrary conclusion relied on MSN testing that was incapable of determining the form of the active pharmaceutical ingredients (API) in MSN's final product, including because it failed to compare the test results to a reference that would identify the API's form.   Instead, MSN merely compared test results of its final product to other results testing the isolated API at an earlier

stage. Such testing merely shows the API alone and in the final product are substantially similar. But it begs the question of what form the API takes at either stage. Only Novartis's testing addressed that issue.

*Second*, the district court also wrongly disregarded the substantial harm an unwarranted premature launch would cause. Introducing a generic ENTRESTO® competitor would inflict massive financial damage on Novartis. That damage would be irreparable, including because it would permanently erode Novartis's market position; could not be accurately calculated; and would be so enormous that MSN is unlikely to be able to satisfy a judgment. The district court concluded otherwise by adopting MSN's unsupported assertions and overlooking the many decisions from this Court recognizing that similar facts suffice to show irreparable harm.

*Finally*, the equities further favor a preliminary injunction. Again, the harm to Novartis from a generic launch would be irreparable. The public interest would also suffer: the public has a strong interest in honoring the bargain of disclosure for a limited patent term—especially when patent validity is not an issue. And a premature launch would imperil Novartis's ability to maintain programs benefiting physicians and patients.

MSN's launch should be preliminarily enjoined until final judgment is entered in this patent-infringement suit.

## STATEMENT OF THE ISSUES

Whether Novartis's request for a preliminary injunction should have been granted because:

a. in concluding Novartis is unlikely to prove infringement:

(i) the district court misconstrued the claims, and under the correct construction, Novartis is more likely than not to show infringement, or

(ii) regardless, Novartis is more likely than not to show infringement under the district court's construction;

b. absent injunctive relief, Novartis is likely to suffer irreparable harm; and

c. the balance of the hardships and public interest weigh in favor of enjoining MSN's launch of its generic products pending resolution of this patent litigation.

## STATEMENT OF THE CASE

### A. The '918 Patent Claims an Amorphous Solid Form of Trisodium Valsartan-Sacubitril Complex

Novartis scientists developed multiple inventions on the path to ENTRESTO®, which has become the preferred first-line therapy for heart failure in adults with reduced ejection fraction.  Appx5781(¶26).  As relevant here, the '918

4

patent claims a version of Novartis's combination therapy employing a "dual-acting

compound" or "complex" of two active ingredients: valsartan and sacubitril.

Claim 1 of the '918 patent recites:

> 1. An amorphous solid form of a compound comprising
> anionic      (S)-N-valeryl-N-{[2'-(1H-tetrazole-5-yl)-
> biphenyl-4-yl]-methyl}-valine,   anionic   (2R,4S)-5-
> biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-
> methyl-pentanoic acid ethyl ester, and sodium cations
> in a 1:1:3 molar ratio.

Appx89(col.32:42-46). The recited chemical names refer to valsartan and sacubitril.

Appx6234-6235(¶11). The specification defines the claimed "compound" as a

supramolecular structure in which valsartan and sacubitril are non-covalently bound.

Appx76(col.6:55-61). That structure is "beneficial over" "simply physically mixing

two active agents," thus improving "use as [a] first line therapy, ease of formulation,

and ease of manufacture." Appx82(col.17:46-51); Appx87(col.28:27-32). The

claim recites "anionic" valsartan and sacubitril, which have charges balanced by

sodium cations when combined in a 1:1:3 molar ratio as claimed. Appx6234-

6235(¶11). The resulting non-covalent bonds yield a complex referred to as

Trisodium Valsartan Sacubitril, or "TVS." Appx6234-6235(¶11); Appx618(¶12).

TVS can exist in different forms, depending on how the subunits (i.e., units

of one anionic valsartan molecule, one anionic sacubitril molecule, and three sodium

atoms) are packed together. Appx82(col.17:41-45). In the crystalline form, these

subunits are oriented the same way and packed in a repeating three-dimensional

pattern. *See* Appx6898(¶35). In the amorphous form, the subunits are oriented at random, with no long-range, three-dimensional order. *See* Appx6898(¶35). Regions of amorphous TVS may be found in heterogeneous physical mixtures with, for example, crystalline valsartan disodium, crystalline sacubitril sodium, crystalline TVS, or other substances such as excipients. Appx84(col.21:63-67); Appx89(col.32:47-49); Appx82(col.17:41-45); Appx1731-1732(¶31); Appx1975(15:8-10). The '918 patent covers the amorphous form of TVS.

The '918 patent gives an example of amorphous TVS. Example 1 describes a process for making a "glassy solid" using starting materials including sacubitril free acid and valsartan free acid. Appx87(col.28:37-54). A skilled artisan would have understood that the "glassy solid" is amorphous TVS. Appx6325-6327(¶¶114-116); Appx6185-6197(¶¶19, 22-23, 25-42); Appx3534(897:11-19).

The patent also details how to identify TVS in its crystalline and amorphous forms. It explains that TVS "is characterized by very distinct spectral peaks and shifts that are not observed in the physical mixture." Appx82(col.17:41-58). These "spectral peaks and shifts" refer to spectroscopic analytical techniques, including Raman spectroscopy, disclosed in the specification. Appx6235(¶13). In Raman spectroscopy, laser light is directed at a point on a sample and is scattered at different wavelengths based on vibrations in the molecules present. Appx6241(¶36). The spectrum of scattered light provides information about the sample's structure at the

sample point; multiple spectra from many sample points can give a picture of the sample's overall structure. Appx6909-6910(¶66). Identifying the sample's makeup at any measured point generally requires "comparing the experimental Raman spectra obtained from the sample to [a] reference Raman spectra of known compounds." Appx6235(¶13); Appx6241-6242(¶¶36-37). Unlike some other analytical techniques, Raman spectroscopy can "detect[] the presence of non-covalent bonds between" molecules and thus is a useful tool for distinguishing a complex in which valsartan and sacubitril are joined by non-covalent bonds from "a physical mixture" in which they are not. Appx6183(¶13).

The validity of the '918 patent has been tested in another, since-settled proceeding involving other generic manufacturers. *Novartis Pharms. Corp. v. Alkem Lab'ys Ltd.*, No. 1:21-cv-01330-RGA (D. Del.); *Novartis Pharms. Corp. v. Hetero USA, Inc.*, No. 1:21-cv-01760-RGA (D. Del); *Novartis Pharms. Corp. v. Torrent Pharma Inc.*, No. 1:21-cv-01794-RGA (D. Del.). After trial, the district court "stated on the record" that it was "going to find … in favor of Novartis." Appx3533-3538(896:24-901:7). It then read from the bench a decision explaining the reasons why it would uphold the patent against all their challenges—lack of written description, nonenablement, and indefiniteness. Appx3533-3538(896:24-901:7). The patent expires on November 8, 2026. Appx67.

### B.    Novartis Sued MSN for Infringement of the '918 Patent

Novartis sued MSN for infringement of the '918 patent.  Appx22.  Expert discovery is ongoing, with trial scheduled in December 2024.  Appx1021-1022.

### 1.    *Claim construction*

At claim construction, the sole disputed phrase was "[a]n amorphous solid form of a compound."  Appx1671.  The district court construed that phrase to mean "a solid form of a compound in which the amorphous form of the compound predominates"; "[a]n amorphous solid form is mutually exclusive from a crystalline solid form, but not necessarily mutually exclusive from a partially crystalline solid form."  Appx16.

In doing so, the court rejected Novartis's position that the claim language should be given its plain meaning.  Appx16; Appx1671-1680; Appx1695-1705.  The court also rejected MSN's meaning of "*a substantially pure* amorphous solid form of a compound."  Appx16; Appx19 (emphasis added).  Instead, the district court formulated its own construction that requires looking outside the recited amorphous TVS to determine infringement.   Under that construction, where there is a combination of amorphous TVS and crystalline TVS, the amorphous form must "predominate" over the crystalline.  Appx16.

## 2.    Infringement dispute over MSN's products

The parties' infringement dispute focused on two aspects of MSN's ANDA products:  (1) whether those products include any amount of amorphous TVS; and (2) if so, whether that amorphous TVS predominates over any crystalline TVS in MSN's products.  At the preliminary-injunction stage, the parties focused on three sources of data:  MSN's ANDA; testing by Novartis's expert Dr. Adam Matzger; and MSN-commissioned lab testing.  Also, although the parties agree that MSN's isolated API is crystalline, they dispute whether the API is a mixture of separate crystalline valsartan disodium and separate crystalline sacubitril sodium (Novartis's position) or instead crystalline TVS (*i.e.*, a crystalline complex of valsartan and sacubitril) (MSN's position).  The parties also dispute whether MSN's ANDA manufacturing process allows for amorphous TVS to be produced and therefore present in MSN's ANDA tablet products accused of infringement.

### a.    MSN's ANDA

***Manufacturing.***  MSN's ANDA describes MSN's manufacturing process, disclosing steps likely to produce TVS in the amorphous form. Manufacturing Information

Manufacturing Information

Manufacturing Information Appx4874;

Appx6249 n.6. Manufacturing Information

Manufacturing Information

████ Manufacturing Information ████.  Appx5103-5104; Appx5116; Appx6249 n.6.  MSN

refers to the resulting solid API as "Form-S" and represents in its ANDA that the

isolated API, before it is ████ Manufactuing Information ████, is ████ Manufacturing Information ████

Appx8155.

    After producing the isolated API, ████ Manufacturing Information ████

████ Manufacturing Information ████

████ Manufacturing Information ████  Appx4861-4862.  ████ Manufacturing Information ████

████ Manufacturing Information ████  Appx4858; Appx4861.  ████ Manufacturing Information ████

████ Manufacturing Information ████  Appx5481;  Appx5487;

Appx5116; Appx5120.  As Dr. Matzger explained, ████ Manufacturing Information ████

████ Manufacturing Information ████  Appx6264-

6265(¶72).

    ***ANDA data.***  MSN's ANDA also discloses data from infrared spectroscopy

("FT-IR") and differential scanning calorimetry ("DSC") testing collected from

isolated API samples, meaning not the API in the ████ Manufacturing Information ████.

Appx8085.  Yet the ANDA never compares that data to any known references.  *See*

Appx8085 ("Sacubitril and Valsartan (Form-S) is not published / reported in the

compendia [USP and Ph. Eur.]; hence conforming to this a laboratory developed

batch has been chosen for the characterization studies." (alteration in original)).  For

example, the ANDA does not show whether the results match those for a physical

mixture of separate crystalline valsartan disodium and separate crystalline sacubitril sodium, where the valsartan and sacubitril are not joined as a complex but instead may be separated into regions containing primarily one molecule or the other. Appx6250(¶52).

The ANDA also discloses X-ray powder diffraction ("XRPD") data for batches of both the isolated API and final drug products. Appx4954. XRPD is a way of characterizing crystalline substances. X-rays directed at a sample diffract at angles that correspond to the distance between atoms in a crystal. Appx6907(¶¶58-59). XRPD characterizes a bulk sample as a whole; it cannot identify small regions of amorphous substances, which do not generate distinct peaks. Appx6269(¶¶85-86); Appx6936(¶117) (MSN's expert agreeing about lack of distinct peaks). MSN's ANDA XRPD data show that its ███████ Manufacturing Information ███████ ███████████████ Manufacturing Information ███████████████ ███████ Manufacturing Information ███████ Appx4954; Appx4964; *see also* Appx8105; Appx8027 ████ Manufacturing Information ████. But as with the other tests, MSN's ANDA never compares the XRPD data to any known references, such as for separate crystalline valsartan and separate crystalline sacubitril—the only comparison was between the final drug product and the isolated API itself. Appx6250(¶52).

>    ***b.    The parties' testing on MSN's isolated API and finished tablets***

The parties also performed testing of MSN's isolated API and its finished tablets, although the party's testing methods differed.

Novartis's expert, Dr. Matzger, performed two types of testing on MSN's isolated API:   X-ray microdiffraction (Appx6247-6249(¶¶45-49)) and Raman mapping (Appx6242-6246(¶¶38-44)).   He also performed Raman mapping on the finished tablets.   Appx6252-6264(¶¶57-68), Appx4420-4446; Appx4470-4541. From these test results, Dr. Matzger concluded MSN's finished tablets contain small regions of amorphous TVS [Manufacturing Information]; the rest of the API in the final product is either separate crystalline valsartan disodium or separate crystalline sacubitril sodium.   Appx6250(¶53).   Dr. Matzger found no regions of crystalline TVS (i.e., a crystalline complex of valsartan and sacubitril). Appx6250(¶53).

**Novartis's X-ray microdiffraction.**   Dr. Matzger collected two X-ray microdiffraction patterns and one XRPD pattern from MSN's isolated API. Appx6247-6249(¶¶45-49).   X-ray microdiffraction is similar to XRPD but is performed on individual particles rather than bulk samples.   Appx6247(¶46); Appx6269(¶86).   Because of that increased granularity in testing, X-ray microdiffraction can detect heterogeneity that XRPD cannot.   Appx6247(¶46); Appx6269(¶86).  Because any two particles in a homogenous substance would have

similar makeups, X-ray microdiffraction of each would produce similar X-ray microdiffraction patterns; but if the test substance is heterogeneous, X-ray microdiffraction of two particles could produce very different microdiffraction patterns. *See* Appx6247(¶46); Appx6269(¶86). Dr. Matzger's two microdiffraction samples (top, red and green) produced two very different patterns, each with a subset of the features present in the bulk XRPD data (bottom, blue):

**Figure 5**
**Overlaid XRD Patterns of MSN's API (Batch No. 21118)**



Appx6247-6249(¶¶47-49). Dr. Matzger concluded that this testing shows the isolated API (i.e., MSN's "Form-S") is a heterogeneous mixture, not a single crystalline complex. Appx6247-6248(¶47).

***Novartis's Raman mapping.*** Dr. Matzger also performed Raman mapping on MSN's isolated API and its final dosage form. Appx6242-6246(¶38-44);

Appx6252-6264(¶¶57-68);   Appx4420-4446;   Appx4470-4541.   Like X-ray microdiffraction, and unlike XRPD, Raman mapping can precisely identify the makeup of a sample within specific regions.  Appx6241; Appx6268-6270(¶36, 82-83, 88).  Dr. Matzger collected thousands of experimental Raman spectra from samples of MSN's products and used them to map the substances in regions across the sample.  Appx6241-6242(¶¶36-37); Appx4394-4575.  Dr. Matzger compared the collected experimental spectra to reference Raman spectra for known substances: separate crystalline sacubitril sodium, separate crystalline valsartan disodium, and amorphous TVS.

Dr. Matzger found that portions of the isolated API samples closely matched the reference spectrum for separate crystalline valsartan disodium (Figure 2), and other parts closely matched the spectrum for separate crystalline sacubitril sodium (Figure 3):

**Figure 2**
**Raman Map Showing Valsartan Disodium in MSN's API (Batch No. SQ0061123)**



**Figure 3**
**Raman Map Showing Sacubitril Sodium in MSN's API (Batch No. SQ0061123)**



15

Appx6242-6246(¶¶38-43).  The entire sample matched one or the other of those two separate substances.  Appx6246-6247(¶44).  Dr. Matzger concluded that MSN's API is a physical mixture of separate crystalline valsartan disodium and separate crystalline sacubitril sodium, not crystalline TVS.  Appx6241(¶35).

In MSN's finished tablets accused of infringement, Dr. Matzger identified regions of the tablets that match the reference spectra for separate crystalline valsartan disodium (green), separate crystalline sacubitril sodium (red), as well as amorphous TVS (bright yellow):



Appx6256-6257(¶61).  Again, Dr. Matzger examined the Raman spectra within the identified regions to confirm a match.  The spectra below illustrate the close match between Dr. Matzger's experimental Raman spectra from a region identified as amorphous TVS (black) and the reference spectrum for amorphous TVS (red).



Appx9030; Appx6257-6258(¶62).  The experimental and reference spectra both exhibit the same peaks at 1287 cm⁻¹, 1605 cm⁻¹ and 1612 cm⁻¹; both also have an upward slope starting at around 800 cm⁻¹ and peaking around 810 cm⁻¹ followed by a downward slope lacking clearly defined peaks from about 810 cm⁻¹ to 900 cm⁻¹ (orange box).  Appx6256-6260(¶¶61-63); *see* Appx6270-6272(¶¶90-96).  Having identified these features in the testing of MSN's products, Dr. Matzger concluded that the products contain amorphous TVS, and no crystalline TVS.  Appx6253-6254(¶59).

*MSN's Raman spectroscopy.*  MSN engaged a lab, EAG, to measure Raman spectra for two samples of its isolated API and for the excipients in its product; MSN performed no Raman spectroscopy testing of its finished tablet product that is actually accused of infringement.  Appx6273-6274(¶¶98-100).  As with Novartis's

X-ray microdiffraction patterns, MSN's two Raman spectra are different, showing heterogeneity in the API:



Appx6274(¶99).  The first sample (top) has peaks around 1598 cm⁻¹ and 1281 cm⁻¹, which Dr. Matzger explained are indicative of crystalline sacubitril sodium. Appx6274(¶100); *see* Appx6260-61(¶64).  The second (bottom) has the sacubitril sodium peaks plus peaks at around 1256 cm⁻¹ and 1299 cm⁻¹ indicative of crystalline valsartan disodium.  Appx6274(¶100); Appx6260-61(¶64).  Dr. Matzger concluded that EAG's Raman data supports his conclusion that the isolated API is a physical mixture of separate valsartan and separate sacubitril, and not crystalline TVS. Appx6274(¶99).

### *3.   Preliminary-injunction proceedings*

After the FDA approved MSN's ANDA in late July 2024, Novartis sought a preliminary injunction based on claim 1 of the '918 patent.   Appx2461-2471; Appx9023-9050; Appx2389.   MSN opposed; on the merits,   MSN disputed only infringement and did "not raise any arguments regarding validity."   Appx4.   The district court held oral argument, with no evidentiary hearing.   Appx9103-9197.

Applying its claim construction, the district court denied Novartis's preliminary-injunction request.   Appx2, Appx4-6.   Without disagreeing with the close match between Dr. Matzger's Raman spectra from MSN's final product and the reference spectra for amorphous TVS, the district court faulted Dr. Matzger for allegedly failing also to compare his spectra to a reference spectrum of MSN's isolated API.   Appx4-5.   Based on that purported failure, the district court concluded Novartis was unlikely to prove "MSN's ANDA products contain amorphous TVS."   Appx5.   The district court also concluded Novartis had failed to show that other regions of MSN's product contain a physical mixture of separate crystalline valsartan disodium and separate crystalline sacubitril sodium rather than crystalline TVS.   Appx5-6.   Citing MSN's ANDA test data and the parties' "supporting test data and what appear to be valid criticisms of said test data from both sides," the district court concluded it was "unable to find that the record favors" either side's

19

view; the district court believed that meant Novartis "has not met its burden." Appx6.

The court separately concluded that Novartis failed to show irreparable harm or that the balance of harms favored a preliminary injunction. Appx6-10. In spite of the irreversible effects of a generic launch and the unpredictable downstream harms to Novartis's business activities, the court believed Novartis's losses could be quantified. Appx6-8. And it accepted MSN's assertions that MSN would be able to cover Novartis's monetary damages. Appx8-9.

## C.     Other Proceedings

As of the filing of this brief, Novartis also has pending in this Court fully briefed consolidated appeals in a separate action involving U.S. Patent No. 8,101,659, in which Novartis has sought an injunction against MSN's at-risk launch pending resolution of those appeals. *Novartis Pharmaceuticals Corp. v. Torrent Pharma Inc.*, Nos. 2023-2218, 2023-2219, 2023-2220, 2023-2221.

In addition to these patent proceedings, Novartis has challenged MSN's approval under the Federal Food, Drug, and Cosmetic Act. *Novartis Pharms. v. Beccera*, No. 1:24-cv-2234 (D.D.C.). On August 19, 2024, the D.C. Circuit stayed that approval pending Novartis's preliminary-injunction appeal to that court, finding Novartis "satisfied" all the traditional stay requirements. Order, *Novartis Pharms. v. Becerra*, No. 24-5186 (D.C. Cir. Aug. 19, 2024), ECF2070612. Despite that stay,

Novartis continues to seek an injunction in this case, which involves distinct legal rights and timing.

## SUMMARY OF ARGUMENT

A.1.    Novartis's ample evidence showed it was more likely than not to prove infringement by a preponderance of the evidence at trial.    The district court predicated its contrary conclusion on a claim-construction error.    Claim 1 plainly recites amorphous TVS, and nothing more.    Yet the district court injected an additional limitation:   a requirement that the amorphous TVS "predominate" over crystalline TVS.   Nothing about the plain claim text suggests such a limitation.    The district court itself "concede[d]" the "intrinsic record provides virtually no useful guidance" about a predominance limitation.    Appx20.    Under basic claim-construction principles, that should have precluded such an addition.

Applying the correct construction, Dr. Matzger's Raman mapping showed MSN's final tablet products include regions of amorphous TVS.   The district court identified no contrary testing.    And its complaint that Dr. Matzger should have performed an additional analysis was unfounded—the additional analysis would not resolve whether MSN's products include amorphous TVS.    In any event, Dr. Matzger did perform that additional analysis, and he explained how the results were consistent with his conclusions.

21

2.    Novartis also showed a likelihood of success under the district court's construction.  Instead of evaluating the evidence—including three sets of tests from Dr. Matzger—the district court merely concluded there was conflicting evidence and stopped.  But the presence of allegedly conflicting evidence does not preclude a preliminary injunction.  Nor does the evidence actually conflict:  MSN's test data either lacks an appropriate comparator, making it incapable of resolving the dispute here; or it confirms Dr. Matzger's conclusions.

B.    Novartis's evidence of irreparable harm was also more than enough to warrant preserving the status quo during the short time needed to complete a trial by the end of this year.  Novartis showed all the classic markers of irreparable harm, including head-to-head competition, lost market share, and more.  The district court rejected all this by uncritically adopting MSN's assertions that Novartis's harms could be quantified and accepting MSN's blithe assurances that MSN could cover the amount.

C.    The equities further favor preserving the status quo.  The public has a paramount interest in protecting patent rights, especially where validity is unchallenged.  And the public has a special interest here, where generic competition will imperil patient programs that have helped increase awareness and access to ENTRESTO®'s lifesaving care.

## STANDARD OF REVIEW

This Court "generally review[s] a denial of a preliminary injunction using the law of the regional circuit, here the Third Circuit," but "gives dominant effect to Federal Circuit precedent insofar as it reflects considerations specific to patent issues." *Nippon Shinyaku v. Sarepta Therapeutics*, 25 F. 4th 998, 1004 (Fed. Cir. 2022).  Both this Court and the Third Circuit review a preliminary-injunction denial for abuse of discretion.  *Id.*  "A district court abuses its discretion when it acts 'based upon an error of law or clearly erroneous factual findings' or commits 'a clear error of judgment.'"  *Robert Bosch LLC v. Pylon Mfg., Corp.*, 659 F. 3d 1142, 1147 (Fed. Cir. 2011).  This Court "review[s] underlying questions of law *de novo*."  *Nippon*, 25 F.4th at 1004.

## ARGUMENT

All four of the traditional factors warrant enjoining MSN from launching: Novartis showed a strong likelihood of proving infringement and will suffer immense and irreparable harm absent injunctive relief; and the equities and public interest warrant an injunction.  *Standard Havens Prods. v. Gencor Indus.*, 897 F.2d 511, 512 (Fed. Cir. 1990).

### A.     Novartis Will Likely Succeed in Proving Infringement

To prove a likelihood of success on infringement, a patentee must show only that it is "more likely than not" that it will ultimately establish infringement by a

preponderance of the evidence. *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1166 (Fed. Cir. 2014). Novartis amply made that showing here. The district court founded its contrary ruling on an error of law: misconstruing the claim. Once that error is set aside, likely infringement is evident, as Novartis's extensive and detailed testing shows that it is more likely than not Novartis will prove MSN's products contain amorphous TVS. But even under the district court's construction, Novartis likewise showed it is more likely than not to prove infringement: because MSN's isolated API is a physical mixture of separate crystalline sacubitril and separate crystalline valsartan, the amorphous TVS in MSN's finished products necessarily predominates over the nonexistent crystalline TVS.

### 1. *The district court erroneously read limitations into the claims, and Novartis will likely prove infringement under the correct construction*

Where a district court bases a preliminary-injunction ruling on an earlier claim construction, this Court has jurisdiction to review that construction in a preliminary-injunction appeal. *Microchip Tech. v. Scenix Semiconductor*, No. 99-1300, 2000 WL 945308, at *2-3 (Fed. Cir. June 16, 2000). This Court reviews claim construction de novo where, as here, it turns on interpreting intrinsic evidence. *Id.*

*a.*    ***The district court erred in construing "an amorphous solid form of a compound" as requiring comparison to an unclaimed form***

*i.*    ***The claim text's meaning is plain and there is no lexicography or disclaimer***

The default rule is well settled: the words of a claim carry "their ordinary and customary meaning" in context to one of ordinary skill in the art. *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016). When claim text has a "plain" meaning on an issue that "leav[es] no genuine uncertainties," the rule favoring that plain meaning is even stronger. *Straight Path IP v. SIPNET EU*, 806 F.3d 1356, 1361 (Fed. Cir. 2015) ("particularly difficult to conclude" different meaning). Absent lexicography or disclaimer, a patentee is "entitled to the full scope of its claim language." *Duncan Parking Techs. v. IPS Grp.*, 914 F.3d 1347, 1364 (Fed. Cir. 2019).

Here, the meaning of claim 1's text is plain. The claim recites "an amorphous solid form of [TVS]." Appx89(col.32:42-46). The parties agree on what those plain words mean: they "are directed to the specific amorphous solid form" of TVS, not "crystalline." MSN.Opp.12-13.[1] And the term "amorphous form" undisputedly has an accepted meaning, referring to a form lacking long-range, three-dimensional

---

[1] Novartis.Motion.## and MSN.Opp.## refer respectively to the page numbers of Novartis's motion in this Court for an injunction pending appeal (ECF No. 5) and MSN's opposition to that motion (ECF No. 16).

order.  Novartis.Motion.4; MSN.Opp.12-16.  As the district court acknowledged, it "is clear" that a skilled artisan "can identify a compound as existing in an 'amorphous solid form,' as opposed to other forms." Appx20.  Claim 1 thus requires amorphous TVS, nothing more.   And nothing about claim 1's text suggests a requirement to consider whether a crystalline TVS form is also present, let alone that the amorphous form must predominate over the crystalline form.

The specification and prosecution history are consistent with the plain claim text and contain no redefinition or disavowal.  Appx74-92; Appx1824-1883.  Rather than suggesting any need to compare amorphous and crystalline TVS, the intrinsic evidence shows that the two forms are "mutually exclusive," as the district court acknowledged.  Appx16-19; Appx82(col.17:43-45).  MSN agrees.  MSN.Opp.13. Given the agreed categorical distinction between amorphous TVS and crystalline TVS, any comparison between them to determine which "predominates" is superfluous to understanding claim 1.  Amorphous TVS is amorphous TVS.  Claim 1 is satisfied when amorphous TVS is present in any environment—without regard to whether any unclaimed crystalline TVS also happens to be present or, if so, how much is present.  *See* Appx18-19(acknowledging parties' agreement that partially crystalline form of a compound is a mixture that contains the amorphous form).

The district court itself recognized the intrinsic record's silence about any "limitation" "regarding the purity of the claimed amorphous compound"—by which

the district court meant "the percentage of the compound that is amorphous rather than crystalline." Appx16. After canvassing the intrinsic record, the district court "concede[d] the difficulty of pinpointing an appropriate limitation when the intrinsic record provides virtually no useful guidance." Appx20. But that should have been the end of the matter—because the intrinsic record is silent about the existence of a limitation on the relative amounts of amorphous and crystalline TVS, the district court was required to reject any such limitation and give Novartis the "full scope" of its claim. *Duncan*, 914 F.3d at 1364.

> ### ii.     *The district court misread the prosecution history and contradicted precedent in injecting a "predominance" requirement into claim 1*

The district court had no basis for nevertheless creating a predominance requirement from whole cloth. It was wrong that the '918 patent's prosecution history "conflicts with" Novartis's interpretation. Appx17. The district court pointed to a nonobviousness declaration by Dr. Michael Cima, submitted during prosecution of the '918 patent. Appx17-18, Appx20-21. Quoting a few isolated statements from that declaration noting the ways in which amorphous and crystalline forms differ generally, the district court concluded: "to embody these properties, rather than properties associated with a crystalline solid, it follows that an amorphous solid form of a compound must be predominantly amorphous." Appx17, Appx20-21.

27

That was legal error twice over—it misreads the intrinsic evidence and contradicts precedent.  Far from supporting the district court's "predominance" requirement, that prosecution-history declaration confirms claim 1's plain meaning and invites no comparison of the claimed amorphous TVS to unclaimed crystalline TVS.  It does the opposite.  In noting the ways amorphous and crystalline forms generally differ, Dr. Cima explained that possessing the crystalline form of a particular compound would not necessarily make it easier to obtain the amorphous form.  Appx1873(¶17).  Ultimately, Dr. Cima's declaration stands for the proposition that amorphous TVS is its own unique and nonobvious invention from crystalline TVS.  Appx1869-1880.  Regardless, nothing in the declaration dictates a claim construction:  a "description of characteristics does not redefine a compound with an established and unambiguous structural definition."  *SmithKline Beecham v. Apotex*, 403 F.3d 1331, 1339 (Fed. Cir. 2005).

The district court also erred in relying on the claim construction of different claims from other patents—Nos. 8,877,938 and 9,388,134.  Appx16-17.  The '938 and '134 patents disclose and claim a different invention:  crystalline trisodium sacubitril-valsartan hemipentahydrate ("crystalline TSVH").  During claim construction for those patents, the district court imposed a "substantially pure" limitation because Novartis and the Examiner had agreed during prosecution of the '938 patent that the crystalline form would be "substantially pure."  Appx19; *In re*

*Entresto (Sacubitril/Valsartan) Pat. Litig.*, No. 20-mc-2930-LPS, 2021 WL 2856683, at \*4-5 (D. Del. July 8, 2021); Appx1832; Appx1840-1841.  Because the "substantially pure" limitation in the '938 and '134 patents required considering unclaimed substances that might be present alongside crystalline TSVH (*i.e.*, potential impurities of crystalline TSVH), the district court here reasoned that the presence of unclaimed substances also needed to be considered for claim 1 of the '918 patent.

That too was legal error.  As the district court itself recognized, "prosecution disclaimer generally does not apply when the claim term in the descendant patent uses different language."  *Ventana Med. Sys. v. Biogenex Lab'ys*, 473 F.3d 1173, 1182 (Fed. Cir. 2006); Appx19-20 (district court quoting same).  And here, there was no similar colloquy or agreement between Novartis and the Examiner while prosecuting the '918 patent.  Because the crystalline TSVH claims of the '938 and '134 patents differ materially from the amorphous TVS claims of the '918 patent, and arise from a different prosecution history, the district court erred in relying upon the "substantially pure" limitation of those different patents to justify limiting the '918 patent's claim.  *Ventana*, 473 F.3d at 1182.

Finally, the district court also misunderstood the technology.  It characterized Novartis as asserting that "any presence of amorphous molecules allows a solid form of a compound to be considered amorphous."  Appx17.  But individual TVS

"molecules" cannot be amorphous or crystalline because those forms depend on whether multiple molecules have (or lack) long-range three-dimensional order. Appx6299(¶56).

### b. Under the correct construction, Novartis is likely to prove infringement

#### i. Dr. Matzger's testing performed the only comparison between the API in MSN's final product and amorphous TVS and showed the final product includes amorphous TVS

Once the construction is corrected, the district court's clear error on Novartis's likely success is glaring. Testing by Novartis's expert Dr. Matzger shows MSN's products contain amorphous TVS. Appx6252-6264(¶¶57-68). Dr. Matzger's Raman mapping of MSN's finished ANDA tablets revealed regions of amorphous TVS (bright yellow), as well as separate crystalline valsartan disodium (green) and separate crystalline sacubitril sodium (red):



Appx6256-6257(¶61).    Experimental Raman spectra from the regions shown in
bright yellow show amorphous TVS in MSN's final ANDA products:



Appx9030; Appx6257-6258(¶62).    Dr. Matzger found a close match between these
experimental spectra from MSN's tablets (black) and a reference spectrum for
amorphous TVS prepared according to the '918 patent (red).    Appx6241-6242(¶37);
Appx6186-6192(¶¶22-23, 29-33).

Dr. Matzger's experimental spectra from MSN's tablets (black) display the
distinctive spectral properties of amorphous TVS shown in the reference spectrum
(red):  peaks at about 1287 cm⁻¹, 1605 cm⁻¹, and 1612 cm⁻¹, and an upward slope
starting at about 800 cm⁻¹ and peaking around 810 cm⁻¹ followed by a downward
slope between 810 and 900 cm⁻¹ without any clearly defined peaks (orange box).
Appx6256-6259(¶¶61-62); *see* Appx6259-6272(¶¶63-65, 89-96) (explaining why
this combination of features is helpful to distinguish amorphous TVS).  Neither the

crystalline complex disclosed in the '918 patent nor a mixture of separate crystalline sacubitril sodium and separate crystalline valsartan disodium produces this combination of spectral features. Appx6259-6272(¶¶63-65, 89-96). These results therefore show that MSN's products contain infringing amorphous TVS.

Dr. Matzger went further than merely identifying amorphous TVS in MSN's final products. He also explained how it got there: when ███ Manufacturing Information ███ ███ Manufacturing Information ███ ███ Manufacturing Information ███ ███ Manufacturing Information ███ Appx6264-6265(¶72); Appx5481; Appx5487; Appx5116; Appx5120; Appx4858.

> ### ii. *The district court was wrong to demand a comparison that would not resolve the issue and which, in any event, only confirms Dr. Matzger's testing*

In nevertheless finding Novartis unlikely to prove the presence of amorphous TVS in MSN's final products, the district court identified no testing contradicting Dr. Matzger's conclusion. Appx4-5. Nor did it disagree with Dr. Matzger's explanation of how ███ Manufacturing Information ███. Appx4-5. Instead, it accepted MSN's criticism that Dr. Matzger should have compared his Raman mapping of MSN's final products to MSN's "Form-S reference spectra," meaning a spectrum obtained from MSN's isolated API. Appx4-5.

That reasoning is doubly flawed. First, comparing Raman mapping of MSN's final products to a reference spectrum from MSN's isolated API would just beg the question of whether MSN's isolated API itself contains amorphous TVS. The only way to determine whether either the final products or the isolated API contains amorphous TVS is to compare Raman mapping of samples to a reference spectrum from a known sample of amorphous TVS—which is exactly what Dr. Matzger did. Appx6257-6258(¶62); Appx9030. And because Dr. Matzger was the only one who performed that comparison, his conclusions that the comparison reveals amorphous TVS in MSN's final products stands unrebutted and suffices to show Novartis's likely success on infringement.

Second, Dr. Matzger actually did compare his Raman mapping of MSN's final products to a reference spectrum from MSN's isolated API ("Form-S"). *See* Appx6270-6272(¶¶90-96). That comparison only confirms Dr. Matzger's conclusion on infringement because it shows that there are regions in MSN's final product that are *different* from the regions in MSN's isolated API:



Appx9048; Appx6376. The overlaid spectra show that Dr. Matzger's experimental spectrum testing from MSN's final tablets (black) better matches the amorphous-TVS reference (red) than it does MSN's "Form-S" reference spectrum (blue). For example, the experimental spectrum (black) and amorphous reference (red) include matching peaks at 1287 and 1605 cm$^{-1}$ and a similar downward slope without distinct peaks from 810-900 cm$^{-1}$ (orange box). *See* Appx6252(¶62), Appx6272(¶¶95-96). The strong match between the experimental spectrum Dr. Matzger collected and the amorphous reference spectrum thus reinforces Dr. Matzger's conclusion that amorphous TVS is ▉Manufacturing Information▉ into MSN's final products.

In short, with Dr. Matzger's testing, Novartis's showing of infringement under the correct claim construction will be straightforward: regardless of the make-up of

the rest of MSN's generic products, MSN's final products contain small regions of amorphous TVS.  Those regions are enough to infringe.  *See SmithKline*, 403 F.3d at 1341 (affirming that even "trace amount" of claimed compound in accused ANDA product infringes).  The district court clearly erred in finding Novartis unlikely to meet its burden to so prove.

### 2.    *Even under the district court's claim construction, Novartis will likely succeed in proving infringement*

The outcome will be the same under the district court's claim construction.  That construction governs only the two possible forms of TVS in the product, not other components.  The construction requires "a solid form *of a compound* in which the amorphous form *of the compound* predominates."  Appx16 (emphasis added).  The claimed "compound" is TVS.  Thus, under that construction, where there is a combination of amorphous TVS and crystalline TVS, the amorphous form must predominate over the crystalline.  Appx6237-6239(¶¶23-29).  As shown above, MSN's final ANDA products contain amorphous TVS.  And as discussed below, Dr. Matzger showed that MSN's products contain no crystalline TVS.  That necessarily means that the amorphous TVS in MSN's final products "predominates" over the nonexistent crystalline TVS.

### a.    *Novartis's multiple tests amply show likely proof of infringement*

Dr. Matzger's multiple analyses confirm that, along with small amounts of amorphous TVS, MSN's products comprise regions of separate crystalline valsartan disodium and separate crystalline sacubitril sodium rather than crystalline TVS.

First, Dr. Matzger compared Raman mapping of samples of MSN's final products to reference spectra, which showed separate regions of crystalline valsartan disodium (green in image below) and separate regions of crystalline sacubitril sodium (red).  *See* Appx6242(¶39).  In the spectra plot below the map in Figure 6, an experimental Raman spectrum (red) from a region in the final-product sample identified as crystalline valsartan disodium closely matches a reference spectrum for crystalline valsartan disodium (blue).  *See* Appx6241-6243(¶¶37, 40-41).

**Figure 6**
**Region of MSN 49/51 mg Sample Containing**
**Valsartan Disodium (AJM-XXVIII-2.3_Cosmic.wdf)**



Appx6254-6255(¶60).

Similarly, in the spectra plot below the map in Figure 7, an experimental Raman spectrum (red) from a region identified as crystalline sacubitril sodium closely matches a reference spectrum for crystalline sacubitril sodium (blue).

**Figure 7**
**Region of MSN 49/51 mg Sample Containing**
**Sacubitril Sodium (AJM-XXVIII-2.3_Cosmic.wdf)**



Appx6254-6255(¶60).

Second, Dr. Matzger compared Raman maps from samples of MSN's isolated API to the same reference spectra and reached the same conclusion. The maps show distinct regions (colored red and green below) that generate distinct Raman spectra corresponding to separate crystalline valsartan disodium and separate crystalline sacubitril disodium, respectively. Appx6243-6246(¶¶42-43).



Raman spectra from the entire sample showed only those two active ingredients (no API powder is present in the black areas of the map), meaning crystalline TVS was absent from MSN's isolated API. Appx6246-6247(¶44).

Finally, Dr. Matzger examined X-ray microdiffraction data from MSN's isolated API and concluded the data show the isolated API is a heterogeneous crystalline physical mixture:

**Figure 5**
**Overlaid XRD Patterns of MSN's API (Batch No. 21118)**



Appx6247-6249(¶¶47-49).  The two microdiffraction samples (top, red and green) are drastically different, showing heterogeneity in the isolated API.  Appx6247-6248(¶47).  Each microdiffraction sample produced a subset of the features present in the bulk XRPD data, consistent with the conclusion that the isolated API is a mixture of separate crystalline sacubitril sodium and separate crystalline valsartan disodium.  Appx6247-6249(¶¶47-49); *see* Appx6908(¶61) ("[W]here the respective locations of the peaks and the intensities do not match for two samples, this suggests that the two samples are composed of different solid forms").

Dr. Matzger was thus more than thorough.  His results from three different analytical tests conclusively show MSN's isolated API contains separate crystalline valsartan disodium and separate crystalline sacubitril sodium, with no crystalline TVS—and MSN's final products likewise show only those separate substances plus

amorphous TVS. That evidence was more than enough at this stage to show MSN likely infringes under the district court's construction.

> **b.    The district court wrongly abdicated its responsibility to assess the evidence, which, in any event, supports only the conclusion that MSN likely infringes**

The district court made no findings contradicting Dr. Matzger's detailed testing. Rather, it merely counted up the parties' arguments and concluded the evidence was conflicting about whether the amorphous TVS in MSN's products predominates because (as Novartis contended) the products contain no crystalline TVS but only a physical mixture: "In the face of supporting test data and what appear to be valid criticisms of said test data from both sides, I am unable to find that the record favors finding Form-S to be one of a physical mixture or a crystalline complex." Appx6. The court thus believed that the mere existence of purportedly conflicting evidence meant Novartis did not meet its burden. Appx6. That was error. At the preliminary-injunction stage, all Novartis must show is that it is "more likely than not" that it will ultimately be able to prove infringement by a preponderance of the evidence. *Trebro*, 748 F.3d at 1166. That required the district court actually to evaluate the evidence and make a predictive judgment about which evidence was stronger. *Id.* And on this record, that predictive judgment could be only in Novartis's favor given Dr. Matzger's rigorous testing. *Supra* Part A.2.a.

In any event, the district court clearly erred in concluding the evidence was conflicting because the data MSN cited either fails to address the relevant inquiry or supports Novartis's showing of infringement. For example, the district court noted that MSN had Raman spectra from two samples of its isolated API that "contained different peaks from those that Dr. Matzger relies on":



Figure 2. Stacked Raman Spectra of Sample S13 (API), Preparations 1 & 2

Appx5-6; Appx6274(¶99). But the district court overlooked the key point of this data—even MSN's two API sample spectra differ materially, which confirms Novartis's showing that MSN's isolated API is heterogeneous (a physical mixture) and not a uniform substance containing crystalline TVS. Appx6273-6274(¶¶98-100). Moreover, the first sample (top) has peaks around 1598 $cm^{-1}$ and 1281 $cm^{-1}$, indicative of crystalline sacubitril sodium; and the second (bottom) has sacubitril

sodium peaks plus peaks at around 1256 cm$^{-1}$ and 1299 cm$^{-1}$ indicative of crystalline valsartan disodium.  Appx6274(¶100); Appx6260-61(¶64).

The district court erred in similar ways in pointing to various test data from MSN's ANDA.  As the district court never contradicted (Appx5-6), none of that test data involves a comparison between the data from MSN's API and any known substance—not to any confirmed sample of amorphous or crystalline TVS, nor to other substances that could be present, like crystalline valsartan disodium or crystalline sacubitril sodium.  Appx6250(¶52); *see* Appx89(col.31:26-32).  Absent such a comparison, as the '918 patent teaches, MSN's tests cannot confirm whether its API is a complex, rather than a physical mixture, of valsartan and sacubitril. Appx82 (col.17:46-58); Appx89(col.31:26-32); Appx6250(¶52).  MSN is left only with Dr. Steed's untested hypotheses, which are insufficient to undermine the well-supported conclusions Dr. Matzger reached based on data actually involving the required comparisons.

Even considering the ANDA data, nothing in that data contradicts Novartis's infringement case.  MSN pointed to XRPD data from three isolated API batches showing a similar pattern, which MSN argued means the isolated API is uniform crystalline TVS rather than a physical mixture of separate crystalline substances. Appx6968-6969(¶¶177-78).  But XRPD is the wrong test for the issue here, because XRPD is a "bulk" measurement that hides small-scale heterogeneity.

43

Appx6269(¶86).  The FT-IR and DSC data from the ANDA are similarly flawed.

MSN compared the FT-IR peaks from its isolated API to peaks from amorphous

TVS and an amorphous mixture.  Appx6973-6974(¶¶188-89).  The data matches

neither, which is exactly as expected because, under both parties' views, the isolated

API is crystalline, not amorphous; amorphous TVS is present Manufacturing Information

Manufacturing Information .  The FT-IR data thus fails to address the issue here,

which is whether the API is a physical mixture of separate crystalline substances or

is instead a crystalline complex.  *See* Appx6974-6975(¶190), Appx6900-6903(¶¶45-

51)(evidence on DSC data suffering from similar flaw).

In the end, the district court recognized Novartis's "valid criticisms" of

MSN's testing data but failed to appreciate that MSN's own test data, as a whole,

supports Novartis's position more than MSN's.

\*\*\*

Considered together, the test data both parties presented leaves no doubt about

the composition of MSN's products:  they contain a mixture of separate crystalline

sacubitril sodium and separate crystalline valsartan disodium—along with

amorphous TVS but no crystalline TVS.  Thus, the amorphous TVS necessarily

predominates over the nonexistent crystalline form.  That shows Novartis is likely

to succeed in proving infringement under the district court's construction.  The

district court clearly erred in finding otherwise.

### B.    Novartis Will Suffer Irreparable Harm Absent an Injunction

MSN's threatened at-risk launch would cause Novartis irreparable harm. Novartis would suffer a dramatic loss of market share, lose substantial profits, and ENTRESTO®'s price would irreversibly erode. These are classic harms that support preserving the status quo. The district court clearly erred in concluding otherwise.

### 1.    Novartis demonstrated substantial and irreparable harm

"Evidence of head-to-head competition and lost market share can support a showing of irreparable harm." *Natera v. NeoGenomics Lab'ys*, 106 F.4th 1369, 1378 (Fed. Cir. 2024). So can evidence that "the alleged injury is not quantifiable." *Id.* This Court has thus recognized the harm, "often irreparable," of forcing a patentee to compete against an infringer in a market the patentee "created with its investment in patented technology." *Douglas Dynamics v. Buyers Prods.*, 717 F.3d 1336, 1344-45 (Fed. Cir. 2013); *see Trebro*, 748 F.3d at 1170.

Here, Novartis's substantial investments in ENTRESTO® created a new market, making ENTRESTO® Novartis's top-selling drug. Appx5778-5779(¶20). That new market has generated $22 billion in cumulative worldwide sales and $3.067 billion in U.S. sales in 2023 alone. Appx5778-5779(¶20). Novartis has consistently identified ENTRESTO® as its top "key growth driver" in recent years. Appx5778-5779(¶20).

An at-risk launch would crater this market and destroy Novartis's position in it. As Dr. Velluturo explains, "[g]eneric entry invariably has a profound effect on the demand for a price of the corresponding branded drug, ultimately leading to the virtual extinction of the brand." Appx5788-5789(¶40). These effects occur immediately, with ENTRESTO® projected to lose ▮%▮ of forecasted new-to-brand prescriptions in the first month after a generic launch. Appx5794-5795(¶54).

The financial effects would be devastating. Entry of a single infringing generic product would result in lost market share, sales, and price erosion resulting in lost profits of at least ▮Amount▮ in four months. Appx5800(¶65). And if MSN's at-risk launch triggers the entry of additional infringing competitors, as expected, the estimated losses would be far higher. Appx5800(¶65).

For multiple reasons, these harms would be irreparable. First, there would be no coming back from the price erosion an at-risk launch would cause. Large third-party payers—private insurance plans, managed care organizations, Medicare, and Medicaid—account for most prescription-drug spending. Appx5786-5787(¶¶34-35). These large payers "often refuse to agree to significant price increases and would likely resist" efforts to restore ENTRESTO®'s price following price cuts from an at-risk launch. Appx5802-5803(¶69). Such a request might even "strain Novartis's relationships with certain payers." Appx5802-5803(¶69). This Court thus has recognized the irreparable harm from irreversible price erosion and

46

loss of goodwill caused by an infringing generic competitor.  *Abbott Lab'ys v. Sandoz*, 544 F.3d 1341, 1361-62 (Fed. Cir. 2008); *Sanofi-Synthelabo v. Apotex*, 470 F.3d 1368, 1382 (Fed. Cir. 2006).  The district court's order does not address this irreversible harm.  Appx6-9.

Second, given previous public disclosures about its revenues and the economics of generic pharmaceutical manufacturing, it is exceedingly unlikely MSN could fully compensate Novartis's losses.  Appx5799-5802(¶¶63-67).  MSN's executive director offered merely that MSN could pay ██Amount██ in damages, but Novartis's damages are expected to be much higher.  Appx6880-6881(¶¶8-11); *supra* pp. 45-46.  Additionally, if Novartis proves infringement during the upcoming December trial (as is likely), it will be entitled—without any showing on the equities—to revocation of MSN's ANDA approval until the '918 patent expires.  35 U.S.C. § 271(e)(4)(A); *Vanda Pharms. v. West-Ward Pharms. Int'l*, 887 F.3d 1117, 1138 (Fed. Cir. 2018).  Given the irreversible changes in the market that a generic launch would cause, MSN's at-risk launch would render that relief all but worthless, further demonstrating Novartis could not be made whole after the judgment.

Third, the total damage is unquantifiable.  Even Novartis has consistently under-forecasted ENTRESTO®'s net revenues.  Appx5797-5798(¶¶58-60).  And the difficulty in predicting ENTRESTO®'s sales has only become more pronounced over time—Novartis's forecasts for the first half of 2024 were far less accurate than

its forecasts for 2021.  Appx6155.  That difficulty reflects the dynamic ENTRESTO®

market and unpredictable growth in demand driven by "recent clinical trials and

updated clinical guidelines."  Appx5798(¶61).  Lost profits would thus be difficult

to calculate and any calculation would likely understate Novartis's actual damages.

Appx5796-5799(¶¶58-62); *see Natera*, 106 F.4th at 1379 (recognizing irreparable

harm based on "challenging to quantify" losses); *Celsis in Vitro v. CellzDirect*, 664

F.3d 922, 930-31 (Fed. Cir. 2012) (similar).

Fourth, the quantifiability problem would be compounded because the effects

from lost sales to generic competition would snowball into other harms that are also

impossible to predict and would be difficult to quantify.  MSN's at-risk launch could

force Novartis "to scale down" "investments," including in "the ENTRESTO sales

force" and "patient support programs."  Appx5803(¶70).  Novartis would be unable

to restore these investments to previous levels.  Appx5804(¶72).  ENTRESTO®'s

sales force also supports other medications, and "[t]he accelerated reduction" in

"sales force personnel and resources would thus likely translate" to non-

compensable lost sales for those products.  Appx5806(¶75).  Reducing programs to

educate patients and physicians about the relative superiority of valsartan-sacubitril

treatments would lead to lost sales volume "unlikely ever to be recovered."

Appx5805-5806(¶74).

Finally, MSN's infringement would be the cause of these harms. *Apple v. Samsung Elecs.*, 809 F.3d 633, 641-642 (Fed. Cir. 2015). MSN seeks to market generic products to compete directly with ENTRESTO®, and MSN's products were approved by piggybacking on Novartis's NDA for ENTRESTO®. MSN must use the manufacturing process proposed in its ANDA and, as shown, that process necessarily results in final drug products that infringe the '918 patent. *Supra* Part A. As this Court recently confirmed, when infringement is a prerequisite to offering a competing product, the causal-nexus standard is met. *Natera*, 106 F.4th at 1380. The district court rightly made no contrary finding.

## 2. *The district court erroneously relied on MSN's unfounded representations*

The district court discounted Novartis's ample showing of irreparable harm only by uncritically accepting MSN's bald representations that Novartis's damages could be fully assessed and compensated. Appx6-9. That was clear error. A factual finding is unsupported where it relies only on conclusory testimony, even from a purported expert. *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012) (damages expert's "superficial recitation" of legal standard "followed by conclusory remarks" insufficient to support jury verdict).

As an initial matter, the district court never addressed Novartis's showing of irreversible price erosion. Appx6-9. To the extent it believed price erosion could be compensated by money damages, it erred. This Court has recognized that

irreversible price erosion is a form of irreparable harm despite the availability of infringement damages. *Abbott*, 544 F.3d at 1361-62. Also, the district court assessed MSN's ability to pay by relying on damages calculations that assume MSN would pay for Novartis's harm only during the course of the at-risk period. Appx6880-6881(¶¶8-9) ███████ Financial Information ███████ ██ Financial ██. The calculations do not figure in price erosion lasting well beyond that time frame.

In any event, the district court also erred by accepting without meaningful analysis MSN's assertions that "Dr. Vellturo overstates Novartis's potential loss and understates MSN's potential revenue." Appx8. That was error because MSN's expert, Dr. McDuff, relied on incorrect assumptions that fatally undermine his conclusions. McDuff dismissed out of hand the possibility that Novartis's sales would decline more than ██% and that the ████████ Cause of Harm ████████ ██ Harm ██. Appx6392(¶17); Appx6394-6395(¶¶23-24). Nor would MSN's at-risk-launch profits enable it to compensate Novartis. MSN's profit estimations fail to account for price competition pushing MSN's pricing even lower. Appx6394-6395(¶23).

The only other basis for the district court's conclusion that MSN could pay a damages award was MSN's self-serving representations that it could. Relying on those representations was also error. First, the district court put great weight on

MSN's supposed "prior experience in conducting at-risk launches." Appx8. But the only previous at-risk launches MSN identified were for Tasimelteon and Pirfenidone. Appx6880(¶5). MSN provides no evidence it actually launched either drug at-risk, let alone that MSN was able to compensate the innovators there for any damages award. Indeed, litigation related to Tasimelteon resulted in a stipulated consent judgment permanently enjoining MSN from selling its generic equivalent without a license from the patentee. Stipulation for Entry of Consent Judgment and Permanent Injunction as to MSN Pharms. Inc. and MSN Laby's Private Ltd., *Vanda Pharms. Inc. v. Teva Pharms. USA, Inc.*, No. 1:18-cv-00651-CFC (D. Del. Jan. 19, 2022), ECF No. 281. Litigation between MSN and Genentech related to Pirfenidone ended with a similar decree. Consent Order of Dismissal, *Genentech, Inc. v. Laurus Labs Ltd. et al.*, No. 1:19-cv-00078-RGA (D. Del. Jan. 2, 2020), ECF No. 93. It is thus far from clear whether MSN has experience launching at-risk, rather than just threatening to do so.

MSN's other arguments are equally unfounded. The district court apparently accepted the bare representation of MSN's executive director that "MSN's current financial condition would allow it to cover the difference between escrowed sales and Novartis's lost profits." Appx8. But MSN's blithe assurances carry little weight. For one, they assume, based on back-of-the-envelope calculations, a much lower damages figure than that calculated by Dr. Vellturo. *Compare* Appx6880(¶8)

51

*with* Appx5800(¶65).  Additionally, MSN asserts it can pay any difference between the damages figure it estimates and Novartis's actual injury based on things like "cash and reserves, and anticipated profits from sales of other products." Appx6879(¶3), Appx6881(¶11).  But because MSN fails to disclose its █Financial Information█, the figures it does provide are cold comfort.

Similarly baseless are MSN's arguments, also relied on by the district court, that it might choose to obtain insurance to cover any liability and that it can mitigate its exposure by limiting the amount of its products manufactured and distributed in the United States.  MSN offers no evidence, beyond its executive director's speculation, that it could obtain insurance to cover its substantial potential liability at this late stage of this case.  Appx6881(¶13).  And its assertion that it could limit its liability during the roughly four-month at-risk period appears at odds with its subsequent representation that it has █Business Strategy█ █Business Strategy█ █Business█ Appx6882(¶15).  Regardless, that MSN must even consider these options is yet more evidence that it does not actually possess the financial wherewithal to pay Novartis's likely damages.

The district court was also wrong to believe that Novartis's harm was quantifiable.  Appx7-8.  The district court ignored, without serious analysis, the factors that would make an accurate damages calculation nearly impossible here.

Appx7-8. The only factor it mentioned, in a footnote, was that ENTRESTO® sales have been historically difficult to forecast. Appx7 n.10. The district court disregarded this point, believing "the parties would have the benefit of actual sales and market data on which to base or adjust their damages models." Appx7 n.10. But a generic launch would change the market fundamentally. If MSN were to launch, past sales and market data could not capture what ENTRESTO®'s market performance would have been in the "but-for" world without generic competition. Appx5805-5806(¶¶73-74).

The district court's remaining criticisms of Novartis's irreparable harm showing were equally wrong. It dismissed the follow-on harms from Novartis's massive financial injury, including non-compensable injury to other product lines, as "profit-maximizing business decisions." Appx7. But this Court has recognized similar facts as supporting irreparable harm. *Celsis*, 664 F.3d at 930 ("loss of business opportunities"); *Apotex*, 470 F.3d at 1383 ("potential reduction in work force" and "discontinuance of clinical trials").

The district court also refused to consider the additional harms that would follow if MSN's launch caused other generic pharmaceutical manufacturers to launch their own valsartan-sacubitril products at risk. Appx6-7. But the irreparable harm analysis is not a damages calculation, and the district court cited no authority from this Court or otherwise supporting its view that "actions taken by other generic

drug makers" could not be considered. Appx 6-7. Indeed, the district court was inconsistent on this very point, seeming to consider the actions of other generic drug manufacturers when it subsequently considered the harm entering an injunction would inflict on MSN by depriving it of a supposed "first-mover advantage" vis-à-vis other generic manufacturers. Appx9.

### C.    The Equities Favor an Injunction

The public interest and equities also weigh in favor of an injunction. On public interest, this Court has "long acknowledged the importance of the patent system in encouraging innovation." *Apotex*, 470 F.3d at 1383. That is especially true in the pharmaceutical context because the incentive to invest "in drug research and development" "would be adversely affected by taking market benefits away from the patentee and giving them to [an] accused infringer." *Celsis*, 664 F.3d at 931-32. Those interests are amplified here because, as explained, generic entry would also cause heart-failure patients to suffer from reduced investments in patient-support programs and educational campaigns. Appx5808-5809(¶81). Such permanently reduced investment in patient outreach may cause a significant number of heart-failure patients to forgo treatment with any sacubitril/valsartan drug—whether ENTRESTO® or a generic—thereby depriving them of the significant clinical benefits the combination offers over other drugs. Appx5802-5803(¶¶69-70). And contrary to the district court's reasoning, this harm cannot be offset by the

availability of cheaper generics.   Appx9-10.   Patients who never learn about sacubitril/valsartan will not take it, regardless of its price.

The significant harm to Novartis and the public outweighs any harm MSN would suffer.  At a minimum, it is undisputed that Novartis stands to lose more revenue than MSN.    MSN.Opp.23-24;  Appx5807-5808(¶79);  Appx6881(¶9). Novartis's harms will also outweigh MSN's because, as discussed, they will continue even after MSN's infringement is permanently enjoined.   Appx5807-5808(¶9); *supra* Part B.  The district court believed otherwise because it thought MSN would lose a "first-mover advantage." Appx9.  But MSN has conceded a bond would secure its alleged harms.  MSN.Opp.25-26.

## CONCLUSION

This Court should reverse and order MSN enjoined from making, using, offering to sell, or selling in the United States, or importing into the United States MSN's generic versions of ENTRESTO® until such time as either a final judgment is entered in this action or the Court orders otherwise.

Dated:  August 20, 2024                    Respectfully submitted,

                                           /s/ Deanne E. Maynard

CHRISTOPHER E. LOH                         DEANNE E. MAYNARD
JARED L. STRINGHAM                         SETH W. LLOYD
VENABLE LLP                                MORRISON & FOERSTER LLP
151 W. 42nd Street, 49th Floor             2100 L Street NW, Suite 900
New York, NY 10036                         Washington, DC 20037
                                           Tel.:  (202) 887-8740
REBECCA E. WEIRES                          DMaynard@mofo.com
MORRISON & FOERSTER LLP
707 Wilshire Boulevard                     JOEL F. WACKS
Los Angeles, CA 90017                      MORRISON & FOERSTER LLP
                                           425 Market Street
                                           San Francisco, CA 94105

*Counsel for Novartis Pharmaceuticals Corporation*

# ADDENDUM

# NOVARTIS PHARMACEUTICALS CORPORATION V. MSN PHARMACEUTICALS, INC.

## Case No. 24-2211 (Fed. Cir.)

## ADDENDUM TABLE OF CONTENTS

| Date | Document | Page |
|------|----------|------|
| 8/12/2024 | Memorandum Order Denying Novartis's Motion for Preliminary Injunction | Appx1 |
| 5/31/2024 | Memorandum Opinion on Claim Construction | Appx12 |
| | U.S. Patent No. 11,096,918 | Appx67 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re Entresto (Sacubitril/Valsartan) Patent Litigation | Civil Action No. 20-md-2930-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION, | |
| Plaintiff, | |
| v. | Civil Action No. 22-1395-RGA |
| MSN PHARMACEUTICALS INC., MSN LABORATORIES PRIVATE LIMITED, MSN LIFE SCIENCES PRIVATE LIMITED, GERBERA THERAPEUTICS, INC., and NANJING NORATECH PHARMACEUTICAL CO., LIMITED, | |
| Defendants. | |

MEMORANDUM ORDER

Before me is Plaintiff Novartis's motion for preliminary injunction. (D.I. 213).[1] I have considered the parties' briefing. (D.I. 214, 227). I heard oral argument on August 9, 2024.[2]

For the reasons set forth below, this motion is DENIED.

## I. BACKGROUND

Novartis holds New Drug Application ("NDA") No. 207620 for Entresto® (sacubitril/valsartan) tablets. (D.I. 1 ¶ 113). Entresto® is indicated "to reduce the risk of cardiovascular death and hospitalization for heart failure in adult patients with chronic heart

---

[1] Docket citations are to Civil Action No. 22-1395 unless otherwise specified.

[2] Citations to the transcript of the argument, which is not yet docketed, are in the format "Hearing Tr. at ___."

1

Appx1

failure, and for the treatment of symptomatic heart failure with systemic left ventricular systolic dysfunction in pediatric patients aged one year and older." (*Id.*). Several drugmakers, including Defendants MSN Pharmaceuticals Inc., MSN Laboratories Private Limited, and MSN Life Sciences Private Limited (collectively, "MSN"), have filed ANDAs seeking FDA approval to launch generic sacubitril/valsartan products. (*See, e.g., id.* ¶¶ 9, 19, 31, 64, 73). This case is one of several patent infringement actions filed by Novartis against these generic drugmakers based on Entresto®-related patents. (*See* MDL No. 20-2930-RGA).

On October 24, 2022, Novartis filed a complaint alleging infringement of U.S. Patent No. 11,096,918 (the "'918 patent") by MSN and several other defendants. (D.I. 1). The '918 patent covers the amorphous solid form of a compound ("TVS") present in Entresto® that is comprised of sacubitril, valsartan, and sodium cations. The patent expires on November 8, 2026. (D.I. 1 ¶ 120). Claim 1 of the '918 patent recites:

> 1. An amorphous solid form of a compound comprising anionic [valsartan[3]], anionic [sacubitril[4]], and sodium cations in a 1:1:3 molar ratio.

('918 patent, 32:42–46). Following a Markman hearing, I construed "an amorphous solid form of a compound" to mean "a solid form of a compound in which the amorphous form of the compound predominates. An amorphous solid form is mutually exclusive from a crystalline solid form, but not necessarily mutually exclusive from a partially crystalline solid form." (D.I. 194 at 5).[5]

---

[3] The chemical name "(S)-N-valeryl-N-{[2'-(1H-tetrazole-5-yl)-biphenyl-4-yl]-methyl}-valine" recited in claim 1 describes valsartan.

[4] The chemical name "(2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester" recited in claim 1 describes sacubitril.

[5] Neither side contests the claim construction for the purposes of this motion. (Hearing Tr. at 24:15–25:12, 50:3–10, 66:8–12).

On July 24, 2024, MSN received final FDA approval for its ANDA product. (D.I. 210 at 1; D.I. 211 at 1). Novartis moves for a preliminary injunction to prevent the prospective at-risk launch of MSN's generic sacubitril/valsartan product. (D.I. 213). Should its motion be denied, Novartis moves for a short stay to allow Novartis to seek injunctive relief from the Federal Circuit. (*Id.*). MSN also moves to strike (D.I. 237) portions of Dr. Matzer's declaration (D.I. 221), which was submitted by Novartis in support of its motion for preliminary injunction.[6]

## II.    LEGAL STANDARD

"The decision whether to enter a preliminary injunction is committed to the sound discretion of the trial court." *Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1437 (3d Cir. 1994) (quoting *Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co.*, 963 F.2d 628, 633 (3d Cir. 1992)). The Third Circuit has cautioned that a preliminary injunction is "an extraordinary remedy" to be granted "only in limited circumstances." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989)). When seeking a preliminary injunction, a movant "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The movant must establish the first two requirements before a court considers, to the extent relevant, the remaining two prongs of the standard. *Cipla Ltd. v. Amgen Inc.*, 778 F. App'x 135, 138 (3d Cir. 2019).

---

[6] Due to the accelerated timeline, Novartis did not have the opportunity to file a response to MSN's motion to strike. Both parties addressed the motion during oral argument. (*See* Hearing Tr. at 3:22–16:12).

3

## III.  DISCUSSION

### A.  Likelihood of Success on the Merits

Novartis argues it is likely to succeed in showing that claim 1 of the '918 patent is valid and infringed by MSN's ANDA product.  (D.I. 214 at 3–14).  MSN challenges Novartis's likelihood of success of proving infringement, but MSN does not raise any arguments regarding validity.  (*See* D.I. 227 at 2–17).

Novartis asserts that testing performed by its expert, Dr. Matzger, revealed that the drug substance in MSN's product contains a small amount of amorphous TVS and does not contain crystalline TVS.[7]  (D.I. 214 at 6).  Novartis contends the drug substance in MSN's ANDA product, which MSN claims is a crystalline TVS complex and which the parties refer to as "Form-S," is actually a physical mixture of separate crystalline valsartan disodium and separate crystalline sacubitril sodium.  (*Id.*).  Novartis argues that the amorphous TVS compound therefore necessarily predominates over the (non-existent) crystalline TVS compound.  (*Id.*).

MSN argues that Novartis has not shown it is likely to succeed in proving MSN's product contains amorphous TVS.  (D.I. 227 at 4–6, 10–15).  Novartis's identification of amorphous TVS within MSN's ANDA product relies on Dr. Matzger's Raman mapping data.  (D.I. 214 at 4–5).  MSN notes that Dr. Matzger did not compare the spectra he obtained from MSN's API to Form-S reference spectra.  (D.I. 227 at 10).  MSN and its expert, Dr. Steed, argue that Dr. Matzger's test results were therefore based on incomplete data.  (D.I. 227 at 10; D.I. 232 ¶¶ 136–37, 141–49; Hearing Tr. at 66:13–73:6).  MSN asserts that, when the comparison is made

---

[7] As I stated during oral argument, I am doubtful of MSN's contention that Dr. Matzger's declaration presented a new infringement theory as opposed to responding to arguments made by MSN's expert.  (Hearing Tr. at 8:16–14:25).  If I needed to rule on it, I would deny it.  I nevertheless do not think I need to rule on it as I find Novartis fails to meet its burden even after full consideration of Dr. Matzger's declaration.  Thus, I will dismiss the motion to strike as moot.

4

between MSN's API spectra and the Form-S reference spectra, the peaks in MSN's API spectra that Dr. Matzger points to as proving the presence of amorphous TVS more closely match the peaks in MSN's Form-S reference spectra than those in amorphous reference spectra. (D.I. 227 at 10; D.I. 232 ¶¶ 136–37, 141–49; Hearing Tr. at 66:13–73:6). Novartis argues the criticism that Dr. Matzger did not use Form-S reference spectra is misplaced because Form-S is not in fact a crystalline TVS complex but a physical mixture of individual crystalline valsartan disodium and individual crystalline sacubitril sodium. (Hearing Tr. at 41:14–42:2). Even if I accept Novartis's assertion as true, however, Dr. Steed's declaration still undermines Dr. Matzger's conclusions by supporting MSN's position that the amorphous regions Dr. Matzger identified are not actually amorphous TVS. I find that Novartis has not met its burden of showing it is likely to succeed in proving MSN's ANDA products contain amorphous TVS.

Furthermore, I find Novartis has not shown it is likely to succeed in proving that Form-S is a physical mixture rather than a crystalline complex. MSN argues that XRPD, Raman, FT-IR, and DSC testing data submitted with its ANDA demonstrates that Form-S is not a physical mixture or amorphous. (D.I. 227 at 3–6, 16–17; D.I. 232 ¶¶ 98, 102, 104–05, 109–12, 175–78, 185–90; Hearing Tr. at 56:5–59:17, 81:16–84:19). Novartis challenges the ANDA testing as flawed because MSN never compared Form-S data to physical mixture data. (Hearing Tr. at 44:10–45:5, 47:18–25, 88:10–25; D.I. 221 ¶¶ 33–34, 50–52). Novartis also contends that MSN's Raman data proves Form-S is a physical mixture. In particular, Novartis argues there are variations between the Raman spectra of the two samples of Form-S that would not be present if Form-S was a crystalline complex. (D.I. 221 ¶¶ 98–100; Hearing Tr. at 46:15–17). Novartis cites Dr. Matzger's Raman data in support of its position that Form-S was a physical mixture. (D.I. 214 at 4–5; D.I. 221 ¶¶ 60–68; Hearing Tr. at 28:17–36:1). MSN argues that Dr. Matzger's

Raman mapping does not show that MSN's API is a physical mixture or amorphous TVS, noting that MSN's Raman spectra from the two samples of Form-S contained different peaks from those that Dr. Matzger relies on to characterize the drug substance. (D.I. 227 at 16; D.I. 232 ¶¶ 180–187; Hearing Tr. at 81:16–13). In the face of supporting test data and what appear to be valid criticisms of said test data from both sides, I am unable to find that the record favors finding Form-S to be one of a physical mixture or a crystalline complex. Novartis bears the burden of proof, both on infringement and on showing likelihood of success. I find it has not met the burden it bears at this stage with regards to demonstrating that Form-S is a physical mixture.[8]

For the reasons above, I conclude Novartis has not shown it is likely to succeed on the merits of showing infringement.

### B. Irreparable Harm

Novartis contends it will suffer irreparable harm absent an injunction. (D.I. 214 at 14–18). As an initial matter, I am skeptical about Novartis's characterization of many of its potential harms. For example, Novartis maintains "[a]n at-risk launch by MSN . . . is also likely to trigger at-risk launches by several other generic drugmakers, thereby destroying Entresto®'s market momentum and causing Novartis to suffer immediate irreparable harm in the form of lost sales, lost market share, loss of formulary position, and price erosion." (*Id.* at 15). I do not find it reasonable to attribute harm resulting from the actions taken by other generic drug makers to

---

[8] In its answering brief, MSN argued Novartis would be unable to show infringement even if the drug substance in MSN's product were proven to be a physical mixture. (D.I. 227 at 17). MSN argued Novartis's infringement theory contradicts my explanation that "construing the term ['amorphous solid form of a compound'] does . . . require looking at looking at the overall makeup of the components within the 'mixture.'" (*Id.*). As MSN did not raise this contention at oral argument and I have ruled in MSN's favor on other grounds, I take no stance on this issue.

MSN's decision to launch its own individual product.[9] Nor do I think it fair to attribute to MSN the harm of impaired promotion of Novartis's other cardiovascular drugs, which would result from Novartis's own profit-maximizing business decision to decrease its cardiovascular product salesforce in response to MSN's launch. (*See id.* at 17–18).

In any event, I believe Novartis has not shown its asserted harms cannot be remedied through monetary damages. *See Automated Merch. Sys., Inc. v. Crane Co.*, 357 F. App'x 297, 301 (Fed. Cir. 2009) ("The burden is . . . on the patentee to demonstrate that its potential losses cannot be compensated by monetary damages."). Novartis and its expert, Dr. Vellturo, offer two main arguments in support of a finding of irreparability, neither of which I find sufficient.

Novartis argues that the "full extent of [its] losses will be difficult—if not impossible—to calculate." (D.I. 214 at 17). Novartis argues that estimating damages would be difficult due to the "complicated and changing dynamics of the heart failure drug market," "uncertainty over how payers will respond to the entry and subsequent withdrawal of generic products," and the "importance of physician and patient education to Entresto®'s continued market momentum." (*Id.* (citing D.I. 219 at ¶¶ 58–62)). The section of Dr. Vellturo's report that Novartis cites in support of this proposition, however, does not discuss these factors.[10] I am unable to find that

---

[9] It also seems perverse to allow Novartis to establish irreparability on this basis. Novartis has entered into settlement agreements with multiple generic drugmakers, which I suspect, based on my experience in dealing with such cases, allow all generics to launch if one generic is able to launch. Such a ruling would effectively allow Novartis to maintain its monopoly by the way it has structured its settlements with other companies that threaten its monopoly.

[10] This section of Dr. Vellturo's report focuses on arguing that, because Novartis's internal predictions continually under-forecasted Entresto®'s annual net sales, any lost profits calculations based on these forecasted sales would also understate lost profits. (*See* D.I. 219 at ¶¶ 58–62). Novartis does not emphasize this argument in its briefing and, in any event, Dr. Vellturo has not convinced me that damages would be impossible to calculate. As Dr. McDuff notes, the parties would have the benefit of actual sales and market data on which to base or adjust their damages models. (*See* D.I. 229 ¶ 19). Furthermore, I agree with Dr. McDuff,

7

Novartis satisfied its burden of establishing that the identified factors (even if I assume their existence) would cause significant difficulty in calculating damages. I agree with the opinion of Dr. McDuff, MSN's expert, that "all of these alleged losses are standard economic analyses that can be quantified and compensated" and that "there are no factors here that make a damages determination particularly unusual or difficult." (D.I. 229 ¶¶ 13–19; *see also Horizon Medicines, LLC v. Alkem Lab'ys, Ltd.*, 2021 WL 10874872, at *1 (D. Del. Aug. 23, 2021) ("Financial harm from launch is complicated, but that is generally true of damages issues in patent cases.")).

Novartis and Dr. Vellturo contend that the monetary damages would likely be beyond MSN's ability to pay. (D.I. 214 at 8–9; D.I. 219 ¶¶ 63–67). I find credible Dr. McDuff's opinion that Dr. Vellturo overstates Novartis's potential loss and understates MSN's potential revenue. (*See* D.I. 229 ¶¶ 21–26 (referencing D.I. 219)). I am confident that MSN, a large generic drugmaker with prior experience in conducting at-risk launches (*see, e.g.*, D.I. 231 ¶ 5 (declaration from an Executive Director of MSN noting two recent at-risk launches conducted by MSN)), would be sufficiently prepared to launch its generic sacubitril/valsartan products without being driven to financial ruin by possible litigation losses. (*See id.* ¶ 11("MSN's current financial condition would allow it to cover the difference between escrowed sales and Novartis' lost profits based on available cash and reserves, and anticipated profits from sales of other products."); *id.* ¶ 12 ("MSN also has the ability to control and limit the amount/volume of

---

MSN's expert, that the data suggests that the actual sales tend to track the forecasted sales within some reasonable margin of error and that growth appears to follow a relatively stable trend. (*Id.* ¶ 18 (referencing D.I. 219, Fig. 2, at 27)). I am convinced that the parties' damages experts, to the extent that they would base their calculations on Novartis's internal reports, could make appropriate estimates and adjustments to their models to account for these documented understatements. While there would be some uncertainty inherent in these calculations, "all [damages] approximations involve some degree of uncertainty." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015).

8

generic sacubitril-valsartan product it manufactures and distributes in the United States, and thereby mitigate its potential financial exposure."); *id.* ¶ 13 ("MSN has the potential to acquire insurance coverage for the profit differential should the Court award Novartis damages.")).

For the stated reasons, I find Novartis has not established irreparable harm.

### C. Balance of Equities and Public Interest

My findings on the likelihood of success and irreparable harm factors call for denial of Novartis's request for injunctive relief. While I need not address the balance of equities and public interest prongs, I note that they do not support granting Novartis a preliminary injunction.

Novartis argues that the balance of hardships favors granting the injunction because MSN would likely be unable to cover all the monetary damages. (D.I. 214 at 18). As stated above, I am skeptical that MSN would be unable to compensate Novartis for its losses. I am further convinced that MSN's potential harm from the loss of its first-mover advantage would outweigh the potential harm to Novartis. I find the balance of equities does not favor enjoining MSN's launch.

Novartis argues that generic entry will cause public harm because Novartis would be forced to reduce its efforts to educate physicians and patients and to reduce its patient support programs for Entresto®. (*Id.* at 18–19). I do not believe that Novartis would be "forced" to take any such actions. Based on the billions in annual net revenues that Novartis has earned, and continues to earn, from Entresto® sales (D.I. 219, Fig. 2, at 27), I doubt that maintaining its current level of investment for these services would cause Novartis to face financial hardship. As stated above, I find it unreasonable to attribute the harm that would result from Novartis's profit-driven actions to MSN's launch. I also agree with MSN that the possible decrease in public awareness is likely outweighed by the increased accessibility and affordability of

9

sacubitril/valsartan drugs that would result from generic competition. (*See* D.I. 227 at 12–13). I find the public interest factor favors denying injunctive relief.

### D. 34 U.S.C. § 271(e)(4)(A)

Novartis additionally seeks injunctive relief under 34 U.S.C. § 271(e)(4)(A). (D.I. 214 at 19). Section 271(e)(4)(A) states, "For an act of infringement . . . the court shall order the effective date of any approval of the drug or veterinary biological product involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed." No finding of infringement has yet been made. Novartis does not identify any cases indicating § 271(e)(4)(A) provides a basis for a district court to grant a preliminary injunction. Nor do I think the statute provides such authority. As stated above, I also do not find Novartis is likely to succeed in proving infringement. I decline to grant injunctive relief under § 271(e)(4)(A).

## IV. CONCLUSION

For the reasons above, Novartis's motion for preliminary injunction (D.I. 213) is **DENIED.**

MSN's motion to strike (D.I. 237) is **DISMISSED AS MOOT**.

I will grant Novartis's request for a stay (*id.*) to allow Novartis to seek injunctive relief from the Federal Circuit. I expect Novartis to appeal this Memorandum Order by filing a notice of appeal today. I further expect Novartis to file emergency motions in the Court of Appeals as soon as possible. With that understanding, Novartis and MSN are hereby ordered to maintain the status quo for 72 hours from the issuance of this Memorandum Order. I expect the Court of Appeals is in the best position to decide whether to continue the stay, and, if it does, for how long.

IT IS SO ORDERED.

Entered this **12**th day of August, 2024

United States District Judge

11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re Entresto (Sacubitril/Valsartan) Patent Litigation | Civil Action No. 20-md-2930-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION, | |
| Plaintiff, | |
| v. | Civil Action No. 22-cv-1395-RGA |
| MSN PHARMACEUTICALS INC., MSN LABORATORIES PRIVATE LIMITED, MSN LIFE SCIENCES PRIVATE LIMITED, NANJING NORATECH PHARMACEUTICAL CO., LIMITED, and GERBERA THERAPEUTICS INC., | |
| Defendants. | |

## MEMORANDUM OPINION

Daniel M. Silver, Alexandra M. Joyce, Maliheh Zare, MCCARTER & ENGLISH, LLP, Wilmington, DE; Nicholas N. Kallas, Christina Schwarz, Christopher E. Loh, Susanne Flanders, Jared L. Stringham (argued), Shannon Clark, Laura Fishwick, Gregory J. Manas, VENABLE LLP, New York, NY,

    Attorneys for Plaintiff.

Stamatios Stamoulis, Richard Charles Weinblatt (argued), STAMOULIS & WEINBLATT LLC, Wilmington, DE; Ronald M. Daignault, Richard Juang, DAIGNAULT IYER LLP, Vienna, VA,

    Attorneys for Defendant MSN Pharmaceuticals Inc., MSN Laboratories Private Limited, and MSN Life Sciences Private Limited.

Dominick T. Gattuso, Denise S. Kraft, HEYMAN ENERIO GATTUSO & HIRZEL, LLP, Wilmington, DE; Don J. Mizerk, Matthew M. Kamps (argued), HUSCH BLACKWELL LLP, Chicago, IL; Thomas P. Heneghan, HUSCH BLACKWELL LLP, Madison, WI,

    Attorneys for Defendant Nanjing Noratech Pharmaceutical Co., Limited and Gerbera Therapeutics, Inc..

May _31_, 2024

1

ANDREWS, U.S. DISTRICT JUDGE:

Before me is the issue of claim construction of one term in U.S. Patent No. 11,096,918 ("the '918 patent"). The parties submitted a Joint Claim Construction Brief. (D.I. 146).[1] I heard oral argument on March 12, 2024. (Markman Tr.).[2] At my request, the parties submitted post-*Markman* hearing supplemental briefing. (D.I. 163, 164, 165).

## I.    BACKGROUND

On October 24, 2022, Plaintiff Novartis filed a complaint alleging infringement of the '918 patent by Defendants MSN Pharmaceuticals Inc., MSN Laboratories Private Limited, MSN Life Sciences Private Limited, and Nanjing Noratech Pharmaceutical Co., Limited. (D.I. 1). The complaint also accused several other firms who have since been terminated from this case. (*See* D.I. 68, 124, 140, 151). Gerbera Therapeutics Inc. was joined as a Defendant on April 26, 2024. (D.I. 181). This case is part of a group of patent infringement actions related to Plaintiff's Entresto product and associated patents. (*See* MDL No. 20-2930-RGA). The '918 patent covers the amorphous solid form of a compound ("TVS") present in Entresto that is comprised of sacubitril, valsartan, and sodium cations. (*See* D.I. 1 ¶ 1; '918 patent; Abstract). The '918 patent descends from U.S. Patent No. 9,388,134 ("the '134 patent") and U.S. Patent No. 8,877,938 ("the '938 patent"). The '134 patent is a child of the '938 patent. The '134 and '938 patents cover a compound ("TVSH") comprised of sacubitril, valsartan, sodium cations, and water molecules. (*See* D.I. 146 at 5; '134 patent, 31:41–45; '938 patent, 30:56–63).

---

[1] Docket citations are to Civil Action No. 22-1395 unless otherwise specified.

[2] Citations to the transcript of the argument, which is docketed as D.I. 172, are in the format "Markman Tr. at __."

2

## II.  LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (alteration in original) (quoting *Phillips*, 415 F.3d at 1324). When construing patent claims, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977–80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotation marks omitted). "While claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed. Cir. 2012) (citing *Phillips*, 415 F.3d at 1323).

"[T]he words of a claim are generally given their ordinary and customary meaning. . . . [Which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312–13 (citations and internal quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim

3

construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

When a court relies solely upon the intrinsic evidence—the patent claims, the specification, and the prosecution history—the court's construction is a determination of law. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015). The court may also make factual findings based upon consideration of extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317–19 (quoting *Markman*, 52 F.3d at 980). Extrinsic evidence may assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention works. *Id.* Extrinsic evidence, however, is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

## III.  CONSTRUCTION OF DISPUTED TERM

The parties agree that claim 1 of the '918 patent is representative for the purpose of claim construction. Claim 1 states:

1.  *An amorphous solid form of a compound* comprising anionic [valsartan[3]], anionic [sacubitril[4]], and sodium cations in a 1:1:3 molar ratio.

('918 patent, 32:42–46 (disputed terms bolded and italicized)).

---

[3] The chemical name "(S)-N-valeryl-N-{[2'-(1H-tetrazole-5-yl)-biphenyl-4-yl]-methyl}-valine" recited in claim 1 describes valsartan.

[4] The chemical name "(2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester" recited in claim 1 describes sacubitril.

4

1. **"an amorphous solid form of a compound" ('918 patent, claims 1–2)**

   a. *Plaintiff's proposed construction*: no construction necessary; to the extent claim construction is required, "an amorphous solid form of a compound."[5]
   b. *Defendants proposed construction*: "a substantially pure amorphous solid form of a compound"
   c. *Court's construction*: "a solid form of a compound in which the amorphous form of the compound predominates. An amorphous solid form is mutually exclusive from a crystalline solid form, but not necessarily mutually exclusive from a partially crystalline solid form."

The parties dispute what limitation, if any, the claims contain regarding the purity of the claimed amorphous compound.[6] Plaintiff contends there is no such limitation. Defendants maintain that the amorphous compound must be "substantially pure."

Plaintiff maintains that, in "[a] mixture that contains the amorphous compound as well as other things, that amorphous compound in that mixture is still amorphous TVS. The other components that are present in that mixture with the amorphous TVS really are irrelevant to the claim construction . . . ." (Markman Tr. at 6:8–7:19). As an initial matter, I understand what Plaintiff refers to as a "mixture" to be the "amorphous solid form of a compound" at issue in the claim construction dispute, while the "compounds" and "components" refer to the molecules that make up the solid. This interpretation is consistent with the parties' agreement that a different solid form of the compound referenced in the specification, the "partially crystalline" solid form, "is a mixture of crystalline and amorphous forms." (D.I. 147-1, Ex. A ¶ 31; Markman Tr. at 15:8–10; *see* '918 patent, 17:43–45). This understanding is consistent with Judge Stark's adoption of a purity requirement for the '938 and '134 patent claims covering the crystalline

---

[5] I am not sure what Plaintiff is trying to accomplish by proposing that the alternative to no construction is a construction that is word for word the same as the disputed term.

[6] Purity, in the context of the present dispute over the amorphous solid form of TVS, relates to the percentage of the compound that is amorphous rather than crystalline.

solid forms of TVSH.[7] (*See* D.I. MDL 20-2930, D.I. 294 at 8). Applying Plaintiff's proposition to the '938 and '134 patent, *i.e.* that one only need to pay attention to the crystalline TVSH "components" within the "mixture," would render the substantial purity requirement for crystalline TVSH meaningless. I therefore disagree with Plaintiff's assertion that construing the term at issue does not require looking at the overall makeup of the components within the "mixture."

Under this understanding, Plaintiff's position is essentially that any presence of amorphous molecules allows a solid form of a compound to be considered amorphous. (*See* Markman Tr. at 46:1–7). This interpretation conflicts with the prosecution history. During prosecution of the '918 patent, Plaintiff submitted a declaration by Dr. Michael J. Cima. (*See* D.I. 147-1, Ex. 9). Dr. Cima's declaration explains that amorphous and crystalline solid forms are distinguishable and exhibit different properties. (*See id.* ¶ 14 ("Morissette states that co-crystals have the potential to be much more useful in pharmaceutical products than solvates or hydrates. However, this is not pertinent or informative with respect to amorphous solids.") (citation omitted) (cleaned up); *id.* ¶ 17 ("Generally speaking, an amorphous complex of two drugs is not necessarily easier to form than a crystalline complex of these drugs. Likewise, the formation of such an amorphous complex is not any more reasonably predictable than the formation of the crystalline complex."); *id.* ¶ 18 ("Rodriguez-Spong notes that an amorphous solid form of a compound can exhibit greater solubility or bioavailability than the crystalline solid form of the same compound. *See* Rodriguez-Spong, p. 252 ('Pharmaceutical glasses or

---

[7] While the '938 and '134 patents do not claim the same compound as the '918 patent, TVSH and TVS are closely related compounds and the patents share similar specifications that discuss substantial purity and solid forms in the same way. (*Compare* '918 patent, 6:40–43, 17:43–45 *with* '134 patent, 6:6–10, 15:63-67 *and* '938 patent, 6:13–17, 16:60–64).

6

amorphous solids present an attractive approach to drug delivery because of their improved bioavailability compared to their crystalline counterparts.').") (emphasis omitted)). The prosecution history thus makes clear that these two forms are distinct from each other.

I note that I do not reach the same conclusion regarding mutual exclusivity between the amorphous solid form and other solid forms, namely the partially crystalline form. Defendants' argument for mutual exclusivity among all forms relies on one sentence from the patent specification: "In the solid state [TVS] can be in the crystalline, partially crystalline, amorphous, or polymorphous form, preferably in the crystalline form." [8] ('918 patent, 17:43–45; *see* D.I. 146 at 12–13). A facial reading of the cited text suggests that these forms are different, but does not exclude the possibility of overlap.[9] Defendants do not point to any intrinsic evidence that suggests these categories are mutually exclusive.[10] In contrast, the parties' agree that the

---

[8] I understand the polymorphous form to be a category not relevant to any issues in this case. I therefore focus on the relationship between the amorphous form and the partially crystalline form.

[9] I asked the parties to search for Federal Circuit case law in support of their positions about whether a series of terms in the specification should be read as suggesting mutual exclusivity. (Markman Tr. at 54:6–56:15). Defendants' identified cases, *Duke Univ. v. BioMarin Pharm. Inc.*, 685 F. App'x 967 (Fed. Cir. 2017) and *Perfect Surgical Techs., Inc. v. Olympus America, Inc.*, 841 F.3d 1004 (Fed. Cir. 2016), appear inapposite and do not affect my reading of the terms. Both cases involve only two terms, rather than a series of terms, determined to be alternatives based on broader context. *See Duke Univ.*, 685 F. App'x at 976 (discussing a precursor form and a mature form of human acid α-glucosidase that were referred to in the specification as "alternative[]" embodiments); *Perfect Surgical Techs.*, 841 F.3d at 1012 (concluding the specification's usage of the disjunctive phrase "or otherwise" in the sentence "the jaws may be perforated or otherwise provided with passages" demonstrated the terms did not refer to the same things).

[10] Defendants did provide extrinsic evidence in the form of an expert declaration by Dr. Edmund J. Elder. (*See* D.I. 147-1, Ex. A). Dr. Elder's opinion is the weakest sort of extrinsic evidence. Dr. Elder bases his opinion on a facial reading of the referenced sentence and what it "states explicitly." (*Id.* ¶ 31). I do not think his opinion is drawing on any scientific expertise, and, in any event, I do not credit it.

7

partially crystalline form of the compound "is a mixture of crystalline and amorphous forms" (D.I. 147-1, Ex. A ¶ 31; Markman Tr. at 15:8–10), which suggests potential overlap along the spectrum of amorphous, partially crystalline, and crystalline forms. I find that the intrinsic record does not support a finding of mutual exclusivity between amorphous and partially crystalline forms.

While I agree with Defendants that construction of the disputed term must distinguish between the amorphous and crystalline forms, I do not agree that "substantially pure" is the proper dividing line. The '918 patent specification only uses the term "substantially pure" in discussing a preferred embodiment. (*See* '918 patent, 6:40–41 ("Preferably, the linked pro-drug is substantially pure . . . .")). "[I]t is improper to read limitations from a preferred embodiment described in the specification . . . into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004). To support its position, Defendants primarily rely on the prosecution histories of the '134 and '938 patents, which are ancestors of the '918 patent. (*See* D.I. 146 at 13).

During prosecution of the '938 patent, Plaintiff and the Examiner agreed that the crystalline form of TVSH must be "substantially pure." (D.I. 147-2, Ex. 5). In construing claim terms of the '938 and '134 patents, Judge Stark ruled that claims covering crystalline compounds in the '134 patent, using the same language as the '938 patent claims, imported this purity limitation. (MDL 20-2930, D.I. 294 at 10–11 (citing *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999))). He declined to apply this requirement to other claims of the '134 patent that are not limited to a crystalline form. (*Id.* at 11 (citing *Ventana Med. Sys., Inc. v. Biogenex Lab'ys, Inc.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006) ("[T]he doctrine of prosecution

8

disclaimer generally does not apply when the claim term in the descendant patent uses different language."); *Broadridge Fin. Sols. Inc. v. Inveshare, Inc.*, 2012 WL 1245723, at *4 (D. Del. Apr. 11, 2012) ("[E]ven if the [parent] patent disclaimer relates to the same subject matter at issue in the [child] patent claims, it may not necessarily affect the [child patent's] claim construction if the claim language is materially different."))).

Defendants argue that their construction adopts "parallel claim language" required to make the disputed term "internally consistent with what came before." (Markman Tr at 42:15–18). I disagree. As I stated at oral argument, Defendants are "seizing on a construction . . . made in a related patent for a different term, based on a different intrinsic record." (*Id.* at 41:9–11). *Ventana* and *Broadridge*, the cases Judge Stark cited in the '134 patent claims that were not limited to crystalline compounds, suggest the limitation should not be applied to the disputed term. *See Ventana*, 473 F.3d at 1182; *Broadridge*, 2012 WL 1245723, at *4.

Defendants appeared to recognize the lack of support for their proposed terminology, as they expressed flexibility with alternative constructions, such as "not partially crystalline" or "isn't trace amounts." (Markman Tr. at 40:17–41:1, 46:1–7). Defendants indicated they were seeking "any construction that . . . distinguishes [the amorphous, partially crystalline, crystalline, and polymorphous] buckets from one another." (*Id.* at 42:12–14). A determination that a construction of the terms should include line-drawing, however, is an insufficient reason to adopt a specific demarcation that is unsupported by the intrinsic record.

While I reject Defendants' formulation, I concede the difficulty of pinpointing an appropriate limitation when the intrinsic record provides virtually no useful guidance. What is clear, from the prosecution history, is that a POSA can identify a compound as existing in an "amorphous solid form," as opposed to other forms (though it may, as indicated above,

9

simultaneously qualify as existing in a partially crystalline solid form). Additionally, an amorphous solid form exhibits certain distinctive properties, as described by Dr. Cima. To embody these properties, rather than properties associated with a crystalline solid, it follows that an amorphous solid form of a compound must be predominantly amorphous. I therefore adopt a definition that encompasses an amorphous solid form's primary nature and its distinctiveness from a crystalline solid form.

## IV.    CONCLUSION

For the reasons stated, I adopt the above construction.



US011096918B2

(12) **United States Patent** 　(10) **Patent No.:** 　US 11,096,918 B2
　Feng et al. 　(45) **Date of Patent:** 　*Aug. 24, 2021

(54) **AMORPHOUS SOLID FORM OF COMPOUNDS CONTAINING S—N-VALERYL-N-{[2'-(1H-TETRAZOLE-5-YL)-BIPHENYL-4-YL]-METHYL}-VALINE AND (2R,4S)-5-BIPHENYL-4-YL-4-(3-CARBOXY-PROPIONYLAMINO)-2-METHYL-PENTANOIC ACID ETHYL ESTER MOIETIES AND SODIUM CATIONS**

(71) Applicant: **Novartis Pharmaceuticals Corporation**, East Hanover, NJ (US)

(72) Inventors: **Lili Feng**, Pine Brook, NJ (US); **Sven Erik Godtfredsen**, Chatham, NJ (US); **Paul Allen Sutton**, Getsville, NY (US); **Mahavir Prashad**, Montville, NJ (US); **Michael J. Girgis**, Montville, NJ (US); **Bin Hu**, Green Brook, NJ (US); **Yugang Liu**, Bridgewater, NJ (US); **Thomas J. Blacklock**, East Hanover, NJ (US); **Piotr Henryk Karpinski**, Lincoln Park, NJ (US)

(73) Assignee: **NOVARTIS PHARMACEUTICALS CORPORATION**, East Hanover, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/579,581**

(22) Filed: **Sep. 23, 2019**

(65) **Prior Publication Data**

US 2020/0016109 A1 　Jan. 16, 2020

**Related U.S. Application Data**

(60) Continuation of application No. 16/006,252, filed on Jun. 12, 2018, now abandoned, which is a continuation of application No. 15/187,872, filed on Jun. 21, 2016, now abandoned, which is a division of application No. 14/311,788, filed on Jun. 23, 2014, now Pat. No. 9,388,134, which is a division of application No. 11/722,360, filed as application No. PCT/US2006/043710 on Nov. 8, 2006, now Pat. No. 8,877,938.

(60) Provisional application No. 60/822,086, filed on Aug. 11, 2006, provisional application No. 60/789,332, filed on Apr. 4, 2006, provisional application No. 60/735,541, filed on Nov. 10, 2005, provisional application No. 60/735,093, filed on Nov. 9, 2005.

(51) **Int. Cl.**
　*A61K 31/216* 　(2006.01)
　*A61K 31/41* 　(2006.01)
　*C07C 233/47* 　(2006.01)
　*C07D 257/04* 　(2006.01)
　*A61K 45/06* 　(2006.01)
　*A61K 31/4422* 　(2006.01)
　*A61K 31/5415* 　(2006.01)
　*C07D 207/50* 　(2006.01)

(52) **U.S. Cl.**
　CPC ............ *A61K 31/216* (2013.01); *A61K 31/41* (2013.01); *A61K 31/4422* (2013.01); *A61K 31/5415* (2013.01); *A61K 45/06* (2013.01); *C07C 233/47* (2013.01); *C07D 207/50* (2013.01); *C07D 257/04* (2013.01); *A61K 2300/00* (2013.01)

(58) **Field of Classification Search**
　CPC ........................... C07C 233/47; C07D 257/04
　See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,954,909 A | 4/1934 | Adler et al. | |
| 2,499,058 A | 2/1950 | Cusic | |
| 2,534,813 A | 12/1950 | Cusic | |
| 3,057,731 A | 10/1962 | Froman et al. | |
| 4,610,816 A | 9/1986 | Berger | |
| 4,722,810 A | 2/1988 | Gordon | |
| 4,740,499 A | 4/1988 | Olins | |
| 4,749,688 A | 6/1988 | Sybertz, Jr. | |
| 4,929,641 A | 5/1990 | Haslanger | |
| 5,217,996 A * | 6/1993 | Ksander ................ | C07C 233/47 514/533 |
| 5,223,516 A | 6/1993 | Loots | |
| 5,250,522 A | 10/1993 | De Lombaert | |
| 5,273,990 A | 12/1993 | De Lombaert | |
| 5,294,632 A | 3/1994 | De Lombaert | |
| 5,376,293 A | 12/1994 | Johnston | |
| 5,399,578 A | 3/1995 | Teruo | |
| 5,520,522 A | 5/1996 | Teruo | |
| 6,248,729 B1 | 6/2001 | Coniglio et al. | |
| 6,262,092 B1 | 7/2001 | Hamanaka | |
| 6,693,216 B2 | 2/2004 | Raczek | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1061404 A | 5/1992 |
| CN | 1097576 A | 1/1995 |

(Continued)

OTHER PUBLICATIONS

Morissette et al. ("High-throughput crystallization: polymorphs, salts, co-crystals and solvates of pharmaceutical solids"; 2004; Advanced Drug Delivery Reviews; 56: 275-300 (Year: 2004).*

(Continued)

*Primary Examiner* — Timothy P Thomas

(57) **ABSTRACT**

An amorphous solid form of a compound comprising the angiotensin receptor antagonist (ARB) valsartan, the neutral endopeptidase inhibitor (NEPi) (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methylpentanoic acid ethyl ester and sodium cations is provided. This compound is useful for the treatment of hypertension and/or heart failure.

**2 Claims, 1 Drawing Sheet**

**US 11,096,918 B2**

Page 2

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,737,430 | B2 | 5/2004 | Pettman |
| 6,869,970 | B2 | 3/2005 | Marti |
| 2002/0098241 | A1 | 7/2002 | Venkatesh |
| 2004/0138274 | A1 | 7/2004 | Watson |
| 2005/0070551 | A1 | 3/2005 | Remenar et al. |
| 2009/0299056 | A1 | 12/2009 | Wang et al. |

FOREIGN PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| CN | 1246482 | A | 3/2000 | | |
| CN | 1397556 | A | 2/2003 | | |
| CN | 1513854 | A | 7/2004 | | |
| CN | 1603326 | A | 4/2005 | | |
| CN | 1651433 | A | 8/2005 | | |
| CN | 1793147 | A | 6/2006 | | |
| CN | 105037289 | A | 11/2015 | | |
| CN | 105503760 | A | 4/2016 | | |
| CN | 105873586 | A | 8/2016 | | |
| CN | 106905253 | A | 6/2017 | | |
| EP | 0034172 | B1 | 5/1983 | | |
| EP | 0342850 | A1 | 11/1989 | | |
| EP | 0343911 | A2 | 11/1989 | | |
| EP | 0361365 | A1 | 4/1990 | | |
| EP | 0443983 | A1 | 8/1991 | | |
| EP | 0498361 | A2 | 8/1992 | | |
| EP | 0509442 | A1 | 10/1992 | | |
| EP | 0636621 | A1 | 2/1995 | | |
| EP | 0726072 | A2 | 8/1996 | | |
| GB | 2218983 | A1 | 11/1989 | | |
| JP | 06234754 | A | 8/1994 | | |
| JP | 07157459 | A | 6/1995 | | |
| WO | 9009374 | A1 | 8/1990 | | |
| WO | 9214706 | A1 | 9/1992 | | |
| WO | 9309101 | A1 | 5/1993 | | |
| WO | 9310773 | A1 | 6/1993 | | |
| WO | 9415908 | A1 | 7/1994 | | |
| WO | 00/02543 | A2 | 1/2000 | | |
| WO | 0073271 | A1 | 12/2000 | | |
| WO | 0073298 | A1 | 12/2000 | | |
| WO | 0174348 | A2 | 10/2001 | | |
| WO | 2002/06253 | A1 | 1/2002 | | |
| WO | 0206253 | A1 | 1/2002 | | |
| WO | WO-0206253 | A1 | * 1/2002 | ........... | A61K 31/41 |
| WO | 0240007 | A1 | 5/2002 | | |
| WO | 02/083066 | A2 | 10/2002 | | |
| WO | 02092622 | A2 | 11/2002 | | |
| WO | 2003/035046 | A2 | 5/2003 | | |
| WO | 03059345 | A1 | 7/2003 | | |
| WO | WO-03059345 | A1 | * 7/2003 | ........... | A61K 31/192 |
| WO | 03066606 | A1 | 8/2003 | | |
| WO | 2003074474 | A2 | 9/2003 | | |
| WO | 2003/089417 | A1 | 10/2003 | | |
| WO | 03/094915 | A1 | 11/2003 | | |
| WO | 03/097045 | A1 | 11/2003 | | |
| WO | 2003097098 | A1 | 11/2003 | | |
| WO | 2004/078163 | A2 | 9/2004 | | |
| WO | 2004/083192 | A1 | 9/2004 | | |
| WO | 2004078161 | A2 | 9/2004 | | |
| WO | 2004101535 | A1 | 11/2004 | | |
| WO | 06086456 | A2 | 8/2006 | | |
| WO | 2007056546 | A1 | 5/2007 | | |
| WO | 2016037552 | A1 | 3/2016 | | |
| WO | 2016049663 | A1 | 3/2016 | | |
| WO | 2016/201238 | A1 | 12/2016 | | |
| WO | 2017009784 | A1 | 1/2017 | | |
| WO | 2017/042700 | A1 | 3/2017 | | |
| WO | 2018/069833 | A1 | 4/2018 | | |
| ZA | 8400670 | A | 1/1984 | | |

OTHER PUBLICATIONS

Rodriguez-Spong et al. ("General principles of pharmaceutical solid polymorphism: a supramolecular perspective"; 2004; Advanced Drug Delivery Reviews; 56:241-274 (Year: 2004).*

"Polymorphism in Pharmaceutical Solids" in Drugs and the Pharmaceutical Sciences 1999, vol. 95 (edited by H. G. Brittain, Marcel Dekker, Inc) pp. 197-199.

Medicinal Chemistry, 2nd Edition, Edited by Zongru Guo: China Medicinal Science and Technology Publishing House Published in Aug. 2003.

Chen 2003 Science Press : Principle and Practice of Single Crystal Structure Analysis, edited by Chen Xiaoming and Cai Jiwen, 2003, Science Press, cover page, copyright page, Table of Contents, pp. 2, 41-44, 126-127.

Shou 2006 Chemical Engineer: Shou Kaisheng, Cultivation of singe crystal for X-ray diffraction test, Chemical Engineer, No. 4, Apr. 2006, pp. 64-66.

Randy Webb Declaration, signed May 11, 2006 (Filed in U.S. Appl. No. 10/341,846).

Applicant's submissions pursuant to rule 116 EPC of Feb. 11, 2013 in EP Patent Application No. 06827689.8.

Entresto Label, Nov. 24, 2015.

Response to the communication under Article 94(3) EPC dated Oct. 3, 2013 in EP Patent Application No. 10176094.0.

Vranic, "Amorphous Pharmaceutical Solids", Bosnian Journal of Basic Medical Sciences, 4(3):35-39. 2004.

Decision X ZR 126/09 of the German Supreme Court: Obvious to combine two active ingredients into one pharmaceutical preparation—leflunomide (GRUR 2012, 1130), German document with English translation.

EMEA (European Medicines Agency) Specifications: Test Procedures and Acceptance Criteria for New Drug Substances and New Drug Products: Chemical Substances, May 2000.

Novartis Response to A94(3), Jan. 4, 2018 in EP Patent Application No. 10176094.0.

Novartis Response to A94(3), Jan. 7, 2010 in EP Patent Application No. 06827689.8.

Sekiguchi and Ito, "Studies on the Molecular Compounds of Organic Medicinals. I. Dissolution Behavior of the Molecular Compound of Sulfanilamide and Sulfathiazole", Chem Pharm Bull 13(4):405-413, 1965.

French and Morrison, "Identification of Complexes of Phenobarbital with Quinine, Quinidine, or Hydroquinidine in Pharmaceutical Dosage Forms", J Pharm Sci, 54(8):1133-1136, 1965.

Guillory et al., "Interactions Between Pharmaceutical Compounds by Thermal Methods", J Pharm Sci, 58(3):301-308, 1969.

Fujioka and Tan, "Biopharmaceutical Studies on Hydantoin Derivatives. III. Physio-Chemical Properties, Dissolution Behavior, and Bioavailability of the Molecular Compound of 1-Benzenesulfonyl-5,5-Diphenylhydantoin and Anti-Pyrine", J Pharm Dyn, 5:475-484, 1982.

Caira, "Molecular complexes of sulfonamides. 2. 1:1 complexes between drug molecules: sulfasimidine-acetylsalicyclic acis and sulfadimidine-4-aminosalicyclic acid", J Crystallogr Spectrosc Res, 72(2): 193-200, 1992.

Sardone et al., "Trimethoprim-Sulfadimidine 1:2 Molecular Complex Monohydrate", Acta Cryst, C53,1295-1299, 1997.

Sangster, "Phase Diagrams and Thermodynamic Properties of Binary Systems of Drugs", J Phys Chem Ref Data, 28 (4):889-930, 1999.

EMA (European Medicines Agency) Note for Guidance on Pharmaceutical Development (May 2006).

Wikipedia entry "Van der Waals force", retrieved from "https://en.wikipedia.org/w/index.php? title=Van_der_Walls_force&oldid=1012426507", last edit date Mar. 16, 2021.

Encyclopedia Britannica entry "Van der Waals force", retrieved from https://www.britannica.com/science/van-der-Waals-forces, access date Apr. 13, 2021.

Wikipedia entry "Sacubitril" (in German).

Rifaximin alpha decision by the federal Supreme Court (BGH), GRUR 2019, 157. English translation.

Definition of "Supramolecular assembly" https://en.wikipedia.org/wiki/Supramolecular_assembly, downloaded Oct. 22, 2019.

Nakao, et al. "The crystal and molecular structure of the 2: 1 molecular complex of theophylline with phenobarbital", Acta Crystallogr. B, 33 (1977), pp. 1373-1378.

# US 11,096,918 B2
Page 3

(56)        References Cited

OTHER PUBLICATIONS

Bettinetti, et al. "Methanol solvate of the 1:1 molecular complex of trimethoprim and sulfadimidine", Acta Crystallogr. C: Struct. Chem, 53 (1997), pp. 594-597.
Zaitu, et al. "A 2:1 Molecular Complex of Theophylline and 5-Fluorouracil as the Monohydrate", Acta Crystallogr. C: Struct. Chem., 51 (1995), pp. 1857-1859.
Brittain, Methods for the Characterization. . . Polymorphism in Pharmaceutical Solids 1999 pp. 227-278.
Byrn et al., "Solid-state Pharmaceutical Chemistry", Chem. Mater., 6, 1148-1158 (1994).
Byrn et al., Solid State Chemistry of Drugs (2d ed. 1999), pp. 47-58.
Haleblian, et al. "Pharmaceutical Applications of Polymorphism", 58 J. Pharm. Sci., 911-929 (1969).
Haleblian, et al. "Characterization of Habits and Crystalline Modifications of Solids and Their Pharmaceutical Applications", J. Pharm. Sci., 64, 8, 1269-1288 (1975).
Hsieh et al., "Non-Isothermal Dehydration Kinetic Study of Aspartame Hemihydrate using DSC, TGA, and DSC-FTIR Microspectroscopy", Asian J. Pharm. Sci., 13, 212-219 (2018).
Khankari et al., "Pharmaceutical hydrates", Thermochimica Acta, 248, 61-79 (1995).
Rose, Erythromycin and Some of Its Derivatives, Analytical Chemistry, 26, 5, 938-939 (1954).
Wells, Structural Inorganic Chemistry, p. 572 (3d ed. 1962).
Zumdahl et al., Chemistry 68-110 (10th ed. 2018).
Reports on the filing or determination of an action regarding a patent; File history of U.S. Pat. No. 8,877,938; Jun. 29, 2020-Mar. 31, 2021.
Reports on the filing or determination of an action regarding a patent; File history of U.S. Pat. No. 9,388,134; Jun. 29, 2020-Mar. 31, 2021.
Defendants' Joint Initial Invalidity Contentions Under Local Patent Rules; Action regarding U.S. Pat. No. 8,877,938 and U.S. Pat. No. 9,388,134; Dec. 4, 2020.
Remenar, et al. "Crystal Engineering of Novel Cocrystals of a Triazole Drug with 1,4-Dicarboxylic Acids" J. Am. Chem. Soc. 125:8456-8457, 2003.
Joint Claim Construction Brief and Appendices; Action regarding U.S. Pat. No. 8,877,938; and U.S. Pat. No. 9,388,134; May 21, 2021.
Prescribing Information for ENTRESTO (sacubitril and valsartan), for oral use, revised Feb. 2021.
Prescribing Information for ENTRESTO (sacubitril and valsartan), for oral use, revised Oct. 2019.
Kaneniwa & Otsuka, "The Interaction between Water and Cephalexin in the Crystalline and Noncrystalline States," Chem. Pharm. Bull. 32(11): 4551-4559 (1984).
"Chemical and Pharmaceutical Bulletin," Instructions to Authors (last updated Jan. 1, 2020).
Aakeroy, C.B., et al., "Avoiding 'Synthon Crossover' in Crystal Engineering with Halogen Bonds and Hydrogen Bonds", Crystal Growth and Design, 11:5333-5336, 2011.
Schartman, R.R., "On the thermodynamics of cocrystal formation", International Journal of Pharmaceutics, 365:77-80. 2009.
Kawashima, Y., et al., "Preparation of directly compressible powders of a physical mixture and a complex of throphylline-phenobarbital using spray-drying", International Journal of Pharmaceutics, 18:345-343, 1984.
Almarsson Organic Crystal Engineering: Frontiers in Crystal Engineering , Edited by Tiekink, E.R.T., Vital, J., and Zaworotko, M., John Wiley and Sons. pp. 69-70,87-90 and 98, 2010.
Principle of IUPAC Nomenclature of Organic Compounds, Zhejiang Science & Technology Publishing house 1985.
Drug Design, Chapter 2—Principles and Methods of Drug Design, edited by Qiu Zhuibai, High Education Press, Edition 1, pp. 223-226, Dec. 1999.
Shimizu and Nishigaki, Structure of 2,4-Diamino-5-(3,4,5-trimethoxybenzyl)pyrimidine-5,5-Diethylbarbituric Acid (1:1), Acta Cryst., B38:2309-2311, 1982.

Remenar, et al., "Salt Selection and Simultaneous Polymorphism Assessment via High-Throughout Crystallization: The Case of Sertraline", Organic Process Research & Development, 7:990-996, 2003.
Carter, et al., "Hydrochlorothiazide Versus Chlorthalidone Evidence Supporting Their Interchangeability", Hypertension, 43:4-9, 2004.
Dahlof, et al., "Prevention of cardiovascular events with an anti-hypertensive regimen of amlodipine adding perindopril as required versus atenol adding bendroflumethiazide as required, in the Anglo-Scandinavian Cardiac Outcomes Trial-Blood Pressure Lowering Arm (ASCOT-BPLA): a multicentre randomized controlled trial", Lancet, 366:895-906, 2005.
Levy, et al., "The Progression From Hypertension to Congestive Heart Failure", JAMA, 275(20): 1557-1562, 1996.
Luft, et al., "Macromolecular crystallization in a high throughput laboratory—the search phase", Journal of Crystal Growth, 232:591-595, 2001.
Morissette, et al., "Elucidation of crystal form diversity of the HIV protease inhibitor ritonavir by high-throughput crystallization", PNAS, 100(5):2180-2184, 2003.
Desiraju, "Chemistry beyond the molecule", Nature, 412(6845):397-400, 2001.
Etter, "Hydrogen Bonds as Design Elements in Organic Chemistry", J. Phys. Chem., 95:4601-4610, 1991.
General Chemistry, Ch. 3: "Substance Structure and Periodic law of Elements", Sec. 7: Intermolecular force and hydrogen bond', edited by Tianpeng Cao, 2000.
Basic Material Science, Part II: "Basic Theory of Material Structure", Ch. 3: "Atomic structure and bonding", edited by Zhangzhong Wang, 2015.
Basic Medical Chemistry, Ch. 8: "Molecular Science", Sec. 3: "Intermolecular force", edited by Zhao, Q and Liu, L., Ed., 2015.
State Food and Drug Administration (SFDA), 2006 National Drug Standard, vol. 49, edited by National Pharmacopoeia Committee.
Online dictionary (Merriam-Webster) for the definition of "subtherapeutic". downloaded 2019.
Chinese Pharmacopoeia, Part IV, 0451: X-ray diffraction method, Edited by National Pharmacopoeia Committee, Chinese Medical Science Press, 2015.
The American Heritage Dictionary of the English Language, 3rd Ed., p. 1792, 1992.
Miroshnyk, et al., "Pharmaceutical co-crystals—an opportunity for drug product enhancement", Expert Opin. Drug. Deliv. 6(4):333-341, 2009.
Izzo, Jr., et al., "Efficacy and Safety of Crystalline Valsartan/Sacubitril (LCZ696) Compared With Placebo and Combinations of Free Valsartan and Sacubitril in Patients With Systolic Hypertension: The RATIO Study", J. Cardiovasc. Pharmacol. 69(6):374-381, 2017.
"Guideline on clinical investigation of medicinal products in the treatment of hypertension", European Medicines Agency, Science Medicines Health, EMA/238/1195/Rev. 3, p. 1-18, 2010.
Organic Chemistry Experimentation, 2.3, Recrystallization and Filtration, Edited by Guanggen XI, Changhong Zhao, Zhongde Zhao, et al., Published by East China University of Science and Technology Press, 1st edition, 1st printing, pp. 31-37, 1995.
Pharmaceutics, edited by Chuanfu Yu, Published by People's Medical Publishing House, 1st edition, 1st printing, Chapter 15: "Introductions for other formulations", Section 6: "Prodrug Formulation", pp. 417-419, 1986.
Concise Course of Social Chemistry, edited by Pingchu Chen, Wuke Li, Zhengkun Zhan, Published by Higher Education Press, 1st edition, 1st printing, Chapter 2: "Chemistry in modern society", Section 2.5.2: "Supermolecular Chemistry", pp. 64-66, 2004.
Pharmaceutical Science (a training textbook for qualification exam of licensed pharmacist), edited by Mingxia Xu, Published by China Medical Science and Technology Press, 1st edition, 2nd printing, Chapter 19, Section 2, p. 221, 1988.
Etter, M.C., et al., "Hydrogen-Bond Directed Cocrystallization as a Tool for Designing Acentric Organic Solids", Chemistry of Materials, 1(1):10-12, 1989.

US 11,096,918 B2

Page 4

(56)            References Cited

OTHER PUBLICATIONS

Aakeröy, C.B., et.al.; "Crystal Engineering: Strategies and Architectures", Acta Crystallographica Section B, pp. 569-586; ISSN 0108-7681, 1997.
Preparation called Diovan and Co-Diovan in free base form, 2003.
The Merck Index entry for Entresto®, downloaded Aug. 23, 2017.
"Technical Guidelines for Research on Bioavailability and Bioequivalence of Chemical Drug Formulations", (Guidelines No. [H]GCL2-1), issued by CFDA, 2005.
Vishweshwar, Peddy et al., "Crystal engineering of pharmaceutical co-crystals from Polymorphic active pharmaceutical ingredients", Chem. Communication, pp. 4601-4603, 2005.
Xu, textbook portion "Pharmaceutical Chemistry", 1996.
Registration file of the composition valsartan/sacubitril (trade name Entresto)—p. 4 of the Summary Review document, 2015.
Datta Sharmistha et al., "Crystal Structures of Drugs: Advances in Determination, Prediction and Engineering", Nature Reviews, vol. 3, pp. 42-57, 2004.
Berge, Stephen M. et al., Pharmaceutical Salts, Journal of Pharmaceutical Sciences, vol. 66 (1), pp. 1-19, 1977.
Byrn, Stephen et al., "Pharmaceutical Solids: A Strategic Approach to Regulatory Considerations", Pharmaceutical Research, vol. 12 (7), pp. 945-954, 1995.
Biopharmaceutics and Pharmacokinetics, Ch. 11 "Nonlinear Pharmacokinetics", Section One, (2000).
"Principle of Nomenclature of Organic Compounds", Science Publishing House, pp. 146 and 268, 2017.
Yung, S. L., "Hydrothermal Crystallization of Organic Compounds", Thesis, the Hong Kong University of Science and Technology, 2004.
Zhang, W., et al., "A Simplified Table For Conversion Between 2-theta Value and d Value in X-Ray Powder Diffraction Pattern", Journal of Ningxia University (Natural Science Edition), 2007.
English-Chinese Dictionary of Chemistry and Chemical Engineering (4th Edition), 2000.
Compiled references relating to the compounds listed in Annex 2 named using "butylcarbamoyl" or "carbamoylpropionate" nomenclature, 2017.
Packer, M., et al., "Comparison of Omapatrilat and Enalapril in Patients With Chronic Heart Failure", Circulation, 920-926, 2002.
Medpage Today 5 Game-Changers in Cardiology in 2015: Entresto, 2015.
King, J. B., et al., "Neprilysin Inhibition in Heart Failure with Reduced Ejection Fraction: A Clinical Review: A Clinical Review", Pharmacotherapy, 35(9):823-837, 2015.
Kario, K., et al., "Efficacy and Safety of LCZ696, a First-in-Class Angiotensin Receptor Neprilysin Inhibitor, in Asian Patients with Hypertension, A Randomized, Double-Blind, Placebo-Controlled Study", Hypertension, 63:698-705, 2014.
Gu. J., et al., "Pharmacokinetics and Pharmacodynamics of LCZ696, a Novel Dual-Acting Angiotensin Receptor—Neprilysin Inhibitor (ARNi)",The Journal of Clinical Pharmacology, 50:401-414, 2010.
Aitipamula, S., et al., "Polymorphs, Salts, and Cocrystals: What's in a Name?", Crystal Growth & Design, 12:2147-2152, 2012.
Aakeroy, C. B., et al., "Cocrystal or Salt: Does It Really Matter?", Molecular Pharmaceutics, 4(3):317-322, 2007.
Braga, D., et al., "From unexpected reactions to a new family of ionic co-crystals: the case of barbituric acid with alkali bromides and caesium iodide", Chem. Comm. 46:7715-7717, 2010.
US FDA Entresto Prescribing Information.
Aakeroy, C.B., et al., "Building co-crystals with molecular sense and supramolecular sensibility", Cryst. Eng. Comm., 7 (72):439-448, 2005.
Rissanen K. et al; Self-assembly by co-ordination and strong hydrogen bonding. X-ray crystal structures of a dimeric trisodium complex of a new acidic complexing ligand and its dehydrate. Supramolecular Chemistry. 247-250, 1991.
De-Dong W. et al.; Formation of Various Polymeric Frameworks by Dicarboxylate-Like Ligands: Synthesis and Crystal Structures of

Polymeric Complexes of Sodium Perchlorate with Flexible Double Betaines. Structural Chemistry, vol. 7, No. 2, 1996.
Andrews P.C et al.; Synthesis and Crystal Structures of [C6H4SC (-S)-NNa-3P(NMe2)3O.NAN-(S-)CSC6HJ     and [C6H4SC(~S}~NLiÿpmdien] (pmdien = N.N.N',N",N"-Pentamethyldiethylenetriamine): Alkali-metal Amides from 2-Sulfanylbenzothiazole. J. Chem. Soc. Dalton Trans. 4059-4065, 1995.
Wang Y. et al.; Crystal Structures and Spectroscopic Properties of Zinc(II) Ternary Complexes of Vitamin L, Hÿ and Their Isomer/«-Aminobenzoic Acid with Bipyridine; Chem. Pharm. Bull; 53(6):645-652, 2005.
Papadimitriou C. et al.; Chloranilate bridged sodium chains. Inorganic Chemistry Communications 1; 418-420, 1998.
Novartis' letter of Feb. 11, 2013 to the European Patent authority.
Affidavit of Alan Graff; Dated Feb. 17, 2016.
Novartis Notice of Marketing of Entresto, Summary of Product Characteristics, Ministry of Health, Nov. 2015 (English Translation).
Testimony of Prof. Dahloff, Mar. 4, 2015 (English Translation).
Petition for Patent Term Extension-IL Patent Application No. 184027 (under opposition) and IL Patent Registration No. 162661, Feb. 17, 2016 (English Translation).
Ksander et al., Journal of Medicinal Chemistry, vol. 38, No. 10, 1995, pp. 1689-1700.
Vishweshwar, Peddy, Journal of Pharmaceutical Sciences, vol. 95, No. 3, Mar. 2006; Review: Pharmaceutical Co-Crystals, (Univ of South Florida), pp. 499-516.
Morissette et al.; "High-throughput crystallization: ploymorphs, salts, co-crystals and solvates of pharmaceutical solids"; 2004; Advanced Drug delivery Reviews; 56: 275-300.
Matsumoto et al, "Blockade of rennin-angiotensin system and enhancement of atrial natriuretic peptide with neutral endopeptidase inhibition cause natriuresis in congestive heart failure and renal dysfunction in conscious dogs", Abstract, JASN, Hemodynamics and Vascular Regulation, Sep. 1993, pp. 517.
Almeida et al, "Clearance Function of Type C receptors of Atrial Natriuretic Factor in rats", American Journal of Physiology, 1999, vol. 256, pp. R469-R475.
Bazil K et al, "Telemetric monitoring of cardiovascular parameters in conscious spontaneously hypertensive rats", Journal of Cardiovascular Pharmacology, 1993, vol. 22, pp. 897-905.
Consensus Trial Study Group, "Effects of enalapril on mortality in severe congestive heart failure", New England Journal of Medicine, 1987, vol. 316, No. 23, pp. 1429-1435.
Stephenson et al, "The hydrolysis of a human atrial natriuretic peptide by pig kidney microvillar membranes is initiated by endopeptidase-24.11", Biochem J., 1987, vol. 243, pp. 183-187.
Erdos, "Angiotensis I converting enzyme and the changes in our concepts through the years", Lewis K. Dahl Memorial Lecture, Hypertension, 1990, vol. 16, No. 4, pp. 363-370.
Intengan, Thibault, Li et al, "Blood Pressure and Small Arteries in DOCA-salt-treated genetically AVP-deficient rats", Hypertension, 1999, vol. 34, No. 4, Part 2, pp. 907-913.
Needleman et al, "The biochemical pharmacology of atrial peptides", Annual Reivew Pharm., Tox., 1989, vol. 29, pp. 23-41.
Sybertz et al, "Atrial natriuretic factor-potentiating and antihypertensive activity of SCH 34826", Hypertension, 1990, vol. 15, No. 2, pp. 152-161.
Williford, Sharma et al, "Spatial Heterogeneity of Intracellular Ca concentration in nonbeating guinea pig ventricular myocytes", Circ Res, 1990, vol. 66, No. 1, pp. 241-248.
Zannad, "The Emerging Role of ACE inhibitors in the treatment of disease", Journal of Cardiovasc. Pharmacol., 1990, vol. 15, Suppl. 2, pp. S1-S5.
Taub et al, CAPLUS Abstract AN 1986:573042, ZA 8400670, Sep. 25, 1985.
Sugano et al, CAPLUS Abstract AN 1995:931230; JP 07157459, Jun. 29, 1995.
Yamada et al, CAPLUS Abstract AN 1995:4126620, Aug. 23, 1994.
Intengan et al, "Resistance Artery mechanics, structure, and Extracellular Components in Spontaneously Hypertensive Rats", Circulation, Nov. 30, 1999, pp. 2267-2275.

# US 11,096,918 B2

Page 5

(56)        **References Cited**

OTHER PUBLICATIONS

Ruilope, Luis M, et al, "Blood-pressure reduction with LCZ696, a novel dual-acting inhibitor of the angiotensin II receptor and neprilysin" Lancet 2010; 375:1255-66.

Waeber, Bernard and Feihl, Francois, The Lancet, "Blood pressure reduction with LCZ696" Mar. 16, 2010, vol. 375 No. 97222 pp. 1228-1229.

Wood et al., "Structure-based design of aliskiren, a novel orally effective renin inhibitor" Biochemical and Biophysical Research Communications, 2003, vol. 308, pp. 698-705.

Day, et al, Significant progress in predicting the crystal structures of small organic molecules—a report on the fourth blind test, Acta Cryst. B65, pp. 107-125 (2009).

Duniz, et al, Exercises in prognostication: Crystal structures and protein folding, PNAS, 2004, vol. 101, vol. 101, No. 40, pp. 14309-14311.

Stahly, G. Patrick, "A Survey of Cocrystals Reported Prior to 2000"Crystal Growth and Design Perspective, 2009, vol. 9, pp. 4212-4229.

Stephenson and Kenny, "Metabolism of Neuropeptides", Biochem. Journal, 1987, vol. 241, pp. 237-247.

Feng et al. "LCZ696: a dual-acting sodium supramolecular complex"; 2012; Tetrahedron Letters 53:275-276.

Almarsson, Oern et al., Chem. Community, 2004, pp. 1889-1896.

Aakeröy,Christer et.al.; Acta Crystallographica Section B, pp. 569-586; ISSN 0108-7681.

Patentee's submission of Feb. 11, 2013, in EP 06 827 689.8.

Stahl, Heinrich et al., Helvetica Chimica Acta,"Handbook of Pharmaceutical Salts . . ." 2002, pp. 265-327.

McMurray et al.; Angiotensin-Neprilysin Inhibition versus Enalapril in Heart Failure; 2014; New England Journal of Medicine; vol. 371, No. 1, pp. 993-1004.

Nakao et al. "The Crystal and Molecular Structure of the 2:1 Molecular Complex of Theophylline with Phenobarbital", Acta Cryst., 1977, B33, pp. 1378-1384.

Black et al., "Valsartan, a new angiotensin II antagonist for the treatment of essential hypertension: efficacy, tolerability and safety compared to an angiotensin-converting enzyme inhibitor, lisinopril", Journal of Human Hypertension, 1997, vol. 11, pp. 483-489.

Entresto Prescribing Information, Aug. 2015.

Polymorphism in Molecular Crystals, Joel Bernstein, Clarendon Press/Oxford, Oxford (UK), pp. 27,46-49, 112, 150 and 151, (2002).

Polymorphism in Pharmaceutical Solids in Drugs and the Pharmaceutical Sciences, vol. 95 (edited by H. G. Brittain), Marcel Dekker, Inc, pp. 229-278, (1999).

Hickey et al., "Performance comparison of a co-crystal of carbamazepine with marketed product", European Journal of Pharmaceutics and Biopharmaceutics, 67:112-119. 2007.

Bettinetti and Giordano, "Interaction Between Trimethoprim and Some Sulfa Drugs", Drug Development and Industrial Pharmacy, 14(4):431-449. 1988.

Guillory, "Generation of Polymorphs, Hydrates, Solvates, and Amorphous Solids", Polymorphism in Pharmaceutical Solids (ed. Harry G. Brittain), vol. 95, Chapter 5, pp. 183-226. 1999.

Regulatory Classification of Pharmaceutical Co-Crystals Guidance for Industry, 2018, P3.

Variankaval, et al., "Preparation and Solid-State Characterization of Nonstoichiometric Cocrystals of a Phosphodiesterase-IV Inhibitor and L-Tartaric Acid", Crystal Growth & Design, 6(3):690-700. 2005.

Martin, et al., "Polyphenol-Caffeine Complexation", J. Chem. Soc., Chem. Commun. 2:105-106. 1986.

Brittain and Byrn, "Structural Aspects of Polymorphism", Polymorphism in Pharmaceutical Solids (ed. Harry G. Brittain), vol. 95, Chapter 3, pp. 74-124. 1999.

Vippagunta et al., "Crystalline solids", Advanced Drug Delivery Reviews, 48:3-26. 2001.

Morris and Rodriguez-Hornedo, "Hydrates", Encyclopedia of Pharmaceutical Technology, 7:393-440. 1993.

Vogt, et al., "A Study of variable hydration states in topotecan hydrochloride", Journal of Pharmaceutical and Biomedical Analysis, 40:1080-1088. 2006.

Griesser, "The Importance of Solvates", Polymorphism in the Pharmaceutical Industry, (Ed. Rolf Hilfiker) Ch. 8, p. 211-233. 2006.

Drug Design, (ed. Qiu Zhuibai), Higher Education Press, Edition 1, p. 105. 1999.

Physical Pharmaceutics, (ed. Desen Su and Siling Wang), Chemical Industry Press, Edition 1, p. 9 and 17. 2004.

"Jiuzhou Pharmaceutical: the sale of Entresto is slower than expected, and an extended layout is expected in a short term", Guang Fa Securities, Tencent News. 2016.

Rodriguez-Spong, et al., "General principles of pharmaceutical solid polymorphism: a supramolecular perspective", Advanced Drug Delivery Reviews, 56(3):241-274. 2004.

Bettinetti et al., "Structure and Solid-State Chemistry of Anhydrous and Hydrated Crystal Forms of the Trimethoprim-Sulfamethoxypyridazine 1:1 Molecular Complex", Journal of Pharmaceutical Sciences, 89(4):478-489. 1999.

Israili, "Clinical pharmacokinetics of angiotensin II (AT1) receptor blockers in hypertension", Journal of Human Hypertension, 14, Suppl 1, S73-S86. 2000.

Feng, et al., "High-throughput crystallization in pharmaceutical research and development", Acta Pharmaceutica Sinica, 40(6):481-485. 2005.

Zhou, Academic Dissertation for Master Degree, "Theoretical Study of Intermolecular Interaction Between Tetrazole Compounds and Dimers of Tetrazole and Water", Ch. II, 2005.

Zhang, "Use of Coloring Agent in Pharmaceutical Formulation", Tianjing Pharmacy, 8(4):36-38. 1996.

Zhang et al., "Technology and Principle for Manufacture of Tablets", Chinese Textbook with English translation, 1991.

Polymorphic Drugs, Ed. Yang Lu & Guanhua Du, People Health Publishing House, First Edition, Ch. II, 2009.

"ICH Harmonized Tripartite Guideline", Good Manufacturing Practice Guide for Active Pharmaceutical Ingredients, 2000.

"Handbook of Pharmaceutical Salts Properties, Selection, and Use", Ed. Stahl and Wermuth, forward, preface, contents and p. 214. 2002.

FDA Co-Crystal Directives of 2013: Guidance for Industry: Regulatory Classification of Pharmaceutical Co-Crystals. 2013.

FDA Chemical Review NDA 207620—In the registration file of the composition valsartan/sacubitril (trade name Entresto) it is mentioned (p. 95). 2015.

Data which Novartis submitted to the Examiner in letter dated May 14, 2012.

Hoffman, D., "Is Novartis' CZ696 'revolutionary' or just a marginal improvement?", Philly.com. 2014 (downloaded Dec. 11, 2015).

Examiner's reservation of Aug. 17, 2015 in the scope of Examination of divisional application 219782.

Cody, Robert J. et al., "Physiologic and Pharmacologic Studies of Atrial Natriuretic Factor: Anatriuretic and Vasoactive Peptide", Therapeutic Review, J Clin Phrmacol 1987, 27:927-936.

Fields, Larry E. et. al, The Burden of Adult Hypertension in the United States 1999 to 2000. A Rising Tide. Hypertension. 2004; 44:398-404.

Rubattu, Speranza, et.al, "The atrial natriuretic peptide: a changing view." Journal of Hypertension, 2001, vol. 19, No. 11, pp. 1923-1931.

Kearney, Patricia M., et al, "Global burden of hypertension: analysis of worldwide data" Lancet, 365: 217-223, 2005.

Takasu, K, et. al, "Synthesis ad Evaluation Carbolinium Cations as New Antimalarial Agents based on Delocalized Lipophilic Cation (DLC) Hypothesis", Chem. Pharm. Bull. 53(6) 653-661 (Jun. 2005).

Patel, Mona et.al, "Treatment of non-insulin-dependent diabetes mellitus", Expert Opin. Investig. Drugs (2003) 12 (4):623-633.

Roques, Bernard P. et.al, Neutral endopeptidase 24.11: Structure, Inhibition, and Experimental and Clinical Pharmacology, Pharmacological Reviews, vol. 45, No. 1, pp. 87-146, 1993.

Sonnenberg, J.L. et. al, "Identification of Protease 3.4.24.11 as the Major Atrial Natriuretic Factor Degrading Enzyme in the Rat Kidney," Peptides, vol. 9, pp. 173-180, May 29, 1987.

(56)            **References Cited**

OTHER PUBLICATIONS

Trapani, Angelo J., et. al, "CGS 35601 and its orally Active Prodrug CGS 37808 as Triple Inhibitors of Endothelin-converting Enzyme-1, Neutral Endopeptidase 24.11, and Angiotensin-converting Enzyme." J Cardiovasc Pharmacol, vol. 44, Supplement 1, Nov. 2004, S211-S215.

Stout, G.H. et al., "X-ray Structure Determination, A Practical Guide, Symmetry Operations and Space Groups", 1968, Chpt. 3.

"Drug Structures and Formulations" edited by Jianmin Shen and Zhenqing Wu, Aug. 1989, preface, contents, and p. 104.

"The Practice of Medicinal Chemistry" edited by Camille Georges Wermuth et.al. and translated by Yumin Chi, Apr. 2005, preface, contents, and p. 822.

Bohlender, J., et al., "High Human Renin Hypertension in Transgenic Rats", Hypertension, vol. 29, No. 1, Part 2, Jan. 1997, pp. 428-434.

Childs S. L. et al.; Crystal Engineering Approach To Forming Cocrystals of Amine Hydrochlorides with Organic Acids. Molecular Complexes of Fluoxetine Hydrochloride with Benzoic, Succinic, and Fumaric Acids. JACS Articles; vol. 126: 13335-13342, Apr. 1, 2004.

Shefter E. et al.; Structural Studies on Molecular Complexes V: Crystal Structures of Sulfathiazole-Sulfanilamide and Sulfathiazole-Theophylline Complexes. Journal of Pharmaceutical Sciences. vol. 60(2): 282-286, Feb. 2, 1971.

Nakai H. et al.; X-Ray and Infrared Spectral Studies of the Ionic Structure of Trimethoprim t-Sulfamethoxazolet1 :1 Molecular Complex. J. Chem. Soc. Perkin Trans; 1459-1464, 1984.

Hughes D.L. et al; Crystal Structures of Complexes between Alkali-metal Salts and Cyclic Polyethers. Part IX.t Complex formed between Dibenzo-24-crown-8 (6,7,9,10,12,13,20,21,23,24,26,27-Dodecahydrodibenzo[b,n][1,4,7,10,13,16,19,22]octaoxacyclotetracosin) and two molecules of Sodium IMitrophenolate. J. Chem. Soc., Dalton Trans., 2374-2378, Jan. 1, 1975.

3rd party observation, Opposition against EP1948158B (EP06827689.8), Feb. 19, 2016.

Sokolov et al, "Synthesis and the crystal structure of the supramolecular complex [Cl3InW3S4(H2O)9]2+ with cucurbituril", Russian Chemical Bulletin, International Edition, vol. 50, No. 7, p. 1144-1147, (2001).

Reply to Communication pursuant to Art 94(3) dated Mar. 25, 2013 regarding European Patent Application No. 10176094.0 submitted Oct. 3, 2013.

IUPAC nomenclature of organic chemistry from Wikipedia, downloaded Apr. 10, 2017.

Interim Development Report, Feb. 23, 2017.

European Medicines Agency, Guidelines by the European Medicines Agency of May 2000, "ICH Topic Q6A—Specifications: Test Procedures and Acceptance Criteria for New Drug Substances and New Drug Products: Chemical Substances", 2000.

German Supreme Court, GRUR, 2012 [English Translation].

Sybertz et al, "SCH 39370, a neutral metalloendopeptidase inhibitor, potentiates biological responses to atrial natriuretic factor and lowers blood pressure in desoxycorticosterone acetate-sodium hypertensive rats", J Pharmacol. Exp. Ther., 1989, vol. 250, No. 2, pp. 624-631.

* cited by examiner



US 11,096,918 B2

1

# AMORPHOUS SOLID FORM OF COMPOUNDS CONTAINING S—N-VALERYL-N-{[2'-(1H-TETRAZOLE-5-YL)-BIPHENYL-4-YL]-METHYL}-VALINE AND (2R,4S)-5-BIPHENYL-4-YL-4-(3-CARBOXY-PROPIONYLAMINO)-2-METHYL-PENTANOIC ACID ETHYL ESTER MOIETIES AND SODIUM CATIONS

## RELATED APPLICATIONS

This application is a continuation application of U.S. application Ser. No. 16/006,252, filed on Jun. 12, 2018, which is a continuation application of U.S. application Ser. No. 15/187,872, filed on Jun. 21, 2016, which is a divisional application of U.S. application Ser. No. 14/311,788, filed on Jun. 23, 2014, now U.S. Pat. No. 9,388,134, which is a divisional application of U.S. application Ser. No. 11/722, 360, filed on Jan. 15, 2008, now U.S. Pat. No. 8,877,938, which is a national stage application, filed under 35 U.S.C. § 371, of International Application No. PCT/US06/43710, filed on Nov. 8, 2006, which claims the benefit of and priority to U.S. Provisional Application No. 60/822,086, filed Aug. 11, 2006, 60/789,332, filed Apr. 4, 2006, 60/735, 541, filed on Nov. 10, 2005, and 60/735,093, filed on Nov. 9, 2005, the entire contents of each of which are incorporated herein by reference in their entireties.

## FIELD OF THE INVENTION

The present invention is directed to dual-acting compounds and combinations of angiotensin receptor blockers and neutral endopeptidase inhibitors, in particular a dual acting molecule wherein the angiotensin receptor blocker and neutral endopeptidase inhibitor are linked via non-covalent bonding, or supramolecular complexes of angiotensin receptor blockers and neutral endopeptidase inhibitors, also described as linked pro-drugs, such as mixed salts or co-crystals, as well as to pharmaceutical combinations containing such a dual-acting compound or combination, methods of preparing such dual-acting compounds and methods of treating a subject with such a dual-acting compound or combination. Specifically, the invention is directed to a dual acting compound or supramolecular complex of two active agents having the same or different modes of action in one molecule.

## BACKGROUND OF THE INVENTION

Angiotensin II is a hormone that causes blood vessels to constrict. This, in turn, can result in high blood pressure and strain on the heart. It is known that angiotensin II interacts with specific receptors on the surface of target cells. Two receptor subtypes for angiotensin II, namely AT1 and AT2, have been identified thus far. In recent times, great efforts have been made to identify substances that bind to the AT1 receptor. Angiotensin receptor blockers (ARBs, angiotensin II antagonists) are now known to prevent angiotensin II from binding to its receptors in the walls of blood vessels, thereby resulting in lower blood pressure. Because of the inhibition of the AT1 receptor, such antagonists can be used, therefore, as anti-hypertensives or for the treatment of congestive heart failure, among other indications.

Neutral endopeptidase (EC 3.4.24.11; enkephalinase; atriopeptidase; NEP) is a zinc-containing metalloprotease that cleaves a variety of peptide substrates on the amino side of hydrophobic residues [see Pharmacol Rev, Vol. 45, p. 87

2

(1993)]. Substrates for this enzyme include, but are not limited to, atrial natriuretic peptide (ANP, also known as ANF), brain natriuretic peptide (BNP), met- and leu-enkephalin, bradykinin, neurokinin A, endothelin-1 and substance P. ANP is a potent vasorelaxant and natriuretic agent [see J Hypertens, Vol. 19, p. 1923 (2001)]. Infusion of ANP in normal subjects resulted in a reproducible, marked enhancement of natriuresis and diuresis, including increases in fractional excretion of sodium, urinary flow rate and glomerular filtration rate [see J Clin Pharmacol, Vol. 27, p. 927 (1987)]. However, ANP has a short half-life in circulation, and NEP in kidney cortex membranes has been shown to be the major enzyme responsible for degrading this peptide [see Peptides, Vol. 9, p. 173 (1988)]. Thus, inhibitors of NEP (neutral endopeptidase inhibitors, NEPi) should increase plasma levels of ANP and, hence, are expected to induce natriuretic and diuretic effects.

While substances, such as angiotensin receptor blockers and neutral endopeptidase inhibitors may be useful in the control of hypertension, essential hypertension is a polygenic disease and is not always controlled adequately by monotherapy. Approximately 333 million adults in economically developed countries and about 65 million Americans (1 in 3 adults) had high blood pressure in 2000 [see Lancet, Vol. 365, p. 217 (2005); and Hypertension, Vol. 44, p. 398 (2004)]. Prolonged and uncontrolled hypertensive vascular disease ultimately leads to a variety of pathological changes in target organs, such as the heart and kidney.

Sustained hypertension can lead as well to an increased occurrence of stroke. Therefore, there is a strong need to evaluate the efficacy of anti-hypertensive therapy, an examination of additional cardiovascular endpoints, beyond those of blood pressure lowering, to get further insight into the benefits of combined treatment.

The nature of hypertensive vascular diseases is multifactorial. Under certain circumstances, drugs with different mechanisms of action have been combined. However, just considering any combination of drugs having different modes of action does not necessarily lead to combinations with advantageous effects. Accordingly, there is a need for efficacious combination therapy which does not have deleterious side effects.

## SUMMARY OF THE INVENTION

In a first aspect, the present invention is directed to a dual-acting compound, such as a supramolecular complex, comprising:

(a) an angiotensin receptor antagonist;

(b) a neutral endopeptidase inhibitor (NEPi); and optionally

(c) a pharmaceutically acceptable cation.

The present invention is also directed to a dual-acting compound, such as a supramolecular complex, obtainable by:

(i) dissolving an angiotensin receptor antagonist and a neutral endopeptidase inhibitor (NEPi) in a suitable solvent;

(ii) dissolving a basic compound of Cat in a suitable solvent, wherein Cat is a cation;

(iii) combining the solutions obtained in steps (i) and (ii);

(iv) precipitation of the solid, and drying same to obtain the dual-acting compound; or alternatively obtaining the dual-acting compound by exchanging the solvent(s) employed in steps (i) and (ii) by

(iva) evaporating the resulting solution to dryness;

(va) re-dissolving the solid in a suitable solvent;

3

(via) precipitation of the solid and drying same to obtain the dual-acting compound.

The present invention is also directed to linked pro-drugs comprising:

(a) an angiotensin receptor antagonist or a pharmaceutically acceptable salt thereof; and

(b) a NEPi or a pharmaceutically acceptable salt thereof, wherein the angiotensin receptor antagonist or a pharmaceutically acceptable salt thereof and the NEPi or a pharmaceutically acceptable salt thereof are linked by a linking moiety.

The present invention is also directed to a combination comprising:

(a) a pharmaceutically acceptable salt of an angiotensin receptor antagonist; and

(b) a pharmaceutically acceptable salt of a neutral endopeptidase inhibitor (NEPi);

wherein the pharmaceutically acceptable salt of the angiotensin receptor antagonist and the NEPi is the same and is selected from a salt of Na, K or NH₄.

In preferred embodiments, the angiotensin receptor antagonist and NEPi have acidic groups which facilitate formation of the dual acting compound, such as the supramolecular complex of the present invention.

Preferably, the angiotensin receptor antagonist is selected from the group consisting of valsartan, losartan, irbesartan, telmisartan, eprosartan, candesartan, olmesartan, saprisartan, tasosartan, elisartan and combinations thereof.

In preferred embodiments, the NEPi is selected from the group consisting of: SQ 28,603; N—[N-[1(S)-carboxyl-3-phenylpropyl]-(S)-phenylalanyl]-(S)-isoserine; N—[N-[((1S)-carboxy-2-phenyl)ethyl]-(S)-phenylalanyl]-β-ala-nine; N-[2(S)-mercaptomethyl-3-(2-methylphenyl)-propionyl]methionine; (cis-4-[[[1-[2-carboxy-3-(2-methoxyethoxy)propyl]-cyclopentyl]carbonyl]amino]-cyclohexanecarboxylic acid); thiorphan; retro-thiorphan; phosphoramidon; SQ 29072; N-(3-carboxy-1-oxopropyl)-(4S)-p-phenylphenylmethyl)-4-amino-2R-methylbutanoic acid ethyl ester; (S)-cis-4-[1-[2-(5-indanyloxycarbonyl)-3-(2-methoxyethoxy)propyl]-1-cyclopentanecarboxamido]-1-cyclohexanecarboxylic acid; 3-(1-[6-endo-hydroxymethyl-bicyclo[2,2,1]heptane-2-exo-carbamoyl]cyclopentyl)-2-(2-methoxyethyl)propanoic acid; N-(1-(3-(N-t-butoxycarbonyl-(S)-prolylamino)-2(S)-t-butoxy-carbonylpropyl)cyclopentanecarbonyl)-O-benzyl-(S)-serine methyl ester; 4-[[2-(mercaptomethyl)-1-oxo-3-phenylpro-pyl]amino]benzoic acid; 3-[1-(cis-4-carboxycarbonyl-cis-3-butylcyclohexyl-r-1-carbamoyl)cyclopentyl]-2S-(2-methoxyethoxymethyl)propanoic acid; N-((2S)-2-(4-biphenylmethyl)-4-carboxy-5-phenoxyvaleryl)glycine; N-(1-(N-hydroxycarbamoylmethyl)-1-cyclopentanecarbonyl)-L-phenylalanine; (S)-(2-biphenyl-4-yl)-1-(1H-tetrazol-5-yl)ethylamino) methylphosphonic acid; (S)-5-(N-(2-(phosphonomethylamino)-3-(4-biphenyl)propionyl)-2-aminoethyl)tetrazole; β-alanine; 3-[1,1'-biphenyl]-4-yl-N-[diphenoxyphosphinyl]methyl]-L-alanyl; N-(2-carboxy-4-thienyl)-3-mercapto-2-benzylpropanamide; 2-(2-mercaptomethyl-3-phenylpropionamido)thiazol-4-ylcarboxylic acid; (L)-(1-((2,2-dimethyl-1,3-dioxolan-4-yl)methoxy)carbonyl)-2-phenylethyl)-L-phenylalanyl)-β-alanine; N—[(L)-[1-[(2,2-dimethyl-1,3-dioxolan-4-yl)methoxy]carbonyl]-2-phenylethyl]-L-phenylalanyl]-(R)-alanine; N—[N-[(L)-1-carboxy-2-phenylethyl]-L-phenylalanyl]-(R)-alanine; N-[2-acetylthiomethyl-3-(2-methyl-phenyl)propionyl]-methionine ethyl ester; N-[2-mercaptomethyl-3-(2-methylphenyl)propionyl]-methionine; N-[2(S)-mercaptomethyl-3-(2-methylphenyl)propanoyl]-

4

(S)-isoserine; N—(S)-[3-mercapto-2-(2-methylphenyl)pro-pionyl]-(S)-2-methoxy-(R)-alanine; N-[1-[[1(S)-benzyloxy-carbonyl-3-phenylpropyl]amino]cyclopentylcarbonyl]-(S)-isoserine; N-[1-[[1(S)-carbonyl-3-phenylpropyl]amino]-cyclopentylcarbonyl]-(S)-isoserine; 1,1'-[dithiobis-[2(S)-(2-methylbenzyl)-1-oxo-3,1-propanediyl]]-bis-(S)-isoserine; 1,1'-[dithiobis-[2(S)-(2-methylbenzyl)-1-oxo-3,1-pro-panediyl]]-bis-(S)-methionine; N-(3-phenyl-2-(mercapto-ethyl)-propionyl)-(S)-4-(methylmercapto)methionine; N-[2-acetylthiomethyl-3-phenyl-propionyl]-3-aminobenzoic acid; N-[2-mercaptomethyl-3-phenyl-propionyl]-3-amino-benzoic acid; N-[1-(2-carboxy-4-phenylbutyl)-cyclopen-tane-carbonyl]-(S)-isoserine; N-[1-(acetylthiomethyl)cyclo-pentane-carbonyl]-(S)-methionine ethyl ester; 3(S)-[2-(acetylthiomethyl)-3-phenyl-propionyl]amino-ε-caprolactam; N-(2-acetylthiomethyl-3-(2-methylphenyl) propionyl)-methionine ethyl ester; and combinations thereof. Preferably, the dual-acting compound or combination, in particular the supramolecular complex, is a mixed salt or a co-crystal. It is also preferred that the linked pro-drug is a mixed salt or a co-crystal.

In a second aspect, the present invention is directed to pharmaceutical composition comprising

(a) the aforementioned dual-acting compound or combination, such as the aforementioned complex; and

(b) at least one pharmaceutically acceptable additive.

The present invention is also directed to pharmaceutical compositions comprising a linked pro-drug comprising:

(a) an angiotensin receptor antagonist or a pharmaceutically acceptable salt thereof;

(b) a NEPi or a pharmaceutically acceptable salt thereof, wherein the angiotensin receptor antagonist or a pharmaceutically acceptable salt thereof and the NEPi or a pharmaceutically acceptable salt thereof are linked by a linking moiety; and

(c) at least one pharmaceutically acceptable additive.

In a third aspect, the present invention is directed to a method of preparing a dual-acting compound, in particular a supramolecular complex, comprising

(a) an angiotensin receptor antagonist;

(b) a neutral endopeptidase inhibitor (NEPi); and optionally

(c) a pharmaceutically acceptable cation selected from the group consisting of Na, K and NH₄;

said method comprising the steps of:

(i) dissolving an angiotensin receptor antagonist and a neutral endopeptidase inhibitor (NEPi) in a suitable solvent;

(ii) dissolving a basic compound of Cat in a suitable solvent, wherein Cat is a cation;

(iii) combining the solutions obtained in steps (i) and (ii);

(iv) precipitation of the solid, and drying same to obtain the dual-acting compound; or alternatively obtaining the dual-acting compound by exchanging the solvent(s) employed in steps (i) and (ii) by

(iva) evaporating the resulting solution to dryness;

(va) re-dissolving the solid in a suitable solvent;

(via) precipitation of the solid and drying same to obtain the dual-acting compound.

The present invention is also directed to a method of making a linked pro-drug comprising:

(a) an angiotensin receptor antagonist or a pharmaceutically acceptable salt thereof;

(b) a NEPi or a pharmaceutically acceptable salt thereof, wherein the angiotensin receptor antagonist or a pharmaceutically acceptable salt thereof and the NEPi or a pharmaceutically acceptable salt thereof are linked by

US 11,096,918 B2

5

a linking moiety; and comprising adding a linking moiety and a solvent to a mixture of an angiotensin receptor antagonist and a NEPi; and

(d) isolating the linked pro-drug.

In a fourth aspect, this invention is directed to a method of treating or preventing a disease or condition, such as hypertension, heart failure (acute and chronic), congestive heart failure, left ventricular dysfunction and hypertrophic cardiomyopathy, diabetic cardiac myopathy, supraventricular and ventricular arrhythmias, atrial fibrillation, atrial flutter, detrimental vascular remodeling, myocardial infarction and its sequelae, atherosclerosis, angina (unstable or stable), renal insufficiency (diabetic and non-diabetic), heart failure, angina pectoris, diabetes, secondary aldosteronism, primary and secondary pulmonary hypertension, renal failure conditions, such as diabetic nephropathy, glomerulonephritis, scleroderma, glomerular sclerosis, proteinuria of primary renal disease, and also renal vascular hypertension, diabetic retinopathy, other vascular disorders, such as migraine, peripheral vascular disease, Raynaud's disease, luminal hyperplasia, cognitive dysfunction (such as Alzheimer's), glaucoma and stroke comprising administering the afore-mentioned dual-acting compound or combination, in particular the supramolecular complex, or the afore-mentioned linked pro-drug, preferably, the complex, to a subject in need of such treatment.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. **1** shows a pictorial representation of the unit cell of the supramolecular complex of trisodium [3-((1 S,3R) −1-biphenyl-4-y lmethyl-3-ethoxy carbonyl-1-butylcarbamoyl)propionate-(S)-3 '-methyl-2'-(pentanoyl {2 "-(tetrazol-5-ylate)biphenyl-4'-y 'methyl] amino)butyrate] hemipentahydrate comprising two asymmetric units. The following color code is used: grey=carbon atom; blue=nitrogen atom; red=oxygen atom; violet=sodium atom.

## DETAILED DESCRIPTION

The present invention relates to a dual-acting compound or combination, in particular a supramolecular complex, or linked pro-drug or in particular a supramolecular complex of two active agents with different mechanisms of action, namely an angiotensin receptor antagonist and a neutral endopeptidase inhibitor, which can form a unique molecular entity for the treatment of patients with various cardiovascular and/or renal diseases.

One embodiment of the invention is directed to a physical combination comprising:

(a) a pharmaceutically acceptable salt of an angiotensin receptor antagonist; and

(b) a pharmaceutically acceptable salt of a neutral endopeptidase inhibitor (NEPi); wherein the pharmaceutically acceptable salt of the angiotensin receptor antagonist and the NEPi is the same and is selected from a salt of Na, K or $NH_4$.

Specifically, it is preferred that the two active agents are combined with each other so as to form a single dual-acting compound, in particular a supramolecular complex. By doing so, a new molecular or supramolecular entity is formed having distinct properties different to the above physical combination.

6

Thus, the present invention is directed to a dual-acting compound, in particular a supramolecular complex, comprising:

(a) an angiotensin receptor antagonist;

(b) a neutral endopeptidase inhibitor (NEPi); and

(c) a pharmaceutically acceptable cation preferably selected from the group consisting of Na, K and $NH_4$.

The present invention is also directed to a dual-acting compound, in particular a supramolecular complex, obtainable by:

(i) dissolving an angiotensin receptor antagonist and a neutral endopeptidase inhibitor (NEPi) in a suitable solvent;

(ii) dissolving a basic compound of Cat such as (Cat)OH, $(Cat)_2CO_3$, $(Cat)HCO_3$ in a suitable solvent, wherein Cat is a cation preferably selected from the group consisting of Na, K and $NH_4$;

(iii) combining the solutions obtained in steps (i) and (ii);

(iv) precipitation of the solid, and drying same to obtain the dual-acting compound; or alternatively obtaining the dual-acting compound by exchanging the solvent(s) employed in steps (i) and (ii) by

(iva) evaporating the resulting solution to dryness;

(va) re-dissolving the solid in a suitable solvent;

(via) precipitation of the solid and drying same to obtain the dual-acting compound.

The present invention is further directed to linked pro-drugs comprising:

(a) an angiotensin receptor antagonist or a pharmaceutically acceptable salt thereof; and

(b) a NEPi or a pharmaceutically acceptable salt thereof, wherein the angiotensin receptor antagonist or a pharmaceutically acceptable salt thereof and the NEPi or a pharmaceutically acceptable salt thereof are linked by a linking moiety.

The two components are each linked to a linking moiety thereby creating a linked pro-drug.

Preferably, the linked pro-drug is substantially pure; as used herein, "substantially pure" refers to at least 90%, more preferably at least 95% and most preferably at least 98% purity.

As one preferred embodiment of the present invention, the linked pro-drug has a structure such that by linking the two components with the linking moiety, a supramolecular complex is formed.

For the purpose of the present invention, the term "dual-acting compound" is intended to describe that these compounds have two different modes of action in one compound, one is the angiotensin receptor blockade resulting from the ARB molecular moiety of the compound and the other is the neutral endopeptidase inhibition resulting from the NEPi molecular moiety of the compound.

For the purpose of the present invention, the term "compound" is intended to describe a chemical substance comprising covalent bonds within the two pharmaceutically active agents, the ARB and the NEPi molecular moieties, and non-covalent interactions between these two pharmaceutically active agents, the ARB and the NEPi molecular moieties.

Typically, hydrogen bonding can be observed between the two pharmaceutically active agents, the ARB and the NEPi molecular moieties. Ionic bonds can be present between the cation and one or both of the two pharmaceutically active agents, the ARB and the NEPi molecular moieties. Other types of bonds may also be present within the compound

US 11,096,918 B2

7

such as van der Waals forces. For illustrative purposes, the dual-acting compound of the present invention could be represented as follows:

(ARB)-(L)$_m$-(NEPi)

wherein L is a linking moiety, such as a cation or is a noncovalent bond and m is an integer from 1 or more. In other words the ARB and NEPi moiety can be connected via non-covalent bonds such as hydrogen bonding. Alternatively or additionally they may be connected via a linking moiety such as a cation.

In one embodiment, the dual-acting compound may be considered to be a linked pro-drug, whereby the linking moiety, such as the cation, linking the two pharmaceutically active agents, the ARB and the NEPi, forms the pro-drug of these agents which are released once the linked pro-drug is ingested and absorbed.

In a preferred embodiment, the dual-acting compound is a complex, in particular a supramolecular complex.

For the purpose of the present invention, the term "supra-molecular complex" is intended to describe an interaction between the two pharmaceutically active agents, the cations and any other entity present such as a solvent, in particular water, by means of noncovalent, intermolecular bonding between them. This interaction leads to an association of the species present in the supramolecular complex distinguish-ing this complex over a physical mixture of the species.

The noncovalent intermolecular bonding can be any inter-actions known in the art to form such supramolecular complexes, such as hydrogen bonding, van der Waals forces and π-π stacking. Ionic bonds can also be present. Prefer-ably, there exists ionic bonding and additionally hydrogen bonding to form a network of interactions within the com-plex. The supramolecular complex exists preferably in the solid state but may also be present in liquid media. As a preferred embodiment of the invention, the complex is crystalline and in this case is preferably a mixed crystal or co-crystal.

Typically, the dual-acting compound, in particular the supramolecular complex shows properties such as melting point, IR spectrum etc. that are different from a physical mixture of the species.

Preferably, the dual-acting compound, in particular the supramolecular complex, has a network of non-covalent bonds, in particular hydrogen bonds, between the two phar-maceutically active agents and any solvent, if present, preferably water. Moreover, it is preferred that the dual-acting compound, in particular the supramolecular complex, has a network of non-covalent bonds, in particular ionic and hydrogen bonds, between the two pharmaceutically active agents, the cation and any solvent, if present, preferably water. The cation is preferably coordinated to several oxy-gen ligands, thus, providing a linkage between these oxygen ligands. The oxygen ligands come from the carbonyl and carboxylate groups present in the two pharmaceutically active agents and preferably also from any solvent, if present, preferably water.

The dual acting compound comprises a molecular moiety of an angiotensin receptor antagonist. This means that a molecular moiety derived from an angiotensin receptor antagonist is participating in the build-up of the dual-acting compound. The angiotensin receptor antagonist is part of the compound and connected to the NEP inhibitor directly or indirectly via non-covalent bonds. For sake of convenience, throughout the application, the term "angiotensin receptor antagonist" will be used when describing this part of the compound. Angiotensin receptor antagonists (ARBs) suit-

8

able for use in the present invention include, without limi-tation, valsartan, losartan, irbesartan, telmisartan, eprosar-tan, candesartan, olmesartan saprisartan, tasosartan, elisartan, the compound with the designation E-1477 of the following formula



the compound with the designation SC-52458 of the following formula



and the compound with the designation the compound ZD-8731 of the following formula



Suitable angiotensin II receptor antagonist also includes, but is not limited to, saralasin acetate, candesartan cilexetil, CGP-63170, EMD-66397, KT3-671, LR-B/081, valsartan, A-81282, BIBR-363, BIBS-222, BMS-184698, candesartan, CV-11194, EXP-3174, KW-3433, L-161177, L-162154, LR-B/057, LY-235656, PD-150304, U-96849, U-97018, UP-275-22, WAY-126227, WK-1492.2K, YM-31472, losar-tan potassium, E-4177, EMD-73495, eprosartan, HN-65021, irbesartan, L-159282, ME-3221, SL-91.0102, Tasosartan, Telmisartan, UP-269-6, YM-358, CGP-49870, GA-0056,

US 11,096,918 B2

9

L-159689, L-162234, L-162441, L-163007, PD-123177, A-81988, BMS-180560, CGP-38560A, CGP-48369, DA-2079, DE-3489, DuP-167, EXP-063, EXP-6155, EXP-6803, EXP-7711, EXP-9270, FK-739, HR-720, ICI-D6888, ICI-D7155, ICI-D8731, isoteoline, KRI-1177, L-158809, L-158978, L-159874, LR B087, LY-285434, LY-302289, LY-315995, RG-13647, RWJ-38970, RWJ-46458, S-8307, S-8308, saprisartan, saralasin, Sarmesin, WK-1360, X-6803, ZD-6888, ZD-7155, ZD-8731, BIBS34, CI-996, DMP-811, DuP-532, EXP-929, L-163017, LY-301875, XH-148, XR-510, zolasartan and PD-123319.

Also included within the scope of this aspect of the invention are combinations of the above-identified ARBs.

ARBs to be used for preparing the combination or complex in accordance with the present invention can be purchased from commercial sources or can be prepared according to known methods. ARBs may be used for purposes of this invention in their free form, as well as in any suitable salt or ester form.

Preferred salts forms include acid addition salts. The compounds having at least one acid group (e.g., COOH or 5-tetrazolyl) can also form salts with bases. Suitable salts with bases are, e.g., metal salts, such as alkali metal or alkaline earth metal salts, e.g., sodium, potassium, calcium or magnesium salts, or salts with ammonia or an organic amine, such as morpholine, thiomorpholine, piperidine, pyrrolidine, a mono-, di- or tri-lower alkylamine, e.g., ethyl-, tert-butyl-, diethyl-, diisopropyl-, triethyl-, tributyl- or dimethylpropylamine, or a mono-, di- or trihydroxy lower alkylamine, e.g., mono-, di- or tri-ethanolamine. Corresponding internal salts may furthermore be formed. Salts which are unsuitable for pharmaceutical uses but which can be employed, e.g., for the isolation or purification of free compounds I or their pharmaceutically acceptable salts, are also included. Even more preferred salts are, e.g., selected from the mono-sodium salt in amorphous form; di-sodium salt of valsartan in amorphous or crystalline form, especially in hydrate form, thereof.

Mono-potassium salt of valsartan in amorphous form; di-potassium salt of valsartan in amorphous or crystalline form, especially in hydrate form, thereof.

Calcium salt of valsartan in crystalline form, especially in hydrate form, primarily the tetrahydrate thereof; magnesium salt of valsartan in crystalline form, especially in hydrate form, primarily the hexahydrate thereof; calcium/magnesium mixed salt of valsartan in crystalline form, especially in hydrate form; bis-diethylammonium salt of valsartan in crystalline form, especially in hydrate form; bis-dipropylammonium salt of valsartan in crystalline form, especially in hydrate form; bis-dibutylammonium salt of valsartan in crystalline form, especially in hydrate form, primarily the hemihydrate thereof; mono-L-arginine salt of valsartan in amorphous form; bis-L-arginine salt of valsartan in amorphous form; mono-L-lysine salt of valsartan in amorphous form; bis-L-lysine salt of valsartan in amorphous form.

Preferably when preparing the dual-acting compound, in particular the complex according to the present invention, the free form of the ARB is used.

10

In a preferred embodiment of this invention, the angiotensin receptor blocker used in the combination or complex of the present invention is Valsartan the molecular structure of which is shown below



Valsartan may be in the racemic form or as one of the two isomers shown below



or



preferably

Valsartan ((S)—N-valeryl-N-{[2'-(1H-tetrazole-5-yl)-biphenyl-4-yl]-methyl}-valine) used according to the present invention can be purchased from commercial sources or can be prepared according to known methods. For example, the preparation of valsartan is described in U.S. Pat. No. 5,399, 578 and EP 0 443 983, the entire disclosure of each of which is incorporated by reference herein. Valsartan may be used for purposes of this invention in its free acid form, as well as in any suitable salt form. Additionally, esters or other derivatives of the carboxylic grouping may be applied for the synthesis of linked pro-drugs, as well as salts and derivatives of the tetrazole grouping. Reference to ARBs includes reference to pharmaceutically acceptable salts thereof.

Preferably, the ARB is a diprotic acid. Thus, the angiotensin receptor blocker has a charge of 0, 1 or 2 depending on the pH of the solution.

In the combination of the present invention, the ARB is in the form of a pharmaceutically acceptable salt selected from Na, K or $NH_4$, preferably Na. This includes both the mono- and di-salt of these cations, preferably the di-salt. In particular in the case of valsartan this means that both the carboxylic acid moiety and the tetrazole moiety form the salt.

In the dual-acting compound, in particular the supramolecular complex of the present invention, typically the free form of the ARB is employed in the preparation and the cationic species present in the complex is introduced by using a base, e.g. (Cat)OH.

The dual acting compound comprises a molecular moiety of a neutral endopeptidase inhibitor. This means that a molecular moiety derived from a neutral endopeptidase inhibitor is participating in the build-up of the dual-acting compound. The neutral endopeptidase inhibitor is part of the compound and connected to the ARB directly or indirectly via non-covalent bonds. For sake of convenience, throughout the application, the term "neutral endopeptidase inhibitor" will be used when describing this part of the compound. Neutral endopeptidase inhibitors suitable for use in the present invention include those of formula (I)

$$HS—CH_2—CH—C—NH—CH—(CH_2)_n—C—R_1,$$

(I)

wherein

$R_2$ is alkyl of 1-7 carbons, trifluoromethyl, phenyl, substituted phenyl, $—(CH_2)_1$ to 4-phenyl, or $—(CH_2)_1$ to 4-substituted phenyl;

$R_3$ is hydrogen, alkyl of 1-7 carbons, phenyl, substituted phenyl, $—(CH_2)_1$ to 4-phenyl or $—(CH_2)_1$ to 4-substituted phenyl;

$R_1$ is hydroxy, alkoxy of 1-7 carbons or $NH_2$;

n is an integer from 1-15;

and the term substituted phenyl refers to a substituent selected from lower alkyl of 1-4 carbons, lower alkoxy of 1-4 carbons, lower alkylthio of 1-4 carbons, hydroxy, Cl, Br or F.

Preferred neutral endopeptidase inhibitors of formula (I) include compounds,

wherein

$R_2$ is benzyl;

$R_3$ is hydrogen;

n is an integer from 1-9; and

$R_1$ is hydroxy.

Another preferred neutral endopeptidase inhibitor is (3S, 2'R)-3-{1-[2'-(ethoxycarbonyl)-4'-phenyl-butyl]-cyclopentan-1-carbonylamino}-2,3,4,5-tetrahydro-2-oxo-1H-1-benzazepine-1-acetic acid or a pharmaceutically acceptable salt thereof.

Preferred neutral endopeptidase inhibitors suitable for use in the present invention include, without limitation, SQ 28,603; N—[N-[1(S)-carboxyl-3-phenylpropyl]-(S)-phenylalanyl]-(S)-isoserine; N—[N-[((1S)-carboxy-2-phenyl) ethyl]-(S)-phenylalanyl]-β-alanine; N-[2(S)-mercaptomethyl-3-(2-methylphenyl)-propionyl]methionine; (cis-4-[[[1-[2-carboxy-3-(2-methoxyethoxy)propyl]-cyclopentyl] carbonyl]amino]-cyclohexanecarboxylic acid); thiorphan; retro-thiorphan; phosphoramidon; SQ 29072; (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester; N-(3-carboxy-1-oxopropyl)-(4S)-p-phenylphenylmethyl)-4-amino-2R-methylbutanoic acid; (S)-cis-4-[1-[2-(5-indanyloxycarbonyl)-3-(2-methoxy-ethoxy)propyl]-1-cyclopentanecarboxamido]-1-cyclohexanecarboxylic acid; 3-(1-[6-endo-hydroxymethylbicyclo [2,2,1]heptane-2-exo-carbamoyl]cyclopentyl)-2-(2-methoxyethyl)propanoic acid; N-(1-(3-(N-t-butoxycarbonyl-(S)-prolylamino)-2(S)-t-butoxy-carbonylpropyl)cyclopentanecarbonyl)-O-benzyl-(S)-serine methyl ester; 4-[[2-(mercaptomethyl)-1-oxo-3-phenylpropyl]amino]benzoic acid; 3-[1-(cis-4-carboxycarbonyl-cis-3-butylcyclohexyl-r-1-carbamoyl)cyclopentyl]-2S-(2-methoxyethoxymethyl)propanoic acid; N-((2S)-2-(4-biphenylmethyl)-4-carboxy-5-phenoxyvaleryl)glycine; N-(1-(N-hydroxycarbamoylmethyl)-1-cyclopentanecarbonyl)-L-phenylalanine; (S)-(2-biphenyl-4-yl)-1-(1H-tetrazol-5-yl)ethylamino) methylphosphonic acid; (S)-5-(N-(2-(phosphonomethylamino)-3-(4-biphenyl)propionyl)-2-aminoethyl)tetrazole; β-alanine; 3-[1,1'-biphenyl]-4-yl-N-[diphenoxyphosphinyl]methyl]-L-alanyl; N-(2-carboxy-4-thienyl)-3-mercapto-2-benzylpropanamide; 2-(2-mercaptomethyl-3-phenylpropionamido)thiazol-4-ylcarboxylic acid; (L)-(1-((2,2-dimethyl-1,3-dioxolan-4-yl)-methoxy)carbonyl)-2-phenylethyl)-L-phenylalanyl)-β-alanine; N—[N-[(L)-1-[(2,2-dimethyl-1,3-dioxolan-4-yl)methoxy]carbonyl]-2-phenylethyl]]-L-phenylalanyl]-(R)-alanine; N—[N-[(L)-carboxy-2-phenylethyl]-L-phenylalanyl]-(R)-alanine; N-2-acetylthiomethyl-3-(2-methyl-phenyl)propionyl]-methionine ethyl ester; N-[2-mercaptomethyl-3-(2-methylphenyl)propionyl]-methionine; N-[2(S)-mercaptomethyl-3-(2-methylphenyl)propanoyl]-(S)-isoserine; N—(S)-[3-mercapto-2-(2-methylphenyl)propionyl]-(S)-2-methoxy-(R)-alanine; N-[1-[[(S)-benzyloxycarbonyl-3-phenylpropyl]amino]cyclopentylcarbonyl]-(S)-isoserine; N-[1-[[1(S)-carbonyl-3-phenylpropyl]amino]cyclopentylcarbonyl]-(S)-isoserine; 1,1'-[dithiobis-[2(S)-(2-methylbenzyl)-1-oxo-3,1-propanediyl]]-bis-(S)-isoserine; 1,1'-[dithiobis-[2(S)-(2-methylbenzyl)-1-oxo-3,1-propanediyl]]-bis-(S)-methionine; N-(3-phenyl-2-(mercaptom-

US 11,096,918 B2

13

14

ethyl)-propionyl)-(S)-4-(methylmercapto)methionine; N-[2-acetylthiomethyl-3-phenyl-propionyl]-3-aminobenzoic acid;   N-[2-mercaptomethyl-3-phenyl-propionyl]-3-amino-benzoic   acid;   N-[1-(2-carboxy-4-phenylbutyl)-cyclopentane-carbonyl]-(S)-isoserine; N-[1-(acetylthiomethyl)cyclopentane-carbonyl]-(S)-methionine   ethyl   ester;   3(S)-[2-(acetylthiomethyl)-3-phenyl-propionyl]amimo-ε-caprolactam;     N-(2-acetylthiomethyl-3-(2-methylphenyl) propionyl)-methionine ethyl ester; and combinations thereof.

Neutral endopeptidase inhibitors can be purchased from commercial sources or can be prepared according to known methods, such as those set forth in any of U.S. Pat. Nos. 4,722,810, 5,223,516, 4,610,816, 4,929,641, South African Patent Application 84/0670, UK 69578, U.S. Pat. No. 5,217, 996, EP 00342850, GB 02218983, WO 92/14706, EP 00343911, JP 06234754, EP 00361365, WO 90/09374, JP 07157459, WO 94/15908, U.S. Pat. Nos. 5,273,990, 5,294, 632, 5,250,522, EP 00636621, WO 93/09101, EP 00590442, WO 93/10773, U.S. Pat. No. 5,217,996, the disclosure of each of which is incorporated by reference. Neutral endopeptidase inhibitors may be used for purposes of this invention in their free form, as well as in any suitable salt form. Reference to neutral endopeptidase inhibitors includes reference to pharmaceutically acceptable salts thereof.

Additionally esters or other derivatives of any carboxylic grouping may be applied for the synthesis of linked prodrugs, as well as salts and derivatives of any other acidic grouping. In a preferred embodiment of this invention, the NEPi is 5-biphenyl-4-yl-4-(3-carboxy-priopionylamino)-2-methyl-pentanoic acid ethyl ester of formula (II) or the respective hydrolysed form 5-biphenyl-4-yl-4-(3-carboxy-priopionylamino)-2-methyl-pentanoic acid.

(II)



The compound of formula (II) can exist as the (2R,4S), (2R,4S), (2R,4S) or (2R,4S) isomer. Preferred is (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester as shown below:



The compound of formula (II) is a specific inhibitor of NEP and is described in U.S. Pat. No. 5,217,996. It can be purchased from commercial sources or can be prepared according to known methods. The compound of formula (II) may be used for purposes of this invention in its free form, as well as in any suitable salt or ester form.

Preferably the NEPi is a monoprotic acid. Thus, the NEPi has a charge of 0 or 1 depending on the pH of the solution.

In the combination of the present invention, the NEPi is in the form of a pharmaceutically acceptable salt selected from Na, K or NH₄, preferably Na.

In the dual-acting compound, in particular the supramolecular complex of the present invention, typically the free form of the NEPi is employed in the preparation and the cationic species present in the complex is introduced by using a base, (Cat)OH.

The dual acting compound preferably comprises non-covalent bonds between the ARB and the NEPi. Alternatively or in addition, it optionally comprises a linking moiety such as a pharmaceutically acceptable cation.

The linking moiety includes, but is not limited to, generally regarded as safe (GRAS) compounds or other pharmacologically acceptable compounds. The linking moiety may be an ion or a neutral molecule. In the case wherein the linking moiety is an ion the linked pro-drug is a salt and when the linking moiety is a neutral molecule the linked pro-drug is a co-crystal. Without being bound by any particular theory, the acidic portion of the ARB and NEPi donate a proton to the basic linking moiety such that all three components then become united to form one molecule. When the linked pro-drug is ingested by the subject intended to be treated the more acidic nature of the ingestion environment causes the linked pro-drug to separate into individual components concomitant with ingestion and absorption and therefore be converted into active agents to provide their beneficial biological action to treat the intended diseases.

In the case of a linked pro-drug salt or the dual-acting compound, the linking moiety or the cation, respectively, is preferably a positively charged mono-, di- or tri-valent cation, an organic base or an amino acid. Preferred cations (Cat) both for the linked pro-drug in general and the dual-acting compound, in particular the complex are basic cations, even more preferably metallic cations. Preferred metallic cations include, but are not limited to Na, K, Ca, Mg, Zn,

US 11,096,918 B2

15

16

Fe or NH₄. Amine bases and salt forming agents may also be employed, such as benzathine, hydrabamine, ethylenediamine, n-n-dibenzyl-ethylenediamine, L-arginine, choline hydroxide, N-methyl-glucamine, (Meglumine), L-Lysine, dimethylaminoethanol (Deanol), t-butylamine, diethylamine, 2-(diethylamino)-ethanol, 4-(2-hydroxyethyl)-morpholine, Thromethanine (TRIS), 4-acetamidophenol, 2-amino-2-methyl-1,3-propanediol, 2-amino-2-methyl-propanol, benzylamine, cyclohexylamine, diethanolamine, ethanolamine, imidazole, piperazine and triethanolamine.

Most preferably, the cation is Na, K or NH₄, such as Na. In one embodiment Ca is preferred.

In the case of a linked pro-drug co-crystal, the linking moiety is may also be a neutral molecule which provides hydrogen-bonding functionality.

In one embodiment, the linked pro-drugs of this invention are represented as set forth below, wherein scheme (1) and (2) represent a salt and scheme (3) represents a co-crystal:

NEPi·Xa·ARB                    scheme (1)

NEPi·XaYb·ARB                  scheme (2)

NEPi·Zc·ARB                    scheme (3),

wherein
X is Ca, Mg, Zn or Fe;
Y is Na, K or NH4;
Z is a neutral molecule; and
a, b and c reflect the stoichiometry of the linked pro-drug, preferably, a, b and c are a valence of 1⁺, 2⁺ or 3⁺.

For the linked pro-drugs of schemes (1) and (2), above, preferably the NEPi is a monoprotic acid and ARB is a diprotic acid. The angiotensin receptor blocker has a charge of 0, 1 or 2 and the NEPi has a charge of 0 or 1 depending on the pH of the solution, while the overall molecule will be neutral. Ratios of ARB to NEPi will be 1:1, 1:2, 1:3, 3:1, 2:1, 1:1, preferably 1:1, 1:2 or 1:3, most preferably 1:1.

Multi-component salts, particularly with zinc and calcium have been reported in the literature, e.g., *Chem Pharm Bull*, Vol. 53, p. 654 (2005). These ions require a coordination geometry that facilitates the crystallization of multi-component systems. The metal ions have coordinating geometries governed by the atomic orbitals for each species

Valsartan comprises two acidic groupings: the carboxylic acid and the tetrazole. In one embodiment of this aspect of the present invention, the molecular structure of linked pro-drugs of valsartan and a NEPi comprise a linkage between the carboxylic acid and the linking moiety or a linkage between the tetrazole grouping and the linking moiety. In yet another embodiment, the linked pro-drug comprises a trivalent linking moiety linked to the valsartan carboxylic acid grouping, the tetrazole grouping and the NEPi grouping.

In an embodiment of this aspect of the invention, valsartan is linked to (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester by a calcium salt ion.

In a preferred embodiment of the present application, the angiotensin receptor antagonist and the neutral endopeptidase inhibitor are present in a molar ratio of 1:1, 1:2, 1:3, 3:1, 2:1, more preferably 1:1 in the combination as well as in the supramolecular complex. This is also true for the

linked pro-drug. Moreover, in the complex, angiotensin receptor antagonist, the neutral endopeptidase inhibitor and the cation are present in a molar ratio of 1:1:1, 1:1:2, 1:1:3, more preferably 1:1:3. This applies equally to the linked pro-drug.

The combination or the dual-acting compound, in particular the complex of the present invention may contain a solvent. This is particularly preferred in the case of the dual-acting compound, in particular the complex, where the solvent may contribute to the intermolecular structure, e.g. the supramolecular interactions. Preferred solvents include water, methanol, ethanol, 2-propanol, acetone, ethyl acetate, methyl-t-butylether, acetonitrile, toluene, and methylene chloride, preferably water. If a solvent is present, one or more molecules per molecule of the active agent can be present. In this case, namely if a stoichiometric amount of the solvent is present, preferably 1, 2, 3, 4 or 5, more preferably 3, molecules of solvent, such as water, can be present per molecule of active agent. Alternatively, the solvent may be present in non-stoichiometric amounts. This means preferably any stoichiometric fraction of the solvent, such as 0.25, 0.5, 0.75, 1.25, 1.5, 1.75, 2.25, 2.5, 2.75, 3.25, 3.5, 3.75, 4.25, 4.5 and 4.75, preferably 2.5, molecules of solvent, such as water, can be present per molecule of active agent. If the dual-acting compound, in particular the complex is in the crystalline form, the solvent may be part of the molecular packing and be trapped in the crystal lattice.

Thus in a preferred embodiment of the present invention, the dual-acting compound, in particular the supramolecular complex is described by the sum formula:
[ARB(NEPi)]Na₁₋₃.xH₂O, wherein x is 0, 1, 2 or 3, such as 3, preferably
[ARB(NEPi)]Na₃.xH₂O, wherein x is 0, 1, 2 or 3, such as 3, more preferably
[valsartan ((2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester)]Na₃.x H₂O, wherein x is 0, 1, 2 or 3, such as 3.

Thus in a preferred embodiment of the present invention, the dual-acting compound, in particular the supramolecular complex is described by the sum formula:
[ARB(NEPi)]Na₁₋₃.xH₂O, wherein x is 0 to 3, such as 2.5, preferably
[ARB(NEPi)]Na₃.xH₂O, wherein x is 0 to 3, such as 2.5, more preferably
[(N-valeryl-N-{[2'-(1H-tetrazole-5-yl)-biphenyl-4-yl]-methyl}-valine) (5-biphenyl-4-yl-4-(3-carboxy-priopionylamino)-2-methyl-pentanoic acid ethyl ester]Na₃.x H₂O, in particular [((S)—N-valeryl-N-{2'-(1H-tetrazole-5-yl)-biphenyl-4-yl]-methyl}-valine) ((2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester]Na₃.x H₂O, wherein x is 0 to 3, such as 2.5. In this most preferred example, the complex is termed trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl) propionate-(S)-3'-methyl-2'-(pentanoyl{2''-(tetrazol-5-ylate) biphenyl-4'-ylmethyl}amino) butyrate] hemipentahydrate.

A simplified structure of trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl))propionate-(S)-3'-methyl-2'-(pentanoyl{22''-(tetrazol-5-yl)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate used to formally calculate the relative molecular mass, is shown below.

US 11,096,918 B2

17                                                                 18



Valsartan comprises two acidic groupings: the carboxylic acid and the tetrazole. In one embodiment of this aspect of the present invention, the molecular structure of the dual-acting compound, in particular, the complex, of valsartan and a NEPi comprises an interaction between the carboxylic acid and the cation, such as Na, or the solvent, such as water, or a linkage between the tetrazole grouping and the cation, such as Na, or the solvent, such as water. In yet another embodiment, the dual-acting compound, in particular, the complex, comprises an interaction between the valsartan carboxylic acid grouping, the tetrazole grouping or the NEPi grouping and the cation, such as Na, or the solvent, such as water.

The combination or dual-acting compound, in particular, the complex, of the present invention is preferably in the solid form. In the solid state it can be in the crystalline, partially crystalline, amorphous, or polymorphous form, preferably in the crystalline form.

The dual-acting compound, in particular, the complex, of the present invention is distinct from a combination of an ARB and a NEPi obtained by simply physically mixing the two active agents. Thus, it can have different properties that make it particularly useful for manufacturing and therapeutic applications. The difference of the dual-acting compound, in particular, the complex, and the combination can be exemplified by the dual-acting compound of (S)—N-valeryl-N-{[2'-(1H-tetrazole-5-yl)-biphenyl-4-yl]-methyl}-valine and (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester which is characterized by very distinct spectral peaks and shifts that are not observed in the physical mixture.

Specifically, such a dual-acting compound is preferably characterized by an X-ray powder diffraction pattern taken with a Scintag XDS2000 powder diffractometer using Cu-Ka radiation (lamda=1.54056 A) with a Peltier-cooled Silicon detector at room temperature (25 degree C.). Scan range was from 1.5 degree to 40 degree in 2 theta with a scan rate of 3 degree/minute. The most important reflections in the X-ray diffraction diagram comprise the following interlattice plane intervals:

The preferred characterization of trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2''-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate is obtained from the interlattice plane intervals d of the ascertained X-ray diffraction diagrams, whereby, in the following, average values 2Θ in [°] are indicated (error limit of ±0.2)

4.5, 5.5, 5.6, 9.9, 12.8, 15.7, 17.0, 17.1, 17.2, 18.3, 18.5, 19.8, 21.5, 21.7, 23.2, 23.3, 24.9, 25.3, 27.4, 27.9, 28.0, 30.2.

or with an error limit of ±0.1:

4.45, 5.52, 5.57, 9.94, 12.82, 15.66, 17.01, 17.12, 17.2, 18.32, 18.46, 19.76, 21.53, 21.72, 23.17, 23.27, 24.88, 25.3, 27.4, 27.88, 28.04, 30.2.

The most intensive reflections in the X-ray diffraction pattern show the following interlattice plane intervals:

2Θ in [°]: 0.4.5, 5.6, 12.8, 17.0, 17.2, 19.8, 21.5, 27.4, in particular 4.45, 5.57, 17.01, 17.2, 19.76, 21, 27.4.

A preferred method of checking the above-indicated average values of the interlattice plane intervals and intensities measured by experimentation from X-ray diffraction, for a given substance, consists in calculating these intervals and their intensities from the comprehensive single crystal structure determination. This structure determination yields cell constants and atom positions, which enable the X-ray diffraction diagram corresponding to the solid to be calculated by means of computer-aided calculation methods. The program used is Powder Pattern within the application software Materials Studio (Accelrys). A comparison of these data, namely the interlattice plane intervals and intensities of the most important lines of trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{22''-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate, obtained from measurements and from calculating the single crystal data, is illustrated in the table below.

US 11,096,918 B2

19

20

TABLE

| measured | | calculated | | measured | | calculated | |
|---|---|---|---|---|---|---|---|
| 2θ in [°] | Intensity | 2θ in [°] | Intensity | 2θ in [°] | Intensity | 2θ in [°] | Intensity |
| 4.45 | very strong | 4.15 | very strong | 19.76 | strong | 19.6 | very weak |
| 5.52 | Strong | 5 | strong | 21.53 | weak | 19.8 | very weak |
| 5.57 | strong | 6.5 | strong | 21.72 | very weak | 21.4 | very weak |
| 9.94 | very weak | 9.75 | weak | 23.17 | weak | 23.1 | very weak |
| 12.82 | very strong | 12.6 | weak | 23.27 | weak | 23.15 | very weak |
| 15.66 | very strong | 15.05 | strong | 24.88 | very weak | | very weak |
| 17.01 | weak | 16.9 | very strong | 25.3 | weak | 25.3 | very weak |
| 17.12 | strong | 17.1 | strong | 27.4 | weak | 27.3 | very weak |
| 17.2 | weak | 17.15 | weak | 27.88 | very weak | 27.9 | very weak |
| 18.32 | weak | 18.25 | very weak | 28.04 | weak | | |
| 18.46 | weak | 18.46 | weak | 30.2 | weak | | |

Relative intensity between 100% to 50% is referred to as very strong, 50% to 10% as strong, 10% to 5% as weak, and below 5% as very weak.

The invention relates to trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate)bi-phenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate, a crystalline solid which is characterized by the data and parameters obtained from single crystal X-ray analysis and X-ray powder patterns. An in-depth discussion of the theory of the methods of single crystal X-ray diffraction and the definition of the evaluated crystal data and the parameters may be found in Stout & Jensen, X-Ray Structure Determination; A Practical Guide, Mac Millian Co., New York, N.Y. (1968) chapter 3.

| Crystal data | |
|---|---|
| sum formula | $C_{48}H_{55}N_6O_8Na_3 \cdot 2.5H_2O$ |
| molecular mass | 957.99 |
| crystal colour | colourless |
| crystal shape | tabular: hexagonal |
| crystal system | monoclinic |
| space group | $P2_1$ |
| Cell parameters | a = 20.344 Å |
| | b = 42.018 Å |
| | c = 20.374 Å |
| | α = 90° |
| | β = 119.29° |
| | γ = 90° |
| volume of unit cell | 15190.03 Å$^3$ |
| Z (the number of asymmetric units in the unit cell) | 2 |
| calculated density | 1.26845 g/cm3 |
| Single crystal X-ray measurement data | |
| diffractometer | Nonius KappaCCD |
| X-ray generator | Nonius FR571 X-ray generator with a copper rotating anode |
| temperature | 270 K and 150 K |

Notes:
Two data sets on two suitable single crystals were collected at two different temperatures to assure no phase change during cooling.
None of the hydrogen atoms on the water or amine nitrogen atoms were observed in the Fourier maps so they were not included in the refinement.

Computer Program Used to Solve the Structure
SHELXD (Sheldrick, Göttingen)
In three dimensions, the unit cell is defined by three edge lengths a, b, and c, and three interaxial angles α, β, and γ. In this way, the volume of the unit cell $v_c$ is determined. A differentiated description of these crystal parameters is illus-

trated in chapter 3 of Stout & Jensen (see above). The details for trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate from the single crystal measurements, especially the atom coordinates, the isotropic thermal parameters, the coordinates of the hydrogen atoms as well as the corresponding isotropic thermal parameters, show that a monoclinic unit cell exists, its cell content of twelve formula units of $C_{48}H_{55}N_6O_8Na_3 \cdot 2.5$ $H_2O$ occurring as a result of two asymmetric units on two-fold positions.

The acentric space group $P2_1$ determined from the single crystal X-ray structure is a common space group for enantiomorphically pure molecules. In this space group there are two general positions which means that for twelve formula units in the unit cell there must be 18 sodium ions and 15 waters in the asymmetric unit.

A pictorial representation of the unit cell of the supramolecular complex of trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl) propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate) biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate comprising two asymmetric units is shown in FIG. **1**.

Based on the single crystal structure solution, the asymmetric unit of the trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl) propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate) biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate supramolecule comprises six each of ARB and NEPi moieties, 18 sodium atoms, and 15 water molecules. Trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-utylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate) biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate may be considered a sodium supramolecular complex, coordinated by oxygen ligands. These oxygens come from twelve carboxylate groups and eighteen carbonyl groups of the above moieties, and from 13 of the 15 water molecules. The crystal is an infinite 3-dimensional network of these sodium complexes.

Such a compound may also be characterized by an infrared absorption spectrum obtained using Attenuated Total Reflection Fourier Transform Infrared (ATR-FTIR) spectrometer (Nicolet Magna-IR 560) showing the following significant bands, expressed in reciprocal wave numbers (cm⁻¹):
2956 (w), 1711 (st), 1637 (st), 1597 (st), 1488 (w), 1459 (m), 1401 (st), 1357 (w), 1295 (m), 1266 (m), 1176 (w), 1085 (m), 1010 (w), 942 (w), 907 (w), 862 (w), 763 (st), 742 (m), 698 (m), 533 (st). Characteristic to the complex are in particular the following peaks 1711 (st), 1637 (st), 1597 (st) and 1401 (st). The error margin for all absorption bands of ATR-IR is ±2 cm⁻¹. The intensities of the absorption bands are indicated as follows: (w)=weak; (m)=medium; and (st) =strong intensity.

Such a compound may also be characterized by a Raman spectrum measured by dispersive Raman spectrometer with 785 nm laser excitation source (Kaiser Optical Systems, Inc.) showing the following significant bands expressed in reciprocal wave numbers (cm⁻¹):
3061 (m), 2930 (m, broad), 1612 (st), 1523 (m), 1461 (w), 1427 (w), 1287 (st), 1195 (w), 1108 (w), 11053 (w), 1041 (w), 1011 (w), 997 (m), 866 (w), 850 (w), 822 (w), 808 (w), 735 (w), 715 (w), 669 (w), 643 (w), 631 (w), 618 (w), 602 (w), 557 (w), 522 (w), 453 (w), 410 (w), 328 (w).

US 11,096,918 B2

21

The error margin for all Raman bands is ±2 cm⁻¹. The intensities of the absorption bands are indicated as follows: (w)=weak; (m)=medium; and (st)=strong intensity.

Such a compound may also be characterized by distinct melting properties measured by differential scanning calorimetry (DSC). Using Q1000 (TA Instruments) instrument, the melting onset temperature and the peak maximum temperature for such a complex are observed at 139° C. and 145° C., respectively. The heating rate is 10 K/min.

The second embodiment of the present invention is directed to pharmaceutical compositions comprising a combination, a linked pro-drug or a dual-acting compound, in particular the complex as described herein and at least one pharmaceutically acceptable additive. The details regarding the combination and the complex, including the ARB and the NEPi, are as described above with regard to the first embodiment of the invention.

The pharmaceutical compositions according to the invention can be prepared in a manner known per se and are those suitable for enteral, such as oral or rectal, and parenteral administration to mammals (warm-blooded animals), including man, comprising a therapeutically effective amount of the combination or dual-acting compound, in particular the complex, alone or in combination with at least one pharmaceutically acceptable carrier, especially suitable for enteral or parenteral application. Typical oral formulations include tablets, capsules, syrups, elixirs and suspensions. Typical injectable formulations include solutions and suspensions.

Pharmaceutically acceptable additives suitable for use in the present invention include, without limitation and provided they are chemically inert so that they do not adversely affect the combination or the dual-acting compound, in particular the complex of the present invention, diluents or fillers, disintegrants, glidants, lubricants, binders, colorants and combinations thereof. The amount of each additive in a solid dosage formulation may vary within ranges conventional in the art. Typical pharmaceutically acceptable carriers for use in the formulations described above are exemplified by: sugars, such as lactose, sucrose, mannitol and sorbitol; starches, such as cornstarch, tapioca starch and potato starch; cellulose and derivatives, such as sodium carboxymethyl cellulose, ethyl cellulose and methyl cellulose; calcium phosphates, such as dicalcium phosphate and tricalcium phosphate; sodium sulfate; calcium sulfate; polyvinylpyrrolidone; polyvinyl alcohol; stearic acid; alkaline earth metal stearates, such as magnesium stearate and calcium stearate; stearic acid; vegetable oils, such as peanut oil, cottonseed oil, sesame oil, olive oil and corn oil; non-ionic, cationic and anionic surfactants; ethylene glycol polymers; β-cyclodextrin; fatty alcohols; and hydrolyzed cereal solids, as well as other non-toxic compatible fillers, binders, disintegrants, buffers, preservatives, antioxidants, lubricants, flavoring agents and the like commonly used in pharmaceutical formulations.

Pharmaceutical preparations for enteral or parenteral administration are, e.g., in unit dose forms, such as coated tablets, tablets, capsules or suppositories and also ampoules. These are prepared in a manner which is known per se, using conventional mixing, granulation, coating, solubilizing or lyophilizing processes. Thus, pharmaceutical compositions for oral use can be obtained by combining the linked pro-drug, combination or dual-acting compound, in particular the complex with solid excipients, if desired, granulating a mixture which has been obtained, and, if required or

22

necessary, processing the mixture or granulate into tablets or coated tablet cores after having added suitable auxiliary substances.

The dosage of the active compounds in the combination or dual-acting compound, in particular the complex can depend on a variety of factors, such as mode of administration, homeothermic species, age and/or individual condition. The projected efficacy in animal disease models ranges from about 0.1 mg/kg/day to about 1000 mg/kg/day given orally, and the projected dose for human treatment ranges from about 0.1 mg/day to about 2000 mg/day. Preferred ranges are from about 40 mg/day to about 960 mg/day of the linked pro-drug, preferably about 80 mg/day to about 640 mg/day. The ARB component is administered in a dosage of from about 40 mg/day to about 320 mg/day and the NEPi component is administered in a dosage of from about 40 mg/day to about 320 mg/day. More specifically, the dosages of ARB/NEPi, respectively, include 40 mg/40 mg, 80 mg/80 mg, 160 mg/160 mg, 320 mg/320 mg, 40 mg/80 mg, 80 mg/160 mg, 160 mg/320 mg, 320 mg/640 mg, 80 mg/40 mg, 160 mg/80 mg and 320 mg/160 mg, respectively. These dosages are "therapeutically effective amounts". Preferred dosages for the linked pro-drug, combination or dual-acting compound, in particular the complex of the pharmaceutical composition according to the present invention are therapeutically effective dosages.

The pharmaceutical compositions may contain in addition another therapeutic agent, e.g., each at an effective therapeutic dose as reported in the art. Such therapeutic agents include:

a) antidiabetic agents such as insulin, insulin derivatives and mimetics; insulin secretagogues such as the sulfonylureas, e.g., Glipizide, glyburide and Amaryl; insulinotropic sulfonylurea receptor ligands such as meglitinides, e.g., nateglinide and repaglinide; peroxisome proliferator-activated receptor (PPAR) ligands; protein tyrosine phosphatase-1B (PTP-1B) inhibitors such as PTP-112; GSK3 (glycogen synthase kinase-3) inhibitors such as SB-517955, SB-4195052, SB-216763, NN-57-05441 and NN-57-05445; RXR ligands such as GW-0791 and AGN-194204; sodium-dependent glucose cotransporter inhibitors such as T-1095; glycogen phosphorylase A inhibitors such as BAY R3401; biguanides such as met-formin; alpha-glucosidase inhibitors such as acarbose; GLP-1 (glucagon like peptide-1), GLP-1 analogs such as Exendin-4 and GLP-1 mimetics; and DPPIV (dipeptidyl peptidase IV) inhibitors such as LAF237;

b) hypolipidemic agents such as 3-hydroxy-3-methyl-glutaryl coenzyme A (HMG-CoA) reductase inhibitors, e.g., lovastatin, pitavastatin, simvastatin, pravastatin, cerivastatin, mevastatin, velostatin, fluvastatin, dalvastatin, atorvastatin, rosuvastatin and rivastatin; squalene synthase inhibitors; FXR (farnesoid X receptor) and LXR (liver X receptor) ligands; cholestyramine; fibrates; nicotinic acid and aspirin;

c) anti-obesity agents such as orlistat; and

d) anti-hypertensive agents, e.g., loop diuretics such as ethacrynic acid, furosemide and torsemide; angiotensin converting enzyme (ACE) inhibitors such as benazepril, captopril, enalapril, fosinopril, lisinopril, moexipril, perinodopril, quinapril, ramipril and trandolapril; inhibitors of the Na—K-ATPase membrane pump such as digoxin; ACE/NEP inhibitors such as omapatrilat, sampatrilat and fasidotril; 3-adrenergic receptor blockers such as acebutolol, atenolol, betaxolol, bisoprolol, metoprolol, nadolol, propranolol, sotalol and timolol; inotropic agents such as digoxin, dobutamine and milrinone; calcium channel blockers such as amlodipine, bepridil, diltiazem, felodipine,

US 11,096,918 B2

23                                                                24

nicardipine, nimodipine, nifedipine, nisoldipine and verapamil; aldosterone receptor antagonists; and aldosterone synthase inhibitors. Most preferred combination partners are diuretics, such as hydrochlorothiazide, and/or calcium channel blockers, such as amlodipine or a salt thereof.

Other specific anti-diabetic compounds are described by Patel Mona in *Expert Opin Investig Drugs*, 2003, 12(4), 623-633, in the FIGS. 1 to 7, which are herein incorporated by reference.

A compound of the present invention may be administered either simultaneously, before or after the other active ingredient, either separately by the same or different route of administration or together in the same pharmaceutical formulation.

The structure of the therapeutic agents identified by code numbers, generic or trade names may be taken from the actual edition of the standard compendium "The Merck Index" or from databases, e.g., Patents International or IMS World Publications). The corresponding content thereof is hereby incorporated by reference.

Accordingly, the present invention provides pharmaceutical compositions in addition a therapeutically effective amount of another therapeutic agent, preferably selected from antidiabetics, hypolipidemic agents, anti-obesity agents or anti-hypertensive agents, most preferably from antidiabetics, anti-hypertensive agents or hypolipidemic agents as described above.

The person skilled in the pertinent art is fully enabled to select a relevant test model to prove the efficacy of a combination of the present invention in the hereinbefore and hereinafter indicated therapeutic indications.

Representative studies are carried out with trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-{2"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate, e.g. applying the following methodology:

The antihypertensive and neutral endopeptidase 24.11 (NEP)-inhibitory activities of trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl) propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino) butyrate] hemipentahydrate is assessed in conscious rats. The blood pressure-lowering effect is evaluated in double-transgenic rats (dTGRs) that overexpress both human renin and its substrate, human angiotensinogen (Bohlender, et al, High human renin hypertension in transgenic rats. Hypertension; 29(1 Pt 2):428-34, 1997). Consequently, these animals exhibit an angiotensin II-dependent hypertension. The NEP-inhibitory effect of trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl) propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate is determined in conscious Sprague-Dawley rats infused with exogenous atrial natriuretic peptide (ANP). Potentiation of plasma ANP levels is used as an index of NEP inhibition in vivo. In both models, trisodium [3-((1S, 3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{22"-(tetra-zol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate is administered orally as a powder in gelatin mini capsules. The results are summarized below.

Trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxy-carbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate)        biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate exhibits a

dose-dependent and long-lasting antihypertensive effect after oral administration in conscious dTGRs, a rat model of fulminant hypertension.

Oral administration of trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate) biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate rapidly and dose-dependently inhibits NEP with a long duration of action, as reflected by its potentiation of plasma ANP immunoreactivity (ANPir) in conscious Sprague-Dawley rats infused with exogenous ANP.

Antihypertensive Effect In Vivo

The dTGRs are instrumented with radiotelemetry transmitters for continuous measurement of arterial blood pressure and heart rate. Animals are randomly assigned to vehicle (empty capsule) or treatment (at 2, 6, 20 or 60 mg/kg, p.o.) groups. Baseline 24-hr mean arterial pressure (MAP) is approximately 170-180 mmHg in all groups. Trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino) butyrate] hemipentahydrate dose-dependently reduces MAP. The values obtained from the treatment groups are dose-dependent, and the results from the three highest doses are significantly different from the vehicle controls

Inhibition of NEP In Vivo

The extent and duration of trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl) propionate-(S)-3'-methyl-2'-(pentanoyl{22"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate for NEP inhibition in vivo is assessed with methodologies as described previously (Trapani, et al, CGS 35601 and its orally active prodrug CGS 37808 as triple inhibitors of endothelin-converting enzyme-1, neutral endopeptidase 24.11, and angiotensin-converting enzyme. J Cardiovasc Pharmacol; 44(Suppl 1):S211-5, 2004). Rat ANP(1-28) is infused intravenously at a rate of 450 ng/kg/min in conscious, chronically cannulated, male Sprague-Dawley rats. After one hour of infusion, rats are randomly assigned to one of six groups: untreated control, vehicle (empty capsule) control, or one of four doses of drug (2, 6, 20, or 60 mg/kg, p.o.). ANP infusion is continued for an additional eight hours. Blood samples are collected for measuring plasma ANPir by a commercial enzyme immunoassay kit at −60 min (i.e., before initiating ANP infusion), −30 min (after 30 min of ANP infusion), 0 min ("baseline"; after 60 min of ANP infusion but before dosing with drug or its vehicle), and at 0.25, 0.5, 1, 2, 3, 4, 5, 6, 7, and 8 hr post-dosing.

Before ANP infusion, ANPir is low (0.9-1.4 ng/ml) and similar in all six groups. ANP infusion rapidly (by 30 min) elevates ANPir to ~10 ng/ml. This ANPir level is sustained for the duration of the experiment in the untreated and vehicle control groups. In contrast, trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate rapidly (within 15 min) and dose-dependently augments ANPir. In summary, orally administered LCZ696 rapidly and dose-dependently inhibited NEP with a long duration of action as reflected by the potentiation of plasma ANPir.

The available results indicate an unexpected therapeutic effect of a compound according to the invention.

In a third aspect, the present invention is directed to a method of making a linked pro-drug of an ARB or a

US 11,096,918 B2

25

pharmaceutically acceptable salt thereof and a NEPi or a pharmaceutically acceptable salt thereof comprising the steps of:

    (a) adding an inorganic salt forming agent to a solvent to form a linked pro-drug salt forming solution;

    (b) adding the salt forming solution to a mixture of an ARB and a NEPi such that the ARB and NEPi form a linked pro-drug; and

    (c) isolating the linked pro-drug.

Preferably, the components are added in an equivalent amount.

The inorganic salt forming agent includes, but is not limited to, calcium hydroxide, zinc hydroxide, calcium methoxide, calcium acetate, calcium hydrogen carbonate, calcium formate, magnesium hydroxide, magnesium acetate, magnesium formate and magnesium hydrogen carbonate, sodium hydroxide, sodium methoxide, sodium acetate, sodium formate. The inorganic salt forming agent releases the linking moiety into the solvent such that when an ARB and a NEPi are present a linked pro-drug is formed.

Solvents included in the scope of the present invention include, but are not limited to, solvents in which the ARB, NEPi and inorganic salt forming agent preferably exhibit a lower solubility that allows the linked pro-drug to crystallize. Such solvents may comprise, but are not limited to, water, methanol, ethanol, 2-propanol, ethyl acetate, methyl-t-butylether, acetonitrile, toluene, and methylene chloride and mixtures of such solvents.

The inorganic salt forming agent and the solvent when combined should have a pH which promotes linked pro-drug formation. The pH may be between about 2 and about 6, preferably between about 3 and about 5, most preferably between 3.9 and 4.7.

The linked pro-drug is isolated by crystallization and chromatography. Specific types of chromatography include, e.g., ligand specific resin chromatography, reverse phase resin chromatography and ion-exchange resin chromatography.

A specific example comprises contacting a divalent salt of one component with a monovalent salt of the other component of the linked pro-drug. Specifically the mixed salt of valsartan and a mono-basic NEPi are synthesized by contacting the calcium salt of valsartan with the sodium salt of the NEPi component. Isolation of the desired mixed salt is carried out by selective crystallization or chromatography using ligand specific resins, reverse phase resins or ion-exchange resins. Similarly this process can be conducted with a monovalent salt of both components, such as the sodium salt of both components.

In another embodiment of this aspect of the invention, a co-crystal of the linked pro-drug is obtained. In a method of making a linked pro-drug co-crystal the inorganic salt forming agent is replaced with a neutral molecule which provides hydrogen binding properties. The solvent may be part of the molecular packing and be trapped in the crystal lattice.

In a preferred embodiment of the third aspect, the present invention is directed to a method of preparing a dual-acting compound comprising

    (a) an angiotensin receptor antagonist;

    (b) a neutral endopeptidase inhibitor (NEPi); and optionally

    (c) a pharmaceutically acceptable cation;

said method comprising the steps of:

    (i) dissolving an angiotensin receptor antagonist and a neutral endopeptidase inhibitor (NEPi) in a suitable solvent;

26

    (ii) dissolving a basic compound of Cat in a suitable solvent, wherein Cat is a cation;

    (iii) combining the solutions obtained in steps (i) and (ii);

    (iv) precipitation of the solid, and drying same to obtain the dual-acting compound; or alternatively obtaining the dual-acting compound by exchanging the solvent(s) employed in steps (i) and (ii) by

    (iva) evaporating the resulting solution to dryness;

    (va) re-dissolving the solid in a suitable solvent;

    (via) precipitation of the solid and drying same to obtain the dual-acting compound.

The details regarding the complex, including the ARB, the NEPi and the cation, are as described above with regard to the first embodiment of the invention.

Preferably, in step (i) the ARB and the NEPi are added in an equivalent molar amount. Both the ARB and the NEPi are preferably used in the free form. The solvent used in step (i) may be any solvent that allows dissolution of both the ARB and the NEPi. Preferred solvents include those mentioned above, namely water, methanol, ethanol, 2-propanol, acetone, ethyl acetate, isopropyl acetate, methyl-t-butylether, acetonitrile, toluene, DMF, NMF and methylene chloride and mixtures of such solvents, such as ethanol-water, methanol-water, 2-propanol-water, acetonitrile-water, acetone-water, 2-propanol-toluene, ethyl acetate-heptane, isopropyl acetate-acetone, methyl-t-butyl ether-heptane, methyl-t-butyl ether-ethanol, ethanol-heptane, acetone-ethyl acetate, acetone-cyclohexane, toluene-heptane, more preferably acetone.

Preferably, in step (ii) the basic compound of Cat is a compound capable of forming a salt with the acidic functionalities of the ARB and the NEPi. Examples include those mentioned above, such as calcium hydroxide, zinc hydroxide, calcium methoxide, calcium ethoxide, calcium acetate, calcium hydrogen carbonate, calcium formate, magnesium hydroxide, magnesium acetate, magnesium formate, magnesium hydrogen carbonate, sodium hydroxide, sodium carbonate, sodium hydrogen carbonate, sodium methoxide, sodium ethoxide, sodium acetate, sodium formate, potassium hydroxide, potassium carbonate, potassium hydrogen carbonate, potassium methoxide, potassium ethoxide, potassium acetate, potassium formate, ammonium hydroxide, ammonium methoxide, ammonium ethoxide, and ammonium carbonate. Perchlorates may also be used. Amine bases or salt forming agents such as those mentioned above may also be used, in particular benzathine, L-arginine, cholin, ethylene diamine, L-lysine or piperazine. Typically an inorganic base is employed with Cat as specified herein. More preferably, the basic compound is $(Cat)OH$, $(Cat)_2CO_3$, $(Cat)HCO_3$, still more preferably $Cat(OH)$, such as NaOH. The basic compound is employed in an amount of at least 3 equivalents relative to either the ARB or the NEPi, preferably it is employed in stoichiometric amount to obtain the dual-acting compound, in particular the complex with three cations. The solvent used in step (ii) may be any solvent or mixtures of solvents that allow dissolution of $Cat(OH)$. Preferred solvents include water, methanol, ethanol, 2-propanol, acetone, ethyl acetate, isopropyl acetate, methyl-t-butylether, acetonitrile, toluene, and methylene chloride and mixtures of such solvents, more preferably water.

In step (iii) the solutions obtained in steps (i) and (ii) are combined. This can take place by adding the solution obtained in step (i) to the solution obtained in step (ii) or vice versa, preferably, the solution obtained in step (ii) to the solution obtained in step (i).

According to the first alternative, once combined and preferably mixed, the dual-acting compound, in particular

US 11,096,918 B2

27
28

the complex precipitates in step (iv). This mixing and precipitation is typically effected by stirring the solutions for an appropriate amount of time such as 20 min to 6 h, preferably 30 min to 3 h, more preferably 2 h, at room temperature. It is advantageous to add seeds of the dual acting compound. This method facilitates precipitation.

In step (iv) according to this first alternative, a co-solvent is typically added. The co-solvent employed is a solvent in which the ARB and the NEPi in the complexed form exhibit a lower solubility that allows the compound to precipitate. Distillation, either continuous or stepwise, with replacement by this co-solvent results in a mixture predominantly of the co-solvent. Preferred solvents include ethanol, 2-propanol, acetone, ethyl acetate, isopropyl acetate, methyl-t-butyle-ther, acetonitrile, toluene, and methylene chloride and mix-tures of such solvents, more preferably isopropyl acetate. Preferably, a minimum amount of solvent is employed to facilitate precipitation. The solid is collected, e.g. by filtra-tion, and is dried to obtain the dual-acting compound, in particular the complex in accordance with the present inven-tion. The drying step can be performed at room temperature or elevated temperature such as 30 to 60° C., preferably 30 to 40° C. Reduced pressure can be employed to facilitate removal of the solvent, preferably, drying is effected at ambient pressure or reduced pressure of e.g. 10 to 30 bar, such as 20 bar.

According to a second alternative, once combined and preferably mixed, the dual-acting compound, in particular the complex the mixture preferably forms a clear solution. This mixing is typically effected by stirring the solutions for an appropriate amount of time such as 20 min to 6 h, preferably 30 min to 3 h, more preferably 1 h, at room temperature. If necessary, the temperature may be raised so as to ensure a clear solution.

The obtained mixture is then further treated by solvent exchange to obtain the dual-acting compound, in particular the complex.

In step (iva) according to this second alternative, the solution is preferably evaporated to dryness at elevated temperatures such as >room temperature to 50° C., more preferably 30 to 40° C.

Preferably, in step (va) the solvent or solvent mixture employed is a solvent in which the ARB and the NEPi in the complexed form exhibit a lower solubility that allows the dual-acting compound, in particular the complex to precipi-tate. Preferred solvents include the ones mentioned above for step (i), such as water, ethanol, 2-propanol, acetone ethyl acetate, isopropyl acetate, methyl-t-butylether, acetonitrile, toluene, and methylene chloride and mixtures of such sol-vents, more preferably isopropyl acetate. Preferably, a mini-mum amount of solvent or solvent mixture is employed to facilitate precipitation.

In step (via) precipitation can take place at room tem-perature. It can be effected by leaving the mixture standing or by agitating the mixture, preferably by agitating it. This is preferably effected by stirring and/or sonication. After precipitation, the solid is collected, e.g. by filtration, and is dried to obtain the compound in accordance with the present invention. The drying step can be performed at room tem-perature or elevated temperature such as 30 to 60° C., preferably room temperature. Reduced pressure can be employed to facilitate removal of the solvent, preferably, drying is effected at ambient pressure.

In a fourth aspect, this invention is directed to a method of treating or preventing a disease or condition, such as hypertension, heart failure (acute and chronic) congestive heart failure, left ventricular dysfunction and hypertrophic

cardiomyopathy, diabetic cardiac myopathy, supraventricu-lar and ventricular arrhythmias, atrial fibrillation, atrial flutter, detrimental vascular remodeling, myocardial infarc-tion and its sequelae, atherosclerosis, angina (unstable or stable), renal insufficiency (diabetic and non-diabetic), heart failure, angina pectoris, diabetes, secondary aldosteronism, primary and secondary pulmonary hypertension, renal fail-ure conditions, such as diabetic nephropathy, glomerulone-phritis, scleroderma, glomerular sclerosis, proteinuria of primary renal disease, and also renal vascular hypertension, diabetic retinopathy, other vascular disorders, such as migraine, peripheral vascular disease, Raynaud's disease, luminal hyperplasia, cognitive dysfunction (such as Alzheimer's), glaucoma and stroke comprising administer-ing the afore-mentioned combination, linked pro-drug or the dual-acting compound, in particular the complex to a subject in need of such treatment.

The combination, linked pro-drug or the dual-acting com-pound, in particular the complex of the first embodiment may be administered alone or in the form of a pharmaceu-tical composition according to the second embodiment. Information regarding dosing, i.e., the therapeutically effec-tive amount, etc., is the same regardless of how the combi-nation, linked pro-drug or he dual-acting compound, in particular the complex is administered.

The combination, linked pro-drug or the dual-acting com-pound, in particular the complex is beneficial over a com-bination of ARBs or neutral endopeptidase inhibitors alone or other ARB/NEPi combinations with regard to use as first line therapy, ease of formulation and ease of manufacture.

Specific embodiments of the invention will now be dem-onstrated by reference to the following examples. It should be understood that these examples are disclosed solely by way of illustrating the invention and should not be taken in any way to limit the scope of the present invention.

Example 1

Preparation of [valsartan ((2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester)]Na$_3$.2.5 H$_2$O

The dual-acting compound of valsartan and (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester is prepared by dissolving 0.42 g of (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester free acid (~95% purity) and 0.41 g of valsartan free acid in 40 ml acetone. Sepa-rately, 0.111 g of NaOH are dissolved in 7 ml H$_2$O. The two solutions are combined and stirred at room temperature for 1 hour and a clear solution was obtained. The solution is evaporated at 35° C. to yield a glassy solid. The glassy solid residue is then charged with 40 ml acetone and the resulting mixture is stirred and sonicated until precipitation occurred (~5 minutes). The precipitate was filtered and the solid is dried at room temperature in open air for 2 days until a constant mass of the crystalline solid is obtained.

Characterization by various methods could confirm the presence of both valsartan and (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester and complex formation in contrast to a simple physical mixture. Significant spectral peaks for the complex are observed e.g. in the XRPD, IR, and Raman spectroscopy which are not present for the physical mixture. See below for details on the characterization.

## Example 2

### Alternative Preparation of [valsartan ((2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester)]Na$_3$.2.5 H$_2$O

The dual acting compound of valsartan and (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester is prepared by dissolving 22.96 mmol of (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester free acid (~95% purity) and valsartan (10.00 g; 22.96 mmol) in acetone (300 mL). The suspension is stirred at room temperature for 15 min to obtain a clear solution. A solution of NaOH (2.76 g; 68.90 mmol) in water (8 mL) water is then added to this solution over a period of 10 min. Solids start to precipitate in 10 min. Alternatively, precipitation can be induced by seeding. The suspension is stirred at 20-25° C. for 2 h. This suspension is concentrated at 15-30° C. under reduced pressure (180-250 mbar) to a batch volume of ~150 mL. Isopropyl acetate (150 mL) is then added to the batch and the suspension is concentrated again at 15-30° C. under reduced pressure (180-250 mbar) to a batch volume of ~150 mL. This operation (addition of 150 mL of isopropyl acetate to the batch and concentration) is repeated once again. The suspension is stirred at 20-25° C. for 1 h. The solids are collected by filtration under nitrogen over a Büchner funnel, washed with isopropyl acetate (20 mL), and dried at 35° C. under reduced pressure (20 mbar) to afford the compound.

Characterization revealed the same product as in Example 1.

## Example 3

### Alternative Preparation of [valsartan ((2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester)]Na$_3$.2.5 H$_2$O Using Seeding

A reactor is charged with 2.00 kg (2,323 mmol) of AHU377 calcium salt and 20 L of isopropyl acetate. The suspension is stirred at 23±3° C., and 4.56 L of 2 N HCl was added. The mixture is stirred at 23±3° C. for 15 min to obtain a clear two-phase solution. The organic layer is separated and washed with 3×4.00 L of water. The organic layer is concentrated at 30-100 mbar and 22±5° C. to ~3.5 L (3.47 kg) of AHU377 free acid isopropyl acetate solution as a colorless solution.

To the above reactor containing ~3.5 L (3.47 kg) of AHU377 free acid isopropyl acetate solution is added 1.984 kg (4,556 mmol) of Valsartan and 40 L of acetone. The reaction mixture is stirred at 23±3° C. to obtain a clear solution which is filtered into a reactor. To the reaction mixture is added a solution of 547.6 g (13,690 mmol) of NaOH in 1.0 L of water at 23±3° C. (which was pre-cooled to 20±5° C. and in-line filtered) over a period of 15-30 min while maintaining the internal temperature at 20-28° C. (slightly exothermic). The flask is rinsed with 190 mL of water and added into the reaction mixture. The reaction mixture is stirred at 23±3° C. for 15 min and a slurry of 4.0 g of [valsartan ((2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester)]Na$_3$.2.5 H$_2$O seeds in 50 mL of isopropyl acetate is added. The mixture is stirred at 23±3° C. for 2 h to obtain a suspension. The suspension is heated to an internal temperature at 40±3° C. over a period of 20 min and 20 L of isopropyl acetate is added over a period of 20 min while maintaining the internal

temperature at 40±3° C. The suspension is stirred at this temperature for an additional 30 min. The mixture is concentrated at an internal temperature at 35±5° C. (T$_j$ 45±5° C.) under reduced pressure (200-350 mbar) to ~35 L of a white slurry (solvent collected: ~25 L). Then 30 L of isopropyl acetate is added the mixture is concentrated at an internal temperature at 35±5° C. (T$_j$ 45±5° C.) under reduced pressure (100-250 mbar) to ~30 L of a white slurry (solvent collected: ~40 L). Again 40 L of isopropyl acetate is added and the mixture is concentrated at an internal temperature at 35±5° C. (T$_j$ 45±5° C.) under reduced pressure (100-200 mbar) to ~30 L of a white slurry (solvent collected: ~30 L). The reaction mixture is cooled to 23±3° C. over ~20 min and stirred at this temperature for an additional 3 h. The solid is collected by filtration under nitrogen over a polypropylene pad on Büchner funnel. The solid is washed with 2×5 L of isopropyl acetate and dried at 35° C. under reduced pressure (20 mbar) until isopropyl acetate content <0.5% to afford the above product as a white solid.

Characterization revealed the same product as in Example 1.

### X-Ray Powder Diffraction

Calculation of the interlattice plane intervals from the X-ray powder pattern taken with a Scintag XDS2000 powder diffractometer for the most important lines for the sample give the following results:

d in [Å]: 21.2 (s), 17.0 (w), 7.1 (s), 5.2 (w), 4.7 (w), 4.6 (w), 4.2 (w), 3.5 (w), 3.3 (w)

The error margin for all interlattice plane intervals is ±0.1 Å. The intensities of the peaks are indicated as follows: (w)=weak; (m)=medium; and (st)=strong.

Average values 2Θ in [°] are indicated (error limit of ±0.2) 4.5, 5.5, 5.6, 9.9, 12.8, 15.7, 17.0, 17.1, 17.2, 18.3, 18.5, 19.8, 21.5, 21.7, 23.2, 23.3, 24.9, 25.3, 27.4, 27.9, 28.0, 30.2.

### Elemental Analysis

Elemental analysis gives the following measured values of the elements present in the sample. The findings of the elemental analysis, within the error limits, correspond to the overall formula of (C$_{48}$H$_{55}$N$_6$O$_8$Na$_3$)*2.5H$_2$O

| | | | |
|---|---|---|---|
| Found | C: 60.05% | H: 6.24% | N: 8.80% |
| Calculated* | C: 60.18% | H: 6.31% | N: 8.77% |

### Infrared Spectroscopy

The infrared absorption spectrum for the sample obtained using Attenuated Total Reflection Fourier Transform Infrared (ATR-FTIR) spectrometer (Nicolet Magna-IR 560) shows the following significant bands, expressed in reciprocal wave numbers (cm$^{-1}$):

2956 (w), 1711 (st), 1637 (st), 1597 (m), 1488 (w), 1459 (m), 1401 (st), 1357 (w), 1295 (m), 1266 (m), 1176 (w), 1085 (m), 1010 (w), 942 (w), 907 (w), 862 (w), 763 (st), 742 (m), 698 (m), 533 (st).

The error margin for all absorption bands of ATR-IR is ±2 cm$^{-1}$.

The intensities of the absorption bands are indicated as follows: (w)=weak; (m)=medium; and (st)=strong intensity.

### Raman Spectroscopy

Raman spectrum of the sample measured by dispersive Raman spectrometer with 785 nm laser excitation source (Kaiser Optical Systems, Inc.) shows the following significant bands expressed in reciprocal wave numbers (cm$^{-1}$):

3061 (m), 2930 (m, broad), 1612 (st), 1523 (m), 1461 (w), 1427 (w), 1287 (st), 1195 (w), 1108 (w), 11053 (w), 1041 (w), 1011 (w), 997 (m), 866 (w), 850 (w), 822 (w), 808 (w),

US 11,096,918 B2

31

735 (w), 715 (w), 669 (w), 643 (w), 631 (w), 618 (w), 602 (w), 557 (w), 522 (w), 453 (w), 410 (w), 328 (w).

The error margin for all Raman bands is ±2 cm$^{-1}$.

The intensities of the absorption bands are indicated as follows: (w)=weak; (m)=medium; and (st)=strong intensity.

High Resolution CP-MAS $^{13}$C NMR Spectroscopy

The samples are investigated by high resolution CP-MAS (Cross Polarization Magic Angle Spinning)$^{13}$C NMR spectroscopy using a Bruker-BioSpin AVANCE 500 NMR spectrometer equipped with a 300 Watt high power $^{1}$H, two 500 Watt high power X-amplifiers, necessary high power pre-amplifiers, a "MAS" controller and a 4 mm BioSolids high resolution Bruker probe.

Each sample is packed in a 4 mm ZrO$_2$ rotor. Critical experimental parameters are 3 msec $^{13}$C contact times, 12 KHz spinning speed at the magic angle, a "ramped" contact time, using a "SPINAL64" $^{1}$H decoupling scheme, a recycle delay of 10 secs and 1024 scans at 293 deg K. The chemical shifts are referenced with respect to an external Glycine carbonyl at 176.04 ppm.

High resolution CP-MAS $^{13}$C NMR shows the following significant peaks (ppm):

179.0, 177.9 177.0, 176.7, 162.0, 141.0, 137.2, 129.6, 129.1, 126.7, 125.3, 64.0, 61.5, 60.4, 50.2, 46.4, 40.6, 38.6, 33.5, 32.4, 29.8, 28.7, 22.3, 20.2, 19.1, 17.8, 16.8, 13.1, 12.1, 11.1.

A physical mixture of individual Na salts of Valsartan and (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester revealed a simple inert mixture of the two salts. However, the sample of the complex prepared in Example 1 exhibited distinctly different spectral features in comparison to a 1:1 mixture of the sodium salts.

DSC and TGA

As measured by differential scanning calorimetry (DSC) using Q1000 (TA Instruments) instrument, the melting onset temperature and the peak maximum temperature for the sample is observed at 139° C. and 145° C., respectively.

As shown by DSC and thermogravimetric analysis (TGA), upon heating, the water of hydration is released in two steps: the first step occurs below 100° C. and the second step above 120° C.

Both DSC and TGA instruments are operated at a heating rate of 10 K/min.

Example 4

Preparation of Linked Pro-Drug of Scheme (1)

Linked pro-drug of valsartan calcium salt and (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-

32

pentanoic acid ethyl ester is prepared at room temperature by dissolving 114 mg of the calcium salt of valsartan and 86 mg of (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester free acid in 2 mL methanol, followed by methanol evaporation. The glassy solid residue is then charged with 3 mL of acetonitrile and equilibrated by 10 min. sonication, followed by 20 hours of magnetic stirring. Approximately 120 mg of white solids are collected by filtration. Liquid chromatography (LC) and elemental analysis indicate 1:1 ratio between (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester and valsartan. The sample is amorphous by X-ray powder diffraction.

Preparation of Linked Pro-Drug of Scheme (2)

Linked pro-drug of valsartan calcium salt and (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester and Tris is prepared at room temperature by dissolving 57 mg of the calcium salt of valsartan, 43 mg of (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester free acid, and 12.6 mg of tris(hydroxymethyl)aminomethane (Tris) in 2 mL methanol, followed by methanol evaporation. The glassy solid residue is then charged with 3 mL of acetonitrile and equilibrated by 10 min. sonication, followed by 20 hours of magnetic stirring. Approximately 83 mg of white solids are collected by filtration. LC and elemental analysis indicate 1:1 ratio between (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester and valsartan. The sample is amorphous by X-ray powder diffraction.

While the invention has been described above with reference to specific embodiments thereof, it is apparent that many changes, modifications, and variations can be made without departing from the inventive concept disclosed herein. Accordingly, it is intended to embrace all such changes, modifications and variations that fall within the spirit and broad scope of the appended claims. All patent applications, patents, and other publications cited herein are incorporated by reference in their entirety.

What is claimed is:

1. An amorphous solid form of a compound comprising anionic (S)-N-valeryl-N-{[2'-(1H-tetrazole-5-yl)-biphenyl-4-yl]-methyl}-valine, anionic (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester, and sodium cations in a 1:1:3 molar ratio.

2. A pharmaceutical composition comprising the amorphous solid form according to claim 1 and at least one pharmaceutically acceptable excipient.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

| | |
|---|---|
| PATENT NO. | : 11,096,918 B2 |
| APPLICATION NO. | : 16/579581 |
| DATED | : August 24, 2021 |
| INVENTOR(S) | : Lili Feng et al. |

Page 1 of 3

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page

Item [56]

Page 2
Column 2:
Line 33, "Compounds" should read --Compounds--;
Line 48, "acis" should read --acid--; and
Line 50, "72(2): 193-200, 1992." should read --22(2): 193-200, 1992.--.

Page 3
Column 2:
Line 2, "High-Throughout" should read --High-Throughput--.

Page 5
Column 1:
Line 17, "vol 101," (2nd occurrence) should be deleted;
Line 20, "2000"Crystal" should read --2000", Crystal--; and
Line 27, "Aakeröy,Christer" should read --Aakeröy, Christer--.

Column 2:
Line 34, "People Health" should read --People's Health--;
Line 52, "Anatriuretic" should read --A natriuretic--;
Line 62, "ad Evaluation Carbolinium" should read --and Evaluation of $\beta$-Carbolinium--; and
Line 63, "on Delocalized" should read --on π-Delocalized--.

Page 6
Column 2:
Line 2, "Part IX.t" should read --Part IX--; and
Line 5, "Sodium IMitrophenolate" should read --sodium o-nitrophenolate--.

Signed and Sealed this
First Day of February, 2022

Drew Hirshfeld
*Performing the Functions and Duties of the*
*Under Secretary of Commerce for Intellectual Property and*
*Director of the United States Patent and Trademark Office*

**CERTIFICATE OF CORRECTION (continued)**                          Page 2 of 3
**U.S. Pat. No. 11,096,918 B2**

In the Specification

<u>Column 3:</u>
Line 65, "methyl-phenyl)propionyl]-methionine)" should read
--methylphenyl)propionyl]-methionine--.

<u>Column 5:</u>
Line 34, "((1 S,3R) –1-biphenyl-4-y lmethyl-3-ethoxy carbonyl" should read
--((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl--;
Line 35, "butylcarbamoyl)propionate-(S)-3 '-methyl-2'-(pentanoyl-" should read
--butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl--; and
Line 36, "{2 ″-(tetrazol-5-ylate)biphenyl-4'-y 'methyl} amino)bu-" should read
--2″-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)bu- --.

<u>Column 15:</u>
Line 15, "is may" should read --may--; and
Line 46, "species" should read --species.--.

<u>Column 16:</u>
Line 63, "onate-(S)-3'-methyl-2'-(pentanoyl{22″-(tetrazol-5-ylate)bi-" should read
--onate-(S)-3'-methyl-2'-(pentanoyl{2″-(tetrazol-5-ylate)bi- --.

<u>Column 18:</u>
Line 62, "[3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-" should read
--[3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1- --; and
Line 64, "onate-(S)-3'-methyl-2'-(pentanoyl{22″-(tetrazol-5-ylate)bi-" should read
--onate-(S)-3'-methyl-2'-(pentanoyl{2″-(tetrazol-5-ylate)bi- --.

<u>Column 19:</u>
Line 25, "onate-(S)-3'-methyl-2'-(pentanoyl{22″-(tetrazol-5-ylate)bi-" should read
--onate-(S)-3'-methyl-2'-(pentanoyl{2″-(tetrazol-5-ylate)bi- --; and
Line 64, "und γ." should read --and γ.--.

<u>Column 22:</u>
Line 43, "met-formin;" should read --metformin;--; and
Line 62, "3-adrenergic" should read --*β*-adrenergic--.

<u>Column 23:</u>
Line 23, "in addition a" should read --in addition to a--;
Line 34, "[3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1" should read
--[3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1- --;
Line 43, "ylate)biphenyl-4'-ylmethyl}amino) butyrate]" should read
--ylate)biphenyl-4'-ylmethyl}amino)butyrate]--; and
Line 60, "bamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{22″-(tetra-" should read
--bamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2″-(tetra- --.

**CERTIFICATE OF CORRECTION (continued)**                                   Page 3 of 3
**U.S. Pat. No. 11,096,918 B2**

Column 24:
Line 30, "propionate-(S)-3′-methyl-2′-(pentanoyl{22″-(tetrazol-5-" should read
--propionate-(S)-3′-methyl-2′-(pentanoyl{2″-(tetrazol-5- --.

Column 28:
Line 25, "or he" should read --or the--; and
Line 43, "ester)]Na$_3$.2.5 H$_2$O" should read --ester)]Na$_3$•2.5 H$_2$O--.

Column 29:
Line 5, "ester)]Na$_3$.2.5 H$_2$O" should read --ester)]Na$_3$•2.5 H$_2$O--;
Line 37, "ester)]Na$_3$.2.5 H$_2$O" should read --ester)]Na$_3$•2.5 H$_2$O--; and
Line 15, "(8 mL) water" should read --(8 mL)--.

Column 30:
Line 6, "added" should read --added and--; and
Line 40, "(C$_{48}$H$_{55}$N$_6$O$_8$Na$_3$)*2.5H$_2$O" should read --(C$_{48}$H$_{55}$N$_6$O$_8$Na$_3$)•2.5H$_2$O--.

Column 31:
Line 14, "1$^3$C" should read --$^{13}$C--.

FORM 31. Certificate of Confidential Material

Form 31
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2024-2211

**Short Case Caption:** Novartis Pharmaceuticals Corporation v. MSN Pharmaceuticals, Inc.

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains <u>130</u> number of unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☑ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 08/20/2024

Signature: /s/ Deanne E. Maynard

Name: Deanne E. Maynard

## CERTIFICATE OF COMPLIANCE

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because the filing has been prepared using a proportionally spaced typeface and includes 9,763 words, excluding the parts of the brief exempted by the Rules.

Dated:  August 20, 2024                    _____/s/ Deanne E. Maynard_____

ny-2776755

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the CM/ECF system on August 20, 2024.

I certify that on August 20, 2024, I served the confidential version of this brief via email on counsel of record.

Dated: August 20, 2024                     /s/ Deanne E. Maynard